IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BRENT NIX, individually and on behalf of all others similarly situated,<br>　　　　Plaintiff,<br><br>　　　　v.<br><br>THE CHEMOURS COMPANY FC, LLC, THE CHEMOURS COMPANY, E.I. DUPONT de NEMOURS AND COMPANY, INC., E.I. DUPONT CHEMICAL CORPORATION, ELLIS H. MCGAUGHY, AND MICHAEL E. JOHNSON;<br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <u>CLASS ACTION AND</u><br><u>INDIVIDUAL COMPLAINT</u><br><br>Civil Action No. |

_____

## CLASS ACTION AND INDIVIDUAL COMPLAINT
## AND REQUEST FOR JURY TRIAL
_____

Plaintiff Brent Nix, individually and as representative of the members of the classes

defined below ("Plaintiff"), files this action against Defendants The Chemours Company FC,

LLC, The Chemours Company, E.I. duPont de Nemours and Company, Inc., E.I. duPont

Chemical Corporation, Ellis H. McGaughy, and Michael E. Johnson ("Defendants") and alleges

as follows:

## I.　　INTRODUCTION

1.　　This action is brought as a class action under Rule 23 of the Federal Rules of

Civil Procedure. Plaintiff, individually, and as a representative of the members of the classes

defined below, seeks compensatory and punitive damages arising out of releases, discharges,

spills and leaks of toxic PFAS and PFECAs, both past and present, from the Fayetteville Works

Facility and property ("the Fayetteville Works Site") currently owned by the Chemours

Defendants in Fayetteville, North Carolina. These damages include the loss in value and

marketability of properties owned by Plaintiff and Class Members, the cost of remediating the properties owned by Plaintiff and Class Members from the toxic chemicals released from the Fayetteville Works Site, the cost of mitigating the contaminated water, and/or the cost of alternative water sources. Plaintiff's and Class Members' damages also include loss of use of their properties they own, loss of use and enjoyment of those properties, annoyance, discomfort and inconvenience. Plaintiff's and Class Members' damages also include the cost of diagnostic testing for the early detection of illness, disease, and disease process caused by exposure to Defendants' toxic PFAS and/or PFECAs released from the Fayetteville Works Site.

## II.    PARTIES

### A.    Plaintiff

2.      Plaintiff Brent Nix owns residential real property at 5008 Laurenbridge Lane, Wilmington, North Carolina, occupies and resides at that property since December 2016. Mr. Nix previously occupied and resided at 4508 Alder Ridge Road, Wilmington, North Carolina for approximately five years before living at 5008 Laurenbridge. Mr. Nix has consumed household water supplied by the Cape Fear Public Utility Authority ("CFPUA") through water from the Cape Fear River during the length of his residencies at each of these addresses, and other previous addresses in the Class Geographic Area.

### B.    Defendants

3.      Defendant The Chemours Company FC, LLC (hereinafter "Chemours FC") is and was at all times relevant hereto a corporation organized under the laws of Delaware with a principal office address of 1007 Market Street, Wilmington, Delaware 19898. Chemours FC is registered to do business as a foreign corporation in the State of North Carolina. Its registered agent is CT Corporation System, 160 Mine Lake Court, Suite 200, Raleigh, North Carolina

27615-6417.  Chemours FC currently owns and has owned the property at 22828 NC Highway 87 W, Fayetteville, North Carolina 28306-7332 ("the Fayetteville Works Site"), and conducts business there.  Chemours FC was formed by the DuPont Defendants in 2015.

4.     Defendant The Chemours Company (hereinafter "Chemours Company") is and was at all times relevant hereto a corporation organized under the laws of Delaware with a principal office address of 1007 Market Street, Wilmington, Delaware 19898-1100.  Chemours Company is registered to do business as a foreign corporation in the State of North Carolina.  Its registered agent is CT Corporation System, 160 Mine Lake Court, Suite 200, Raleigh, North Carolina 27615-6417.  Hereinafter Defendant Chemours FC and Defendant Chemours Company are jointly referred to as the "Chemours Defendants."  The Chemours Defendants currently own and operate the Fayetteville Works Site at 22828 NC Highway 87 W, Fayetteville, North Carolina 28306-7332, and conduct business there.

5.     Defendant E.I. duPont de Nemours and Company, Inc. (hereinafter "E.I. duPont") is and was at all times relevant hereto a corporation organized under the laws of Delaware with a principal office address of 1007 Market Street, Wilmington, Delaware 19898. E.I. duPont is registered to do business as a foreign corporation in the State of North Carolina. Its registered agent is CT Corporation System, 1209 Orange Street, Corporation Trust Center, Wilmington, Delaware 19801.  E.I. duPont owned the property at 22828 NC Highway 87 W, Fayetteville, North Carolina 28306-7332 ("the Fayetteville Works Site") before the Chemours Defendants conducted business there.

6.     Defendant E.I. duPont Chemical Corporation (hereinafter "DuPont Corporation") is and was at all times relevant hereto a corporation organized under the laws of Delaware with a principal office address of 1007 Market Street, Wilmington, Delaware 19898.  DuPont

Corporation is registered to do business as a foreign corporation in the State of North Carolina. Its registered agent is CT Corporation System, 1209 Orange Street, Corporation Trust Center, Wilmington, Delaware 19801. DuPont Corporation operated the Fayetteville Works Site at 22828 NC Highway 87 W, Fayetteville, North Carolina 28306-7332 before the Chemours Defendants and conducted business there. Hereinafter E.I. duPont and DuPont Corporation are jointly referred to as the "DuPont Defendants."

7.     Defendant Ellis H. McGaughy was at times relevant hereto Plant and/or Site Manager of the Fayetteville Works Site for both the DuPont Defendants and the Chemours Defendants.

8.     Defendant Michael E. Johnson was at times relevant hereto environmental manager at the Fayetteville Works Site for both the DuPont Defendants and the Chemours Defendants.

### III.    JURISDICTION AND VENUE

9.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d) because members of the proposed Plaintiff Class are citizens of states different from at least some of Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

10.     Pursuant to 28 U.S.C. § 1391(a), Defendants have done substantial business in this District, and Defendants have caused harm to Plaintiff and Class Members residing in this District. Plaintiff also resides in this District.

## IV. GENERAL ALLEGATIONS

### A. The Fayetteville Works Site

11.     The Fayetteville Works Site consists of about 2150 acres located at 22828 NC Highway 87 W, Fayetteville, North Carolina 28306-7332 on the Cumberland-Bladen County Line about 100 miles north of Wilmington.  The Fayetteville Works Site consists of offices, manufacturing facilities, piping, storage, waste and treatment facilities, release points, and other related buildings and operations ("the Fayetteville Works Facility").  The Chemours Defendants currently own and operate the Fayetteville Works Site.  The DuPont Defendants owned and operated the Fayetteville Works Site from the 1970's through approximately July 2015, and continue to operate at the Fayetteville Works Site.  Chemours was a wholly owned subsidiary of DuPont when it acquired the Fayetteville Works Site from DuPont on February 1, 2015.

12.     The DuPont Defendants manufactured, used, and disposed of chemicals containing perflourinated chemicals, including perfluoroalkyl substances ("PFAS"), which are man-made chemicals, at the Fayetteville Works Site.  PFAS are known to be highly toxic to humans.  Due to their chemical structures, PFAS are both biologically and chemically stable in the environment and resistant to environmental degradation.  Because they are water soluble, PFAS can migrate readily through air, surface water, soil and groundwater.  PFAS remain present in the environment long after they are released.

13.     The DuPont Defendants had long used and disposed of ammonium perflourooctanoate ("APFO"), a PFAS compound, at their Washington Works Facility in Parkersburg, West Virginia.  APFO is the ammonium salt of perfluorooctanoic acid ("PFOA"), a toxic PFAS compound.  Among other releases, the Washington Works Facility released PFOA to the Ohio River, which is used by several municipal water systems to supply household water

to their customers.  In 2000, the 3M Company, who had supplied PFOA to the DuPont Defendants for use in manufacturing at their Washington Works facility, ceased manufacturing PFOA under pressure from the U.S. E.P.A. due to the documented toxic effects of PFOA and other PFAS compounds.

14.     The DuPont Defendants, since approximately 1961, had studied the health effects of PFOA in laboratory animals, and in its workforce at Parkersburg.  From their experience at Parkersburg, the DuPont Defendants knew that their manufacturing processes, including their process for processing and using APFO, released PFAS to the environment, that PFAS were toxic, and that their release resulted in exposure of toxic chemicals to the people living as its neighbors.

15.     In May 2001, the DuPont Defendants submitted a renewal application for their National Pollutant Discharge Elimination System (NPDES) permit disclosing their intent to begin manufacturing APFO at the Fayetteville Works Site.  On information and belief, the 2001 DuPont Defendants' NPDES Permit Renewal Application did not disclose health studies or environmental data on PFAS in the possession of the DuPont Defendants.  The DuPont Defendants instead represented that, based on medical surveillance of its own employees and epidemiological data, PFAS did not pose a health concern to humans or animals, that DuPont had used PFAS for decades with no observed health effects in workers, and that PFAS were not known developmental toxins or human carcinogens, contrary to the then existing data it possessed, contrary to their knowledge and experience at the Parkersburg Facility, and contrary to the information given to the DuPont Defendants by the 3M Company.

16.     In December 2002, the DuPont Defendants began manufacturing and using APFO at the Fayetteville Works Site, well after the DuPont Defendants had been sued for harm

from exposure to discharges of PFOA from their Washington Works Facility in Parkersburg, West Virginia. In particular, in August 2001, the DuPont Defendants were sued for harm from exposure to water through municipal water systems which had been contaminated with PFOA that had been released by the Washington Works Facility.

17. The DuPont Defendants continued to manufacture APFO at the Fayetteville Works Site through April 2013.

18. The DuPont Defendants knew that the Fayetteville Works Facility discharged toxic PFAS to air, soil and surface water at the Fayetteville Works Site. For example, PFOA was found in site-wide groundwater in the Fayetteville Works Site RCRA Facility Investigation which was performed from 2001 to 2014.

19. The DuPont Defendants discharged PFAS into the Cape Fear River, including through the NPDES Outfall 002 at the Fayetteville Works Site. Beginning at least by July 2007, the DuPont Defendants' NPDES permit required monthly monitoring for discharges of PFOA to the Cape Fear River. The DuPont Defendants' Discharge Monitoring Reports documented releases of PFOA to the Cape Fear River from that time, including at least through 2015. Thus at least from 2007, and in fact well before based on their experience in Parkersburg, West Virginia, the DuPont Defendants, and subsequently the Chemours Defendants, knew that the Fayetteville Works Site released toxic PFOA, and later GenX, to the Cape Fear River.

20. In 2009, the DuPont Defendants began the commercial manufacture of Perfluoro-2-propoxypropanoic acid, known commercially as GenX, at the Fayetteville Works Site. GenX is in a family of perfluoroalkyl ether carboxylic acids ("PFECAs") and is also a toxic substance. The DuPont Defendants, and subsequently the Chemours Defendants, released GenX to the environment at the Fayetteville Works Site and to the Cape Fear River.

21.     Upon information and belief, the DuPont Defendants, and later the Chemours Defendants, also manufactured vinyl ethers at the Fayetteville Works Site in a process that produces PFECAs, including GenX as a byproduct, beginning in 1980. Defendants knew that PFECAs were created in that vinyl ethers process, and that they were discharging PFECAs as a result of this process to the Cape Fear River since 1980.

22.     As part of its NPDES permit renewal process, Defendants represented to the state of North Carolina that the wastewater from the manufacture of GenX would be captured and disposed of offsite. Defendants failed to disclose that PFECAs in the form of a compound identical or nearly identical to GenX was being produced and discharged to the Cape Fear River as a byproduct of the vinyl ether process.

23.     On information and belief, GenX and/or other chemicals in a family of PFECAs have been manufactured, used and disposed of at the Fayetteville Works Site since 1980. Defendants did not have a permit to discharge PFECAs, including GenX, to the Cape Fear River.

24.     Ellis McGaughy and Michael Johnson, as Plant Manager and Environmental Manager, respectively, for the DuPont Defendants and the Chemours Defendants, knew of the facts alleged herein, and specifically that processes at the Fayetteville Works Site released toxic PFAS and PFECAs into the Cape Fear River. As part of their NPDES permit renewal process, DuPont representatives, including Michael Johnson, met with North Carolina Department of Environmental Quality ("NDEQ"), and its predecessors and departments, to discuss the presence of and testing requirements for APFO, represented that GenX and related chemicals would be captured and disposed of off-site, and failed to disclose all the processes that released GenX at the Fayetteville Works Site. Ellis McGaughy signed permit applications representing the status

8

of the Fayetteville Works Site and its emissions to State of North Carolina officials, which failed to disclose the releases of GenX to the environment.

25.     Ellis McGaughy and Michael Johnson, as Plant Manager and Environmental Manager, respectively, for the DuPont Defendants and the Chemours Defendants, had a duty to ensure that the Fayetteville Works Facility and Site had sufficient pollution, engineering and process controls and management practices to prevent the releases of toxic chemicals into the environment, including the Cape Fear River.

**B.     Defendants' Knowledge of Contamination and Failure to Act at the Fayetteville Works Site**

26.     Defendants knew the manufacturing process at the Fayetteville Works Site was a source of PFAS and PFECAs to the soil, air and water at the Fayetteville Works Site. Defendants knew the manufacturing processes at the Fayetteville Works Site were sources of discharges and releases of toxic PFAS and PFECAs into the Cape Fear River, which was and is used as a drinking water supply for the people of Wilmington, North Carolina through the CFPUA, and knew that they were in fact discharging and releasing toxic PFAS and PFECAs into the Cape Fear River.

27.     Defendants knew that the Fayetteville Works Facility and Site did not have sufficient pollution, engineering and process controls and management practices to prevent the releases of the toxic chemicals into the Cape Fear River, and that in fact such releases were occurring.  Defendants also knew that the Cape Fear River is a source of household water to many communities, including those supplied by the CFPUA.

28.     Defendants operated the Fayetteville Works Facility and Site without sufficient management or pollution controls to limit and eliminate releases of PFAS and PFECAs into the

water of Cape Fear River, contaminating the household water and residential properties owned and/or occupied by Plaintiff and Class Members, and Defendants failed to eliminate the use of PFAS and PFECAs in the manufacturing process, or use available less toxic alternatives to PFAS and PFECAs. As a result, Defendants released toxic PFAS and PFECAs from the Fayetteville Works Site into the municipal water and household piping and water and properties of Plaintiff and of Class Members, damaging the properties of Plaintiff and Class Members and exposing Plaintiff and Class Members to toxic PFAS and/or PFECAs.

29.     Elevated levels of GenX have been found in the CFPUA water supplying residential properties in the Class Geographic Area. Water sampling at or near the CFPUA intake for municipal water for CPFUA customers who are served by Cape Fear River water have revealed mean levels of GenX of 631 parts per trillion ("ppt") in 2013 with levels as high as approximately 4500 ppt. The DuPont Defendants, and by extension the Chemours Defendants, knew of this data at least by 2015.

30.     Testing by the U.S.E.P.A. found that GenX was being released from the 002 Outfall at the Fayetteville Works Site on June 19, 2017 at 21,760 ppt, on June 26, 2017 at 15,250 ppt and on July 3, 2017 at 21,530 ppt.

31.     Defendants have negligently and otherwise acted to cause toxic chemicals to be released from the Fayetteville Works Site, which then traveled to and contaminated and damaged the properties and household water supplies of Plaintiff and Class Members, and exposed them to toxic chemicals.

**C.     The Toxic Properties of PFAS and PFECAs**

32.     Exposure to PFAS and/or PFECAs through consuming water contaminated with PFAS and/or PFECAs causes PFAS and/or PFECAs to be absorbed into the human body,

resulting in an increased risk of illness, disease and disease process associated with the toxicity of PFAS and PFECAs for those so exposed.  PFAS and PFECAs are bioaccumulative and persist in the body for many years.

33.     Toxicology studies show that PFAS are readily absorbed after oral exposure and ingestion and accumulate in the human body.  There are many health risks associated with exposure to PFAS.  For example, exposure to PFAS is associated with increased risk in humans of testicular cancer and kidney cancer, liver function abnormalities, immunotoxicity, endocrine disruption, and of disorders such as thyroid disease, high cholesterol, ulcerative colitis, and pregnancy-induced hypertension, as well as other conditions.  The United States Environmental Protection Agency (U.S. E.P.A.) has also advised that exposure to PFAS may result in developmental effects to fetuses during pregnancy or to breast-fed infants.  Thus, PFAS are known and proven hazardous substances.

34.     Well before 2009, Defendants knew that exposure to PFAS and PFECAs and other perfluorinated chemicals created a significant risk to human health.  In addition, Defendants knew that PFAS and PFECAs are both biologically and chemically stable in the environment and resistant to environmental degradation.  For example, in May 2000, the 3M Company publicly announced the phase-out of the production of PFAS and PFAS-related products due to pressure from the U.S. E.P.A. based on concerns over the known toxicity of the chemicals.

35.     On information and belief, Defendants have had and continued to have their own toxicology and health and safety programs capable of evaluating the health risks and environmental characteristics of PFAS and PFECAs, and, in fact, performed such evaluations.

36.     An entity referred to as the C8 Science Panel performed diagnostic testing and studies of the population affected by the operation of the DuPont Defendants' Washington Works Facility in Parkersburg, West Virginia.  Some of the C8 Science Panel Studies are found at www.C8Sciencepanel.org. These and other studies show that persons living around and consuming water contaminated with PFAS from the DuPont Defendants' Washington Works Facility were exposed to PFAS, absorbing PFAS into their blood, accumulating PFAS in their bodies, and suffering an increased risk of illness, disease and disease process as a result of exposure to the DuPont Defendants' PFAS.

37.     The DuPont Defendants submitted what they claim was extensive health and safety data on GenX to the U.S. E.P.A. in their premanufacture notices for GenX under the Toxic Substances Control Act ("TSCA").  Upon information and belief, that health and safety data was developed by the DuPont Defendants themselves.  Documents submitted by the DuPont Defendants to U.S. E.P.A. indicate that GenX has been associated with increased risk of health effects in laboratory animal studies, including risks of cancer, increased weight, changes to the immune system and cholesterol levels, fluctuations in size of kidneys and livers, cancerous tumors in liver, pancreas and testicles, and reproductive effects.  Such health effects are consistent with the health risks associated with toxic PFAS.

38.     On January 28, 2009, the DuPont Defendants entered into a TSCA Consent Order with the U.S. E.P.A., which indicated that the U.S. E.P.A. had concerns that GenX could bioaccumulate and be toxic to humans, and that manufacture, use and disposal of GenX may present an unreasonable risk of injury to human health and the environment.

39.     PFECAs have also been shown to have deleterious effects to the health of laboratory animals.  PFECAs are known to have features of chemical structure in common with

PFAS and be persistent in the environment. On information and belief, the DuPont Defendants have long been studying the toxicity of PFECAs without releasing that information to the public. For example, in April 2006, the DuPont Defendants' Haskell Laboratory for Health and Environmental Sciences in Newark, Delaware first submitted to U.S. E.P.A. a 1963 oral toxicity study for health impacts of GenX that Defendant E.I. DuPont had performed on rats.

40.     In 2016, The National Institute for Public Health and the Environment of the Netherlands evaluated substances used in the Chemours GenX technology at the Chemours plant in Dordrecht, The Netherlands which has manufacturing processes and technology substantially similar to that at the Fayetteville Works Site. The National Institute concluded that the Defendants' GenX chemicals should be considered suspected human carcinogens, with effects on the liver at similar dose levels as for PFOA.

41.     On July 24, 2017, the North Carolina Department of Health and Human Services (NCDHHS) issued an updated Health Risk Assessment for GenX and established an updated Health Goal of 140 ppt for consumption of GenX.

42.     In 2017, a report from researchers at Stockholm University in Sweden found GenX may have a higher toxic potency than its PFOA predecessor when correcting for differences in toxicokinetics. They also found that PFECAs are likely similar to PFOA in terms of physicochemical properties and environmental fate.

**D.      The Impacts of Defendants' Contamination on Plaintiff and the Class Members**

43.     CFPUA provides water to over 100,000 residents in Wilmington, North Carolina. CFPUA supplies water using surface water from the Cape Fear River within the Class Geographic Area defined below and identified on the map attached at Appendix A hereto.

44. Testing done by the NCDEQ has verified that PFAS and PFECAs released from the Fayetteville Works Site have contaminated the Cape Fear River water supplying Plaintiff's and Class Members' properties and used by Plaintiff and Class Members for household water.

45. On June 22, 2017, the U.S. E.P.A. measured over 720 ppt of GenX in the finished water delivered to properties served by CFPUA in the Class Geographic Area.

46. In July 2017, CFPUA reported GenX in finished water from CFPUA at 250, 286 and 185 ppt, all above the NCDHHS Health Goal. High levels of other perfluorinated compounds including PFO2HxA and PFO3A were also found in July. The Fayetteville Works Site also released a substance identified as Nafion found in the CFPUA water.

47. Defendants' conduct unnecessarily exposed the Plaintiff and Class Members and their properties to toxic PFAS and/or PFECAs, including by failing to take action to reduce or eliminate that exposure and by failing to warn Plaintiff and Class Members of that exposure, which would have shortened the length of time Plaintiff and Class Members and their properties were exposed to PFAS and/or PFECAs, and/or eliminated that exposure.

48. Through their operation of the Fayetteville Works Site, Defendants released PFAS and PFECAs into the environment and failed to mitigate or remediate contamination that has been released from the Fayetteville Works Site. The releases by Defendants from the Fayetteville Works Site have traveled through air, discharge waters, outfalls, soils and surface water and have been released to the Cape Fear River.

49. Defendants' releases of toxic PFAS and PFECAs to soil and water have migrated from the Fayetteville Works Site through water used as a source for the CFPUA and physically intruded onto and into and damaged the properties and possessory interests of Plaintiff and Class Members. The toxic PFAS and/or PFECAs have migrated to and physically intruded onto and

damaged the properties of Plaintiff and of Class Members, causing contamination of the properties, the household water, the household water systems, structures, and other parts of the properties of Plaintiff and the Class Members that would not be present but for the actions of Defendants.

50.     As a direct and proximate result of Defendants' intentional activities on and operation of the Fayetteville Works Site, PFAS and PFECAs have been released from the Fayetteville Works Site to the Cape Fear River which has contaminated water supplied by CFPUA to the properties of Plaintiff and Class Members.  As a direct and proximate result of Defendants' releases of PFAS and PFECAs and the resulting contamination therefrom, Plaintiff and occupant Class Members have been exposed to and consumed PFAS and/or PFECAs released from the Fayetteville Works Site.

51.     It was reasonably foreseeable by Defendants that PFAS and PFECAs would be released from the Fayetteville Works Site to the air, soil and water during the manufacturing process at the Fayetteville Works Site.  It was further reasonably foreseeable that Defendants' releases of PFAS and PFECAs would migrate to Plaintiff's and Class Members' properties and other properties served by the CFPUA, and physically intrude onto and physically damage those properties, contaminating Plaintiff's and Class Members' soil, household piping and other property owned and used by Plaintiff and Class Members, invading Plaintiff's and Class Members' possessory interest in their properties, and contaminating household water supplies by contaminating water which Plaintiff and Class Members had a right to use and consume.

52.     Defendants' conduct in releasing toxic PFAS and PFECAs was wanton, malicious, and oppressive, and it was done without regard to the rights and safety of others, including Plaintiff and Class Members.

## V.          DAMAGES TO PLAINTIFF AND CLASS MEMBERS

53.     Plaintiff and Class Members and their properties have been and are exposed to PFAS and/or PFECAs through their household water, the sources and cause of which are Defendants' actions, causing releases from the Fayetteville Works Site.  As a direct and proximate result of these releases, Plaintiff and Class Members have suffered damages and losses including, but not limited to, those identified below.

54.     Plaintiff and Class Member property owners have suffered damages and losses including decrease in the value and marketability of their properties and property, the need for and the cost of remediation of Class properties and/or mitigation systems for those properties, and the costs incurred for alternative water.  Plaintiff and property owner Class Members have suffered the loss of use, loss of use and enjoyment of their properties, and the annoyance and discomfort and inconvenience caused by the contamination of and interference with their household water supplies and properties through the intrusion of Defendants' PFAS and/or PFECAs.

55.     As a result of Defendants' conduct and the resulting contamination, Plaintiff and property occupant Class Members have been exposed to toxic substances and have suffered increased risk of illness, disease and disease process as a result of that exposure, requiring an award of the cost of a program for diagnostic testing for the early detection of such illness, disease or disease process.  Early detection of illness, disease and disease process will benefit Plaintiff and Class Members.

## VI.    DEFINITION OF THE CLASSES

56.    This action is brought by the Plaintiff individually on his own behalf and as a representative of the Classes defined below.

57.    The Members of the CFPUA Property Owners Class are defined as:

All persons who own residential properties in the geographic area served by CFPUA water from a Cape Fear River Source. *See* Appendix A attached hereto.

58.    The Members of the CFPUA Medical Monitoring Class are defined as:

All persons who have occupied residential properties in the geographic area served by CFPUA water from a Cape Fear River Source and consumed household water containing 140 parts per trillion ("ppt") or higher of the sum of PFAS and PFECAs and other perfluorinated chemicals for a cumulative time period of one year or more. *See* Appendix A attached hereto.

59.    Excluded from the Classes are any officers, directors, agents, current employees, or representatives of Defendants.

## VII.    COMPLIANCE WITH FED. R. CIV. P. 23 REQUIREMENTS

60.    The Classes satisfy the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Fed. R. Civ. P. 23.

### Numerosity

61.    The members of the Classes are so numerous that joinder of all members is impracticable. The number of owned properties exceeds five thousand. There are well over one thousand members of the Classes who have been exposed to PFAS and/or PFECAs from the Fayetteville Works Site as described herein. Members can be easily identified from public records such as property tax records, municipal water records, and other public records and notified of the pendency of this action by mail or via other public sources.

## Typicality

62.     The Representative Plaintiff's claims are typical of the claims of the members of the Classes since the members of the Classes are similarly affected by Defendants' conduct resulting in damage to all members of the Classes.

## Adequate Representation

63.     The Representative Plaintiff will fairly and adequately protect the interests of members of the Classes and have retained counsel competent and experienced in tort, class action and environmental litigation.

64.     The Representative Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the resources to do so.

65.     Neither Plaintiff nor their counsel have interests adverse to any members of the Classes.

## Predominance of Common Questions

66.     Plaintiff brings this action under Rule 23(b)(3) because numerous questions of law and fact common to Class Members predominate over any question affecting only individual members.  The answers to these common questions will advance resolution of the litigation as to all Class Members.  These common legal and factual issues include:

a.      the type or kinds of chemicals that have been and are being released from the Fayetteville Works Site;

b.      the activities of Defendants that have resulted in the contamination of the household water supplies and properties of the Plaintiff and the Class Members;

c.      the nature and toxicity of the chemicals released from the Fayetteville Works Site;

d.      whether the value and marketability of the property and property rights of Plaintiff and the Class Member property owners have been and will continue to be diminished by the interference caused by the contamination as a result of Defendants' release of toxic chemicals;

e.      whether Plaintiff and the Class Member property owners have suffered the need for and the cost of mitigation at and remediation of their properties and/or alternative water suplies;

f.      whether Plaintiff and the Class Member property owners have lost use and enjoyment of their properties;

g.      whether Plaintiff and the Class Member property owners have suffered discomfort, inconvenience or annoyance as a consequence of the contamination of their properties by Defendants;

h.      whether the members of the medical monitoring class have sustained damages in the form of the need for and cost of diagnostic testing for the early detection of illness, disease, and disease process;

i.      whether Defendants owed a duty to Plaintiff and Class Members;

j.      whether Defendants breached a duty owed to Plaintiff and Class Members;

k.      whether the contamination of properties owned by Plaintiff and Class Members by Defendants' actions was reasonably foreseeable;

l.      whether Defendants knew or should have known that releases from the Fayetteville Works Site would be transported to and contaminate the properties of Plaintiff and Class Members;

m.      whether Defendants' actions constitute a trespass;

n.      whether Defendants' actions constitute a nuisance;

o.      whether Defendants were unjustly enriched by their actions at the expense of Plaintiff and the Class Members; and

p.      whether Defendants' conduct was wanton, malicious or oppressive and in reckless disregard for the rights and safety of Plaintiff and the Class Members.

**Superiority**

67. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.

68. Defendants have acted on grounds generally applicable to the Classes, thereby making appropriate final legal and/or equitable relief with respect to the Classes as a whole.

69. Furthermore, the expense and burden of individual litigation outweighs the individual damages suffered by individual Class Members, making it impossible for members of the Class to individually redress the wrongs done to them.

70. Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

71. There will be no difficulty in the management of this action as a class action.

**Rule 23(b)(2) Injunctive Relief**

72. In addition to or in the alternative to the above, Plaintiff brings this class action under Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class Members as a whole, such that final injunctive relief is appropriate with respect to the Class Members as a whole.

73. Such injunctive relief includes, but is not limited to, the implementation and funding of a program for the Plaintiff and the Class Members sufficient to ensure the beneficial early detection of illness, disease and disease process caused by exposure to Defendants' PFAS and/or PFECAs.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF - TRESPASS
(All Defendants)

74.    Plaintiff incorporates the allegations contained in the preceding paragraphs herein by reference.

75.    As a result of the intentional conduct and activities of the Defendants, the releases of toxic PFAS and/or PFECAs from the Fayetteville Works Site have physically intruded onto and wrongfully entered the Plaintiff's and Class Members' properties, interfering with the Plaintiff's and Class Members' possessory interest in their properties without Plaintiff's or the Class Members' permission.

76.    The physical intrusion of the toxic PFAS and/or PFECAs released by Defendants onto and into the properties of Plaintiff and Class Members has physically injured and damaged their properties, including by contaminating household water of those properties with toxic PFAS and/or PFECAs that would not have been present but for the actions by Defendants, and caused exposure of Plaintiff and occupant Class Members and their properties to toxic PFAS and/or PFECAs.

77.    As a direct and proximate result of Defendants' trespass by the physical intrusion of Defendants' toxic releases onto the properties owned by Plaintiff and the Class Members, Plaintiff and the Class Members have suffered damages and losses identified in paragraphs 53 through 55 above. Accordingly, Defendants are liable for compensatory and punitive damages to Plaintiff and Class Members.

## SECOND CLAIM FOR RELIEF - NUISANCE
### (All Defendants)

78.     Plaintiff incorporates the allegations contained in the preceding paragraphs herein by reference.

79.     The releases of chemicals resulting from Defendants' operation and ownership of the Fayetteville Works Site have caused a substantial and unreasonable interference with the Plaintiff's and Class Members' use and enjoyment of their properties, including causing exposure of Plaintiff and occupant Class Members to toxic PFAS and/or PFECAs.

80.     As a direct and proximate result of Defendants' creation of a nuisance, Plaintiff and Class Members, as owners or occupants of residential real property in the Class Arear, have suffered special injury and special damages and losses identified in paragraphs 53 through 55 above.  Accordingly, Defendants are liable for compensatory and punitive damages to Plaintiff and Class Members.

## THIRD CLAIM FOR RELIEF - NEGLIGENCE
### (All Defendants)

81.     Plaintiff incorporates the allegations contained in the preceding paragraphs herein by reference.

82.     Defendants owed Plaintiff and Class Members a duty of reasonable care in performing their activities and operations at the Fayetteville Works Site and mitigating and remediating the impacts of these activities and operations.  That duty included fully understanding the toxicity of the chemicals used and released from the Fayetteville Works Site, eliminating releases of toxic chemicals from the Fayetteville Works Site, identifying alternatives to toxic chemicals released from the Fayetteville Works Site, understanding the mechanisms of release and transport of toxic chemicals from the Fayetteville Works Site, and investigating the

impacts of the chemicals released by Defendants into the Cape Fear River on the household water supplies of properties and persons who occupy and use properties which receive their household water from the Cape Fear River.

83. Given the likelihood of contamination of Plaintiff's and Class Members' properties, Defendants had a duty to investigate the extent to which toxic PFAS and/or PFECAs released from the Fayetteville Works Site were likely contaminating the properties and water supplies of the Plaintiff and Class Members.

84. Defendants negligently breached their duty of care to Plaintiff and Class Members as identified above, including by releasing and allowing the release of toxic chemicals from the Fayetteville Works Site, by failing to take steps to minimize or eliminate the release of toxic chemicals from the Fayetteville Works Site, by their failure to test the soils and water at or near the Fayetteville Works Site to determine the levels of contaminants, and by failing to timely mitigate or remediate the impact and harm to Plaintiff and Class Members and their properties.

85. Defendants negligently breached their duty and negligently failed to warn the Plaintiff and Class Members of the release of toxic PFAS and/or PFECAs, the likelihood that household water supplies and properties were contaminated with PFAS and/or PFECAs, and that Plaintiff and Class Members and their properties were likely being exposed to toxic PFAS and/or PFECAs.

86. Defendants' negligence has caused contamination of Plaintiff's and Class Members' properties and caused exposure of Plaintiff and Class Members to toxic PFAS and/or PFECAs.

87. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered damages and losses including, but not limited to, those identified in

paragraphs 53 through 55 above. Accordingly, Defendants are liable for compensatory and punitive damages to the Plaintiff and Class Members.

## FOURTH CLAIM FOR RELIEF – NEGLIGENT FAILURE TO WARN
### (All Defendants)

88. Plaintiff incorporates the allegations contained in the preceding paragraphs herein by reference.

89. Defendants had a duty to exercise reasonable care and to warn the Plaintiff and Class Members of the release of toxic PFAS and/or PFECAs and the likelihood that Cape Fear River water and household water supplies were contaminated with PFAS and/or PFECAs emitted from the Fayetteville Works Site, and that they were being exposed to toxic PFAS and/or PFECAs.

90. Defendants breached their duty to exercise reasonable care and to warn the Plaintiff and Class Members of the release of toxic PFAS and/or PFECAs and the likelihood that their residential properties and household water supplies were contaminated with PFAS and/or PFECAs emitted from the Fayetteville Works Site, that they were being exposed to toxic PFAS and/or PFECAs, and the health effects thereof.

91. As a direct and proximate result of Defendants' negligent failure to warn, Plaintiff and Class Members have suffered damages including those damages identified in paragraphs 53 through 55 above. Accordingly, Defendants are liable for the compensatory and punitive damages to Plaintiff and Class Members.

## FIFTH CLAIM FOR RELIEF - UNJUST ENRICHMENT
### (Chemours and DuPont Defendants)

92. Plaintiff incorporates the allegations contained in the preceding paragraphs herein by reference.

93.     Defendants failed to incur expenditures to limit or prevent the release of toxic PFAS and/or PFECAs into the environment and prevent the contamination to Plaintiff's and Class Members' properties and household water supplies, failed to incur the costs to timely investigate the impacts on Plaintiff and Class Members and their properties, failed to incur the costs to timely mitigate the impacts on Plaintiff and Class Members and their properties, and failed to incur costs to remediate the contaminated soil, dust and groundwater at the Fayetteville Works Site. Defendants have been unjustly enriched by these and other failures to make expenditures to prevent the persons and properties of Plaintiff and Class Members from being contaminated with PFAS and/or PFECAs.

94.     Defendants have received a measurable monetary benefit by failing to make the necessary expenditures. It would be unconscionable and contrary to equity for Defendants to retain that benefit. The Court, therefore, should award as a remedy an amount equivalent to the expenditures saved and the profits obtained by Defendants at the expense of Plaintiff and Class Members. Accordingly, Defendants are liable for the compensatory and punitive damages to Plaintiff and Class Members.

### SIXTH CLAIM FOR RELIEF - *RESPONDEAT SUPERIOR*
(DuPont and Chemours Defendants)

95.     Plaintiffs incorporate the allegations contained in the preceding paragraphs herein by reference.

96.     At all times relevant, Defendants Ellis H. McGaughy and Michael E. Johnson were officers or employees of the Chemours and DuPont Defendants.

97.     Any act or omission of an officer or an employee while acting within the scope of his or her authority is the act or omission of the Chemours and DuPont Defendants.

98.     Defendants Ellis H. McGaughy and Michael E. Johnson and other employees at the Fayetteville Works Site were acting within the scope of their employment and authority during the time chemicals were released to the properties of Plaintiffs and Class Members and their household water supplies.

99.     The acts or omissions of the employees of the Chemours and DuPont Defendants are in law the acts or omissions of the Chemours and DuPont Defendants.  Accordingly, the Chemours and DuPont Defendants are liable for compensatory and punitive damages to Plaintiffs and Class Members.

WHEREFORE, Plaintiff and Class Members request the following relief:

a.      for an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure;

b.      that this matter be scheduled for a jury trial;

c.      for judgment against Defendants for compensatory damages on all counts in a fair and just amount as established at trial;

d.      an award for disgorgement of the profits and savings which were obtained by the unjust enrichment of Defendants at the expense of Plaintiff and Class Members;

e.      for an award of punitive damages;

f.      for additional and alternative injunctive relief to fund a program of diagnostic testing;

g.    for an award of interest, costs and attorney fees; and

h.    for such other and further relief as may be just.

Dated: October 3, 2017

Respectfully submitted,

THE LAW OFFICES OF
JAMES SCOTT FARRIN, P.C.

By: */s/ Gary W. Jackson*
Gary W. Jackson, NC Bar No. 13976
280 South Mangum Street
Suite 400
Durham, NC 27701
Phone: (919)-688-4991
gjackson@farrin.com

and

THE HANNON LAW FIRM, LLC

By: */s/ Kevin S. Hannon*
Kevin S. Hannon, *Special Appearance anticipated*
1641 Downing Street
Denver, CO  80218
Phone: (303) 861-8800
khannon@hannonlaw.com