# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### SOUTHERN DIVISION

| | |
|---|---|
| BRENT NIX, individually and on behalf of all others similarly situated, | Civil Action No. 7:17-CV-00189-D |
| Plaintiff, | |
| v. | |
| THE CHEMOURS COMPANY FC, LLC, THE CHEMOURS COMPANY, E.I. du PONT de NEMOURS AND COMPANY, INC., E.I. DUPONT CHEMICAL CORPORATION, ELLIS H. MCGAUGHY, and MICHAEL E. JOHNSON, | |
| Defendants. | |
| ROGER MORTON, individually and on behalf of all others similarly situated, | Civil Action No. 7:17-CV-00197-D |
| Plaintiff, | |
| v. | |
| THE CHEMOURS COMPANY FC, LLC, THE CHEMOURS COMPANY, E.I. du PONT de NEMOURS AND COMPANY, INC., E.I. DUPONT CHEMICAL CORPORATION, ELLIS H. MCGAUGHY, AND MICHAEL E. JOHNSON; | |
| Defendants. | |
| VICTORIA CAREY, MARIE BURRIS, MICHAEL KISER, and BRENT NIX, individually and on behalf of all others similarly situated, | Civil Action No. 7:17-CV-00201-D |
| Plaintiffs, | |
| v. | |
| E.I. du PONT de NEMOURS AND COMPANY and THE CHEMOURS COMPANY FC, LLC, | |
| Defendants. | |

1

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................... 1

II. FACTUAL BACKGROUND ..................................................................................... 2

    A. DuPont Learns Some PFAS Are Toxic and Refuses to Test Others ............................... 3

    B. DuPont Gets Caught Discharging PFAS in West Virginia ............................................... 3

    C. DuPont Continues Discharging PFAS in North Carolina ................................................. 5

    D. DuPont Chooses Profits Over Safety in Refusing to Prevent PFAS Discharges ............ 6

    E. DuPont Transfers Ownership of Fayetteville Works to Chemours ................................. 7

    F. Chemours Knowingly Discharges PFAS Into Drinking Water ....................................... 7

    G. Chemours Gets Caught Discharging PFAS in North Carolina and Employees Admit Wrongdoing ...................................................................................................................... 8

    H. Defendants Caused Widespread Harm to Property and People ....................................... 8

    I. Common Remedies Are Required ................................................................................... 10

III. THE PROPOSED CLASS AND SUBCLASSES ..................................................... 11

IV. ARGUMENT .......................................................................................................... 12

    A. The Class Is Ascertainable ............................................................................................. 13

    B. The Rule 23(a) Factors Are Satisfied ............................................................................. 14

        1. Numerosity ................................................................................................................ 14

        2. Commonality ............................................................................................................. 15

        3. Typicality .................................................................................................................. 17

            a. Negligence ......................................................................................................... 18

            b. Gross Negligence .............................................................................................. 20

            c. Private Nuisance ................................................................................................. 21

            d. Trespass ............................................................................................................. 22

        4. Adequacy .................................................................................................................. 24

    C. The Rule 23(b)(3) Factors Are Satisfied ........................................................................ 27

1. Common Issues Predominate Over Individual Ones ............................................... 27

    a. Negligence and Gross Negligence ..................................................... 28

    b. Private Nuisance .............................................................................. 29

    c. Trespass ............................................................................................ 30

    d. Damages ........................................................................................... 32

2. Classwide Resolution Is Superior to Alternative Methods for Fairly and Efficiently Adjudicating the Controversy ........................................................ 37

D. The Rule 23(b)(2) Factors Are Satisfied for Plaintiffs' Epidemiological Study .......... 39

E. Alternatively, Particular Issues Are Certifiable Under Rule 23(c)(4) .......................... 41

    1. Property Damage Issues .......................................................................... 41

    2. Health Issues: ......................................................................................... 42

V. CONCLUSION ................................................................................................. 43

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adair v. EQT Prod. Co.*,
    320 F.R.D. 379 (W.D. Va. 2017) ........................................................................31

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)) .................................................................13, 14, 17, 24

*Andrews v. Plains All Am. Pipeline, L.P.*,
    2018 WL 2717833 (C.D. Cal. Apr. 17, 2018) .................................................10, 32

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.*,
    2021 WL 248471 (D.S.C. Jan. 25, 2021)......................................16, 19, 23, 29

*Baltimore v. Laborers' Int'l Union of N. Am.*,
    67 F.3d 293 (4th Cir. 1995) ........................................................................14

*Barrier v. Troutman*,
    231 N.C. 47, S.E.2d 923 (1949).................................................................21

*Beaulieu v. EQ Indus. Servs., Inc.*,
    2009 WL 2208131 (E.D.N.C. July 22, 2009) ........................................27

*Bell v. WestRock CP, LLC*,
    2019 WL 1874694 (E.D. Va. Apr. 26, 2019) .................................................14, 23

*Bentley v. Honeywell Int'l, Inc.*,
    223 F.R.D. 471 (S.D. Ohio 2004) ...............................................................28, 32

*Berry v. Schulman*,
    807 F.3d 600 (4th Cir. 2015) ........................................................................40

*Blair v. Equifax Check Servs., Inc.*,
    181 F.3d 832 (7th Cir. 1999) ........................................................................39

*Bouaphakeo v. Tyson Foods, Inc.*,
    564 F. Supp. 2d 870 (N.D. Iowa 2008).......................................................39

*Boykin Anchor Co., Inc. v. AT&T Corp.*,
    825 F. Supp. 2d 706 (E.D.N.C. 2011)........................................................20

*State ex rel. Bruton v. Flying "W" Enterprises, Inc.*,
    273 N.C. 399 S.E.2d 482 (1968)................................................................22

*Bruzek v. Husky Oil Operations Ltd.*,
520 F. Supp. 3d 1079 (W.D. Wis. 2021) ...............................................................16

*BSK Enters., Inc. v. Beroth Oil Co.*,
246 N.C. App. 1, 783 S.E.2d 236 (N.C. Ct. App. 2016).......................................35

*Cent. Wesleyan Coll. v. W.R. Grace & Co.*,
6 F.3d 177 (4th Cir. 1993) ...............................................................32, 41, 42, 43

*Childress v. JPMorgan Chase & Co.*,
2019 WL 2865848 (E.D.N.C. July 2, 2019) .........................................................34

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
2017 WL 1421627 (E.D. La. Apr. 21, 2017).........................................................34

*Cook v. Rockwell Int'l Corp.*,
580 F. Supp. 2d 1071 (D. Colo. 2006)..................................................................36

*Curl v. Am. Multimedia, Inc.*,
187 N.C. App. 649, 654 S.E.2d 76 (2007)............................................................32

*Deiter v. Microsoft Corp.*,
436 F.3d 461 (4th Cir. 2006) .........................................................................17, 18

*Dew v. E.I. du Pont de Nemours and Co.*,
No. 5:17-cv-0073-D (E.D.N.C.) ...........................................................................39

*England v. Fifth Louisiana Levee Dist.*,
167 So. 3d 1105 (La. App. 2 Cir. 2015) ..........................................................36, 37

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) ..................................................................13, 15, 38

*Fordham v. Eason*,
351 N.C. 151, S.E.2d 701 (1999)..........................................................................22

*Foster v. CEVA Freight, LLC*,
272 F.R.D. 171 (W.D.N.C. 2011)..........................................................................25

*Freeman v. Blue Ridge Paper Prod., Inc.*,
2011 WL 13098808 (E.D. Tenn. Sept. 30, 2011) ................................................30

*Freeman v. Blue Ridge Paper Prod., Inc.*,
229 S.W.3d 694 (Tenn. Ct. App. 2007) ...............................................................30

*Goldstein v. ExxonMobil Corp.*,
2019 WL 7165919 (C.D. Cal. Oct. 15, 2019).................................................32, 37

*Gonzalez v. Corning*,
317 F.R.D. 443 (W.D. Pa. 2016) ...........................................................31

*Good v. W. Virginia-Am. Water Co.*,
2017 WL 2884535 (S.D. W. Va. July 6, 2017) .......................................34

*Grace v. Apple, Inc.*,
328 F.R.D. 320 (N.D. Cal. 2018) ...........................................................36

*Gunnells v. Healthplan Servs., Inc.*,
348 F.3d 417 (4th Cir. 2003) ......................................................... *passim*

*Hardwick v. 3M Co.*,
2022 WL 668339 (S.D. Ohio Mar. 7, 2022) ...........................................40

*Hermens v. Textiles Coated, Inc.*,
No. 16-cv-524 (N.H. Sup. Ct. Jul. 30, 2019) ....................................33, 36

*Iorio v. Allianz Life Ins. Co. of N. Am.*,
2009 WL 3415703 (S.D. Cal. Oct. 21, 2009) .........................................33

*Johnson v. 3M*,
2021 WL 4745421 (N.D. Ga. Sept. 20, 2021) ........................................21

*Kent v. Humphries*,
303 N.C. 675 S.E.2d 43 (1981)...............................................................21

*Kilgo v. Bowman Transp., Inc.*,
789 F.2d 859 (11th Cir. 1986) ................................................................14

*Kinlaw v. Chemours Co. FC, LLC*,
No. 7:20-CV-188-D (E.D.N.C. Sept. 15, 2020) .....................................38

*Krakauer v. Dish Network LLC*,
311 F.R.D. 384 (M.D.N.C. 2015), *aff'd* 925 F.3d 643 (4th Cir. 2019) ...................................28

*LeClercq v. Lockformer Co.*,
2001 WL 199840 (N.D. Ill. Feb. 28, 2001) ...........................................28

*Ludwig v. Pilkington N. Am., Inc.*,
2003 WL 22478842 (N.D. Ill. Nov. 4, 2003) .........................................28

*Martin v. Behr Dayton Thermal Prod. LLC*,
896 F.3d 405 (6th Cir. 2018) ..................................................................42

*McKenzie v. City of Chicago*,
175 F.R.D. 280 (N.D. Ill. 1997)..............................................................32

*McMurray v. Sur. Fed. Sav. & Loan Ass'n*,
348 S.E.2d 162 (N.C. Ct. App. 1986) ...................................................................18

*Mejdreck v. Lockformer Co.*,
2002 WL 1838141 (N.D. Ill. Aug. 12, 2002) .........................................................28

*Mejdrech v. Met-Coil Sys. Corp.*,
319 F.3d 910 (7th Cir. 2003) ................................................................................28

*Muniz v. Rexnord Corp.*,
2005 WL 1243428 (N.D. Ill. Feb. 10, 2005) .........................................................28

*Navelski v. Int'l Paper Co.*,
244 F. Supp. 3d 1275 (N.D. Fla. 2017)..................................................................14

*Nix v. Chemours Co. FC, LLC*,
456 F. Supp. 3d 748 (E.D.N.C. 2019)............................................................. *passim*

*O'Connor v. Boeing N. Am., Inc.*,
184 F.R.D. 311 (C.D. Cal. 1998) ...........................................................................36

*Olden v. LaFarge Corp.*,
203 F.R.D. 254 (E.D. Mich. 2001), *aff'd* 383 F.3d 495 (6th Cir. 2004)...............32

*Opperman v. Path, Inc.*,
2016 WL 3844326 (N.D. Cal. July 15, 2016).........................................................37

*Phillips v. Chesson*,
231 N.C. 566 S.E.2d 343 (1950).............................................................................33

*Pontones v. San Jose Rest. Inc.*,
2019 WL 5680347 (E.D.N.C. Oct. 31, 2019) ...................................................38, 39

*Priselac v. Chemours Co.*,
No. 7:20-CV-190-D (E.D.N.C. Sept. 15, 2020) .....................................................38

*Reichert v. Keefe Commissary Network, LLC*,
331 F.R.D. 541 (W.D. Wash. 2019) .......................................................................31

*Rosas v. Sarbanand Farms, LLC*,
329 F.R.D. 671 (W.D. Wash. 2018) .......................................................................31

*Rowe v. E.I. DuPont de Nemours and Co.*,
2011 WL 3837106 (D.N.J. Aug. 26, 2011) ......................................................35, 41

*Ruff v. Parex, Inc.*,
No. 96-CVS-0059 (New Hanover Cty. Sup. Ct. June 17, 1999)............................39

*Scott v. Fam. Dollar Stores, Inc.*,
   2010 WL 143725 (W.D.N.C. Jan. 7, 2010) ...........................................................33

*Sharp Farms v. Speaks*,
   917 F.3d 276 (4th Cir. 2019) ...........................................................................24

*Singleton v. Haywood Elec. Membership Corp.*,
   357 N.C. 623 S.E.2d 871 (2003)..........................................................................22

*Soutter v. Equifax Info. Servs., LLC*,
   307 F.R.D. 183 (E.D. Va. 2015) ..........................................................................14

*Stepp v. Monsanto Rsch. Corp.*,
   2012 WL 604328 (S.D. Ohio Feb. 24, 2012)..........................................................37

*Sullivan v. Saint-Gobain Performance Plastics Corp.*,
   2019 WL 12323322 (D. Vt. July 15, 2019) ...........................................................37

*Sullivan v. Saint-Gobain Performance Plastics Corp.*,
   2019 WL 8272995 (D. Vt. Aug. 23, 2019)..............................................................16

*Turner v. Murphy Oil USA, Inc.*,
   234 F.R.D. 597 (E.D. La. 2006)..........................................................31, 32, 42, 43

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016).......................................................................................29, 37

*U.S. v. Dargan*,
   738 F.3d 643 (4th Cir. 2013) ...........................................................................23

*Velasquez-Monterrosa v. Mi Casita Rests.*,
   2016 WL 1703351 (E.D.N.C. Apr. 27, 2016).........................................................17

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011 ......................................................................................15, 40

*Ward v. Dixie Nat'l Life Ins. Co.*,
   595 F.3d 164 (4th Cir. 2010) ...........................................................................24

*Watts v. Pama Mfg. Co.*,
   256 N.C. 611, S.E.2d 809 (1962)..................................................................21, 22, 27

*Whiteside Ests., Inc. v. Highlands Cove, LLC*,
   169 N.C. App. 209, S.E.2d 804 (2005).................................................................33

*Wixon v. Wyndham Resort Dev. Corp.*,
   2009 WL 3353445 (N.D. Cal. Oct. 19, 2009).........................................................36

*Yancey v. Lea*,
    354 N.C. 48 S.E.2d 155 (2001)....................................................................20

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    7 F.4th 227 (4th Cir. 2021) .....................................................................14

**Other Authorities**

Fed. R. Civ. P. Rule 23 ..................................................................... *passim*

Fed. R. Civ. P. Rule 702 ..........................................................................36

W. Keeton, Prosser and Keeton on Torts, § 30 (5th ed. 1984) ....................................18

## TABLE OF EXHIBITS

| No. | Descriptions |
|-----|--------------|
| 1. | E.I. du Pont de Nemours & Company, Plastics Department, Research & Development Division, *Report on New Dispersing Agents of Reduced Toxicity and Cost for TFE Polymerizations* (Oct. 17, 1963) [Bates Stamp: Carey-CHEM-00750233, -239] |
| 2. | Expert Report of Richard DeGrandchamp (Opening Report) (Jul. 16, 2021) |
| 3. | DuPont's Second Amended Partial Responses to Plaintiffs' Third Set of Requests for Admission (Feb. 9, 2021) |
| 4. | Chemours' Amended Partial Responses to Plaintiffs' Third Set of Requests for Admission (Feb. 9, 2021) |
| 5. | Deposition Transcript of Bernard Reilly (May 12, 2021) |
| 6. | Press Release: *EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History* (Dec. 14, 2005) |
| 7. | C8 Science Panel, *Background Information on Lawsuit Settlement*, available at: http://www.c8sciencepanel.org/panel_background.html. |
| 8. | Expert Report of Ruth Albright (Opening Report) (Jul. 16, 2021) |
| 9. | Consent Order, U.S. Environmental Protection Agency, *In the matter of: DuPont Company*, No. P-08-508/509 (Apr. 4, 2009) (Exhibit 1 to the Deposition Transcript of Michael Johnson (2022)) |
| 10. | North Carolina Dept. of Environmental Quality, FOIA Ref. No. DEQp00020795, Notes on Presentation by Michael Johnson, Chemours Company (Dated June 12, 2017) [DEQp00020795] |
| 11. | Chemours Internal PowerPoint Presentation, *Project Alice Review* [Bates Stamp: Carey-CHEM-00382262 at -63] |
| 12. | E.I. du Pont de Nemours and Co., Annual Report (Form 10-K) (Feb. 8, 2012) |
| 13. | Internal Email, Chemours, *RE: FW: Project Alice Follow-Up* (May 9, 2016) [Bates Stamp: Carey-CHEM-00386619] |
| 14. | Verified Complaint, *The Chemours Company v. DowDuPont Inc.* et al., C.A. No. 2019-0351-SG (Del. Ch. May 13, 2019). |
| 15. | Chemours Internal PowerPoint Presentation, Graph of Estimated Concentration of Fluorinated Alternatives at a WTP in Wilmington (ng/L)) [Bates Stamp: Carey-CHEM-00382260] |
| 16. | Expert Report of Robin Smith (Opening Report) (Jul. 16, 2021) |
| 17. | Vaughn Haggerty, *Toxin Taints CFPUA Drinking Water*, StarNews Online (June 6, 2017) |
| 18. | Press Release: DEQ, DHHS investigating reports of unregulated chemical in Cape Fear River, North Carolina Department of Environmental Quality (June 14, 2017) |

| 19. | Chemours Internal Messages between John A. Wehner and Laura A. Korte [Bates Stamp: Carey-CHEM-00590699] |
| --- | --- |
| 20. | Chemours, Press Release: *Chemours Announces Voluntary Action to Respond to North Carolina Community* |
| 21. | Expert Report of David Duncklee (Opening Report) (Jul. 16, 2021) |
| 22. | Expert Report of Brien Gidlow (Opening Report) (Jul. 16, 2021) |
| 23. | Expert Report of Jamie DeWitt (Opening Report) (Jul. 16, 2021) |
| 24. | Deposition Transcript of Jamie C. Dewitt (May 2, 2022) |
| 25. | Expert Report of David Savitz (Opening Report) (Jul. 16, 2021) |
| 26. | Expert Report of Kimberly Gray (Opening Report) (Jul. 16, 2021) |
| 27. | Expert Report of Roger Griffith (Opening Report) (Jul. 16, 2021) |
| 28. | Expert Report of R. Bruce Gamble (Opening Report) (Jul. 16, 2021) |
| 29. | Expert Report of David Sunding (Opening Report) (Jul. 16, 2021) |
| 30. | NC DEQ, Presentation, North Carolina Department of Environmental Quality Public Meeting: Well Sampling (May 9, 2022) |
| 31. | Chemours (Geosyntec Consultants), Interim Four Counties Sampling and Drinking Water Plan (New Hanover, Brunswick, Columbus and Pender Counties (Feb. 1, 2022) |
| 32. | Consent Order, *State of North Carolina v. The Chemours Co.*, No. 17 CVS 580, Bladen County Superior Court (Feb. 25, 2019). |
| 33. | Chemours, Consent Order Progress Report For First Quarter 2022, Submissions to the State of North Carolina and Cape Fear River Watch |
| 34. | Declaration of Kristi Irick, Director of Customer Service, Cape Fear Public Utility Authority (May 28, 2021) |
| 35. | Declaration of John Nichols, Director of Brunswick County Public Utilities (July 16, 2021) |
| 36. | Deposition Transcript of Victoria Carey (May 21, 2021) |
| 37. | Plaintiff Carey's Responses and Objections to Chemours' First Set of Interrogatories (Dec. 16, 2019) |
| 38. | Plaintiff Burris's Responses and Objections to Chemours' First Set of Interrogatories (May 27, 2021) |
| 39. | Deposition Transcript of Marie Burris (May 11, 2021) |
| 40. | Plaintiff Nix's Responses and Objections to Chemours' First Set of Interrogatories (Dec. 16, 2019) |
| 41. | Plaintiff Nix's Responses and Objections to Chemours' Second Set of Interrogatories (Feb. 10, 2021) |
| 42. | Deposition Transcript of Brent Nix (May 11, 2021) |

| 43. | Order Granting Class Certification, *Hermens v. Textiles Coated, Inc.*, No. 16-cv-524, (N.H. Sup. Ct. Jul. 30, 2019) |
|---|---|
| 44. | Expert Rebuttal Report of Brien Gidlow (Rebuttal Report) (Dec. 16, 2021) |
| 45. | Expert Report of Dr. Robert Michaels (Jul. 16, 2021) |
| 46. | Order Denying Decertification ("Synthetic Stucco" Order), *Ruff v. Parex, Inc.*, No. 96-CVS-0059, (New Hanover Cty. Sup. Ct. June 17, 1999) |
| 47. | Deposition Transcript of R. Bruce Gamble (Apr. 14, 2022) |
| 48. | Gel Labs, Sampling Results for Victoria Carey (Oct. 9, 2017) |
| 49. | Firm Biography, Cohen Milstein Sellers & Toll PLLC |
| 50. | Firm Biography, Susman Godfrey LLP |
| 51. | Chemours, *PFAS Characterization Sampling Plan* (Dec. 28, 2018) |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION**</u>

## I.     INTRODUCTION

Since 1980, Defendants have knowingly discharged per-and polyfluoroalkyl substances ("PFAS")—a family of toxic chemicals—from their Fayetteville Works ("FW") plant in North Carolina, without informing the public. These PFAS flowed directly into the Cape Fear River, which serves as a source of drinking water for more than 100,000 homes. In 2011, Defendants considered installing equipment to stop their harmful emissions, but picked profits over safety and chose not to. In 2017, journalists finally uncovered the large quantity of PFAS in the Cape Fear River, prompting one of Defendants' executives to send a private message to a colleague lamenting: "[W]e knew all along that it was bad." Ex. 19 (Carey-CHEM-00590699) at -703 (Internal Messages between John A. Wehner and Laura A. Korte).

Now, the thousands of property owners and renters whose drinking water has been contaminated by Defendants' PFAS are seeking to hold Defendants liable for negligence, gross negligence, private nuisance, and trespass. Their claims turn on common questions, including (1) did Defendants owe (and breach) a duty of care to homeowners and renters whose properties were contaminated with FW PFAS (negligence)? (2) does Defendants' FW PFAS contamination constitute an objectively unreasonable interference in the use and enjoyment of contaminated properties (nuisance)? (3) have FW PFAS entered these homeowners and renters' properties, and will they continue to enter them in the future (trespass)? Because all homeowners and renters affected by Defendants' contamination will need to answer these questions to obtain relief, and their questions will be answered with the same evidence, Plaintiffs are properly seeking to litigate their property damage claims as a class. Allowing the tens of thousands of class members who were injured by Defendants' conduct to bring their claims in a single proceeding—instead of

presenting the same evidence tens of thousands of times to different tribunals—is exactly what the class action mechanism was designed to do.

While the need to answer common liability questions is a sufficient basis to grant class certification, members of the proposed class are also seeking the same remedies. Plaintiffs want what anyone in their circumstances would want: drinking water filters capable of removing PFAS, new water heaters free of PFAS, and to have Defendants reimburse them for any water filters, water heaters, or bottled water they have already purchased. Plaintiffs' experts have explained how the cost of providing these remedies can easily be calculated for four subclasses. Plaintiffs' experts have also explained how class members would benefit from common injunctive relief.

Given the common liability and damages questions at issue here, the proposed liability class and damages subclasses easily satisfy the requirements of Rules 23(a), 23(b)(2), and 23(b)(3). In addition, several issues common to the class are susceptible to classwide treatment under Rule 23(c)(4). Plaintiffs therefore request certification of the classes and subclasses defined below; appointment of Victoria Carey, Marie Burris, and Brent Nix as Class Representatives; and appointment of Interim Co-Lead Counsel—Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") and Susman Godfrey LLP ("Susman Godfrey")—as Co-Lead Class Counsel.

## II.  FACTUAL BACKGROUND

Since the 1950s, DuPont has made and used PFAS for many purposes, including non-stick products and coatings such as Teflon. In doing so, DuPont discharged PFAS-laden waste from its Washington Works plant in West Virginia and its Fayetteville Works plant in North Carolina. DuPont knew its waste contaminated rivers and groundwater that served as drinking water sources for hundreds of thousands of people, and knew that the waste was likely toxic. Yet it refused to take steps to protect community drinking water supplies and understand the full extent of the dangers posed by its own chemicals.

2

### A. DuPont Learns Some PFAS Are Toxic and Refuses to Test Others

After learning that many PFAS were toxic, even over short periods of time, DuPont declined to conduct robust toxicity testing on all the PFAS it was discharging into public drinking water supplies, deliberately turning a blind eye to the dangers these chemicals posed to public health. The first signs that PFAS were toxic appeared in the 1960s, when DuPont conducted toxicity tests on a dozen PFAS by exposing rats to the chemicals for two to five weeks. Those tests showed that PFAS could produce adverse health effects in mammals, including liver damage. Ex. 1 (Carey-CHEM-00750233), at –239 (Discussion on Toxicity). Over the next three decades, DuPont conducted additional studies showing that animals exposed to PFAS for weeks developed serious health problems, including tumors. Ex. 2 (DeGrandchamp Rpt.) ¶¶ 89-95. As Professor Richard DeGrandchamp explains, given the chemical similarities among PFAS, information that some PFAS were toxic would have prompted a chemical company following industry standards of care to conduct long-term animal toxicity tests on all PFAS (modeling what would happen to individuals exposed to PFAS in their environment over a period of months or years) *before* exposing the public to those chemicals. *Id.* ¶¶ 81-88. Yet DuPont did not do so. *See* Ex. 3 (DuPont RFA Resp.) at 21-37; Ex. 4 (Chemours Second RFA Resp.) at 20-37. For some PFAS at issue here, Defendants conducted no toxicity studies at all. *Id.*

### B. DuPont Gets Caught Discharging PFAS in West Virginia

Despite mounting evidence of PFAS' toxicity, DuPont continued discharging PFAS from its plants. In West Virginia, DuPont discharged a PFAS called perfluorooctanoic acid ("PFOA" or "C8") into the Ohio River, a source of drinking water for local communities. By 2001, DuPont's general counsel Bernard Reilly recognized the dangers posed by these discharges; in an email to his son, he explained that DuPont "learned that not only do we have people drinking our famous

[PFOA], but levels in ambient air [are] above our guidelines … we should have checked this years ago and taken steps to remedy." Ex. 5 (Reilly Dep. Tr.) at 154:5-7, 9-10.

As individuals living near DuPont's West Virginia plant grew ill, DuPont faced legal pressure to stop discharging PFOA. In 2005, DuPont reached a settlement with the U.S. Environmental Protection Agency regarding its discharge of PFOA into the Ohio River. *See* Ex. 6 (EPA Press Release). DuPont paid $10.25 million in fines and $6.25 million for Supplemental Environmental Projects (projects to be completed in lieu of additional penalties)—the largest civil administrative penalty the EPA had ever imposed under any federal environmental statute. *Id.*

The same year, DuPont reached a settlement with West Virginia residents who brought a class action alleging that DuPont had exposed them to PFOA. *See* Ex. 7 (C8 Science Panel, *Background on Lawsuit Settlement*). DuPont agreed to have a panel of neutral scientific experts conduct a rigorous epidemiological study of communities in West Virginia and Ohio that drank water contaminated with PFOA.[1] This C-8 Science Panel (so named because PFOA is also known as C-8) studied the blood and medical records of 69,030 class members to determine whether there was a "probable link" between exposure to PFOA and specific diseases. Ex. 2 (DeGrandchamp Rpt.) ¶ 114. A probable link was defined "to mean that given the available scientific evidence, it is more likely than not that among class members, a connection exists between PFOA exposure and a particular human disease." *Id.* In 2011 and 2012, the C-8 Science Panel concluded that there was a "probable link" between PFOA exposure and six diseases: high cholesterol, ulcerative colitis, thyroid disease, testicular cancer, kidney cancer, and pregnancy-induced hypertension. *Id.* Despite these alarming findings, DuPont continued to release PFOA and other PFAS from its Fayetteville Works plant in North Carolina. Ex. 8 (Albright Rpt.) ¶¶ 183-84 & Table 21.

---

[1] C8 Science Panel, Science Panel on PFOA Study, http://www.c8sciencepanel.org/panel.html.

### C.  DuPont Continues Discharging PFAS in North Carolina

From 1980 to 2009, DuPont discharged dozens of PFAS, including PFOA, from its Fayetteville Works plant. Ex. 8 (Albright Rpt.) ¶¶ 183-84 & Table 21. In the face of legal pressure, DuPont decided to phase out its use of PFOA at Fayetteville Works by 2015 and replace it with two other PFAS—hexafluoropropylene oxide dimer acid and its ammonium salt ("GenX chemicals"). The EPA, however, had concerns about the safety of GenX chemicals. Given the data suggesting PFOA was toxic, and the chemical "analogy" between GenX chemicals and PFOA, the EPA feared that the GenX chemicals could be "toxic … to people." Ex. 9 (2009 EPA Consent Order). As a result, the EPA only approved the manufacture of GenX if DuPont complied with conditions memorialized in a 2009 Consent Order. That Consent Order explains that "[t]oxicity studies on the analogs [of] PFOA … indicate developmental, reproductive and systemic toxicity in various species. Cancer may also be of concern. These factors, taken together, raise concerns for potential adverse chronic effects [of GenX chemicals] in humans and wildlife." *Id.* at *X* (Roman numeral in original). Thus, DuPont could manufacture GenX only if: (1) DuPont conducted additional toxicity tests of the GenX chemicals; and (2) DuPont "recover[ed] and capture[d] (destroy[ed]) or recycle[d]" at least 99% of GenX chemicals from the wastewater and wastegas it created in the GenX manufacturing process. *Id.* at 36.

What DuPont did not disclose to the EPA when it signed the 2009 Consent Order was that, since 1985, DuPont had *already* discharged enormous quantities of GenX and other PFAS as byproducts of its Vinyl Ether manufacturing process. *See* Ex. 10 (DEQp00020795) at 1, 11. Despite the EPA's clear concern about PFAS toxicity, DuPont chose to control GenX emissions only from its GenX manufacturing operations while ignoring emissions of those same chemicals from its Vinyl Ether manufacturing operations. *See id.* Thus, even after DuPont signed the 2009 Consent Order, it continued to discharge large quantities of GenX chemicals into the Cape Fear

River and surrounding air. And—more significantly—DuPont also discharged hundreds of thousands of pounds of other PFAS, without disclosing the scope of those discharges to regulators or the public. Ex. 8 (Albright Rpt.) ¶¶ 183-84 & Table 21, Ex. 16 (Smith Rpt.) ¶¶ 1, 8.

### D. DuPont Chooses Profits Over Safety in Refusing to Prevent PFAS Discharges

In 2011, as the scientific community increasingly saw the dangers of PFAS, DuPont embarked on "Project Alice," an initiative ostensibly designed to reduce PFAS emissions from Fayetteville Works. Ex 11 at -63. DuPont recognized that doing "[n]othing" about its PFAS contamination was a "[b]usiness [r]isk." *Id.* at -64. Removing 100% of PFAS from its waste streams was technologically feasible, but it would cost tens of millions of dollars per year—eating into (but by no means eliminating) DuPont's profits. *Id.*; *see* Ex. 12 (DuPont Form 10-K (2011)) at 15 (Row 6 "Net Income Attributable to Dupont," ITEM 6. SELECTED FINANCIAL DATA). So DuPont instead chose a process that would reduce, but not eliminate, PFAS discharges into the Cape Fear River by 70%, as illustrated in the following slide from an internal DuPont presentation:

| Option | Capital Cost* | Recurring Cost | Aq. Emission Reduction | Reason Rejected |
|---|---|---|---|---|
| Do Nothing | $0 | $0 | None | Business Risk |
| Capture for Off-Site Incineration | $2 MM | $15 MM+ / year | 100% | Excessive Recurring Cost |
| Make TFA & HF | $20-$25 MM | $1 MM / year | 70% | Safety / Higher Investment |
| Make TFA & PPF | $25-$30 MM | $1 MM / year | 60% | Lower Recovery / Higher Investment |
| Make TFA and CaF2 | $20-$25 MM | $2 MM / year | 70% | Higher Investment |
| Make Ca-TFA and CaF2 | $16.5 MM (iVGA) | $1 MM / year | 70% | Chosen |
| Thermal Oxidizer (non-aqueous) | $40 MM | $3 MM / year | 95% | Higher Investment |
| Thermal Oxidizer (all streams) | $60 MM | $4 MM+ / year | 100% | Higher Investment |

Ex. 11 (Carey-CHEM-00382262) at –65 (PowerPoint). DuPont called this cheaper, less effective option "Project Alice."

DuPont completed Phase I of Project Alice in 2013. *Id.* at -65. In July, the "[r]emainder" of the project was "put on [h]old." *Id.* at -64. DuPont employees knew that, with their inaction,

6

large quantities of FW PFAS would continue flowing into the Cape Fear River. Ex. 13 (Carey-CHEM-00386619) (Email re Project Alice Follow-Up).

### E. DuPont Transfers Ownership of Fayetteville Works to Chemours

Instead of finishing Project Alice, DuPont implemented "Project Beta," an initiative to spin off its PFAS manufacturing operations—and the accompanying legal liability for PFAS contamination—into a separate company, Chemours. Ex. 14 (Compl., *Chemours v. DuPont*) ¶¶ 15-16, 81-82. The spinoff was completed in 2015 when DuPont transferred its PFAS-related assets and liabilities to the newly created Chemours, which took over the Fayetteville Works plant. *Id.* In a later lawsuit against DuPont, Chemours explained that, "[w]hen it spun Chemours off in 2015, DuPont knew that the Fayetteville plant had been discharging … PFAS … for 30 years or more into the Cape Fear River," but DuPont did not want to pay to control or remediate PFAS contamination. *Id.* ¶¶ 81-82. As Chemours put it: "Why bother spending money to fix the problem, DuPont apparently reasoned, when it could be conveniently passed on to Chemours"? *Id.* ¶ 82.

### F. Chemours Knowingly Discharges PFAS Into Drinking Water

By 2016, Chemours recognized that there were substantial quantities of PFAS both in the Cape Fear River and in "finished" drinking water at water treatment facilities. Ex. 15 (Carey-CHEM-0000382260) at -261 (Graph of Estimated Concentration of Fluorinated Alternatives at a WTP in Wilmington (ng/L)). These findings suggested (correctly) that water treatment facilities were not filtering PFAS out of local drinking water (just as they had been unable to filter PFOA in the Ohio River Valley). *See, e.g.*, Ex. 8 (Albright Rpt.) ¶ 178. Rather than alerting regulators or the public to the presence of PFAS in drinking water supplies, however, Defendants remained silent. *See* Ex. 16 (Smith Rpt.) ¶ 11.

### G. Chemours Gets Caught Discharging PFAS in North Carolina and Employees Admit Wrongdoing

On November 10, 2016, a group of researchers from North Carolina State University, the University of North Carolina at Charlotte, and several government agencies published a paper showing elevated levels of PFAS in a drinking water treatment plant along the Cape Fear River. The authors expressed particular concern about GenX, which "presents a greater drinking water challenge" than the older industrial compounds it was meant to replace because it is harder to remove from the water. The Wilmington *Star News* obtained a copy of the study, and on June 7, 2017, the paper broke the story that GenX, a chemical "linked to cancer and a host of other ailments has been found in the drinking water system of the Cape Fear Public Utility Authority (CFPUA), which cannot filter it." Ex. 17 (*Toxin Taints CFPUA Drinking Water* (June 7, 2017)).

One week later, on June 14, 2017, The North Carolina Department of Environmental Quality ("NCDEQ") and the North Carolina Department of Health and Human Services ("NCDHHS") began an investigation into GenX in the Cape Fear River. *See* Ex. 18. On June 19, 2017, in the face of intense public scrutiny, Chemours held an internal meeting where staff discussed PFAS flowing into the Cape Fear River. During the meeting, Chemours employee Laura Corte sent a private message to a coworker asking: "What's the downside in barreling it up? [I]t looks like we knew all along that it was bad." Ex. 19 (Internal Chat) at -703. The next day, Chemours announced that it would indeed "capture, remove and safely dispose of" wastewater containing PFAS. Ex. 20 (Chemours, *Chemours Announces Voluntary Actions to Respond to North Carolina Community*, https://pages.chemours.com/fayettevillestatement.html).

### H. Defendants Caused Widespread Harm to Property and People

Defendants' efforts to control PFAS emissions were too little too late. As Dr. Ruth Albright explains in her expert report, by 2017, Fayetteville Works had released approximately 89 million

8

pounds of FW PFAS in wastewater flowing into the Cape Fear River and approximately four million pounds of PFAS into the air. Ex. 8 (Albright Rpt.) ¶ 97. As Defendants have known for decades, PFAS are incredibly persistent in the environment and will not biodegrade for thousands of years. Thus, expert David Duncklee explains that the FW PFAS currently in the Cape Fear River (from Defendants' discharges of wastewater) and the land surrounding Fayetteville Works (from Defendants' discharges of wastegas into the air) will continue contaminating water in the Cape Fear River "for decades to come." Ex. 21 (Duncklee Rpt.) ¶ 13.

Hydraulic modeling performed by Mr. Brien Gidlow confirms that FW PFAS in the Cape Fear River have flowed—and will continue to flow—into every North Carolina home that receives drinking water from the Brunswick County Northwest Water Treatment Plant ("NW WTP") and the Cape Fear Public Utility Authority ("CFPUA") Sweeney Water Treatment Plant ("Sweeney WTP"), including homes that receive water from Bald Head Island, H2GO, Holden Beach, Leland, Navassa, Oak Island, Ocean Isle Beach, Shallotte, and Southport. Ex. 22 (Gidlow Rpt.) ¶¶ 1, 12. Mr. Gidlow, who specializes "in the evaluation, design, and construction review of municipal water treatment and distribution systems," modeled the flow of FW PFAS from these two plants into individual homes and determined that FW PFAS entering the systems contaminate *every home* connected to these public water supplies. *Id.* ¶¶ 4, 10, 58-59. In addition, Chemours' own sampling of private drinking water wells shows that at least 6,100 are contaminated with FW PFAS. Ex. 33 (Chemours Quarterly Progress Rpt. (2022)) at 3.

Blood tests of individuals drinking water from the Cape Fear River also confirm that residents were exposed to PFAS in drinking water, and that those FW PFAS are still contaminating their bodies. Ex. 2 (DeGrandchamp Rpt.) ¶¶ 169-76; Ex. 23 (DeWitt Rpt.) ¶ 156. From November 2017 to May 2018, scientists at North Carolina State University studied the blood of Wilmington-area residents who received drinking water from the Cape Fear River, looking for a small subset

of the FW PFAS. Ex. 2 ¶ 170; Ex. 23 ¶ 156. The study showed that, months after DuPont stopped discharging PFAS into the river, residents still had FW PFAS in their blood; for example, 99% of studied adults and 100% of studied children still had a FW PFAS called Nafion Byproduct 2 in their blood. Ex. 2 (DeGrandchamp Rpt.) at Fig. 36.

### I.   Common Remedies Are Required

Both toxicologists and public health experts have recognized that exposure to PFAS from the Cape Fear River must be stopped. Dr. Jamie DeWitt, a professor of toxicology who has assessed evidence of PFAS' toxicity for the EPA, the U.S. National Toxicology Program, the U.S. Agency for Toxic Substances and Disease Registry ("ATSDR"), the International Agency for Research on Cancer, and the World Health Organization—has concluded that the weight of scientific evidence "provides biological confidence that PFAS leads to toxicity in exposed people." Ex. 24 (DeWitt Dep. Tr.) at 305:5-6. Nor has the scientific community yet identified the dose below which any of the FW PFAS can be considered safe for human consumption, particularly in combination. Thus, Dr. DeWitt concludes, "no amount" of FW PFAS in drinking water can be considered safe. Ex. 23 (DeWitt Rpt.) ¶¶ 5, 24. Dr. DeGrandchamp, a toxicologist with expertise in historical toxicity studies, reached the same conclusion based on a review of DuPont's own studies of PFAS from the 1960s to the present. Ex. 2 (DeGrandchamp Rpt.) ¶¶ 6, 147-48. Similarly, Dr. David Savitz—an epidemiologist at the Brown University School of Public Health who has assessed evidence of PFAS' toxicity for the ATSDR and was a panelist for DuPont's own C-8 Science Panel—has concluded that there is an "immediate need" to "eliminate the [PFAS] exposure source" for individuals living near Fayetteville Works. Ex. 25 (Savitz Rpt.) ¶¶ 4-5, 18.

Plaintiffs' experts explain that *all* individuals receiving water containing FW PFAS must receive reverse osmosis filters to protect them from the dangers of PFAS exposure. Dr. Kimberly Gray describes how PFAS have bound to the pipes and water heaters that have been receiving

contaminated water from private wells or the Cape Fear River. Ex. 26 (Gray Rpt.) ¶¶ 1-3. As Mr. Roger Griffith notes, samples drawn from residential water heaters confirm that they are contaminated by FW PFAS, and that such contamination "will be released and reintroduced into the home's plumbing and tap water" as the water heater is used. Ex. 27 (Griffith Rpt.) ¶ 25. The only way to protect people from ongoing exposure to FW PFAS is to provide them with reverse osmosis filters, and new water heaters are required to protect people from ongoing exposure to FW PFAS—both from within their house and from further upstream. *Id.* ¶ 26. Mr. Bruce Gamble also explains that in addition to filters and water heaters, property owners and renters will need bottled water until such pollution controls can be installed. Ex. 28 (Gamble Rpt.) ¶¶ 38-39, 49.

In addition to ending PFAS exposures to Class Members, Dr. Savitz opines that, "in order to provide an appropriate and informed public health response, it is necessary to directly assess the health impact of PFAS contamination in the Cape Fear River Watershed through a large, scientifically rigorous set of epidemiologic studies." Ex. 25 (Savitz Rpt.) ¶ 21. Such studies can be modeled on the C-8 Science panel's work and "at least three other ongoing studies of geographic areas that have been affected by PFAS contamination in Ronneby, Sweden; Veneto, Italy; and a set of areas in the U.S. proximal to military bases that resulted in PFAS contamination." *Id.* ¶ 16.

## III.     THE PROPOSED CLASS AND SUBCLASSES

Given the widespread and common harms to Plaintiffs' property caused by Defendants' misconduct, Plaintiffs seeks to certify a class (the "Class") of:

Any owner or renter of residential property from February 1, 2015 to present that:

(1) is serviced by a public water utility servicing Bladen, Brunswick, Cumberland, New Hanover or Pender Counties that draws water from or obtains water drawn from the Cape Fear River downstream of Fayetteville Works; or

(2) receives drinking water from a groundwater source with quantifiable concentrations of any of the Fayetteville Works PFAS ("FW PFAS") as defined in Exhibit A hereto.

Excluded from the Class are Defendants, government entities, and judicial officers involved in this proceeding. As part of the Class, Plaintiffs also seek to certify three damages subclasses, each of which can have their damages quantified using common methodologies, and one injunctive and declaratory relief subclass:

- **Owner-Occupier/Renter Damages Subclass**: All Class Members who are currently owner-occupiers of residential property or currently rent residential property and have not yet installed both reverse osmosis filters and new water heaters on their property.

- **Purchaser Damages Subclass**: All Class Members who paid for bottled water, water heaters, and/or reverse osmosis filters from 2017 to present.

- **Long-Time Property Owner Damages Subclass**: All Class Members who purchased their residential property prior to June 2017 and have not installed both reverse osmosis filters and new water heaters.

- **Health Study Injunctive and Declaratory Relief Subclass**: All Class Members who consent to participate in the epidemiological study.

## IV. ARGUMENT

Class actions serve the important public purpose of "promoting judicial economy and efficiency." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003). When ruling on a motion for class certification, "courts should 'give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case 'best serve the ends of justice for the affected parties and … promote judicial efficiency.'" *Id.* (citation omitted). The Fourth Circuit has "expressly embraced the view that the mass tort action for damages may be appropriate for class action, either partially or in whole." *Id.* (cleaned up).

"Class actions must meet several criteria. First, the class must comply with the four prerequisites established in Rule 23(a): (1) numerosity of parties; (2) commonality of factual and legal issues; (3) typicality of claims and defenses of class representatives; and (4) adequacy of

representation." *Id*. at 423 (citing Fed. R. Civ. P. 23(a)). "Second, the class action must fall within one of the three categories enumerated in Rule 23(b)…." *Id*. Where, as here, the plaintiffs "seek to proceed under Rule 23(b)(3), [the Rule] requires that common issues predominate over individual ones and that a class action be superior to other available methods of adjudication." *Id*. (citing Fed. R. Civ. P. 23(b)(3)). "[T]he predominance and superiority requirements in Rule 23(b)(3) do not foreclose the possibility of mass tort class actions, but merely ensure that class certification in such cases 'achieve economies of time, effort, and expense, and promote … uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Id*. at 424 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)).

### A. The Class Is Ascertainable

As required by "Rule 23 … the members of [Plaintiffs'] proposed class [are] 'readily identifiable'" with reference to "objective criteria." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014). Plaintiffs' Class is objectively defined as: any owner or renter of residential property from February 1, 2015 to present that: (1) is serviced by a public water utility servicing Bladen, Brunswick, Cumberland, New Hanover or Pender Counties that draws water from or obtains water drawn from the Cape Fear River downstream of Fayetteville Works; or (2) receives drinking water from a groundwater source with quantifiable concentrations of any FW PFAS.

For the homeowners and renters receiving water from public utilities in the five counties at issue (the "Class Area"), the utilities have records of customer names and addresses that identify every occupied property in the contaminated service areas. *See* Ex. 34 (Irick Decl.) ¶¶ 2-3; Ex. 35 (Nichols Decl.) ¶ 2. For individuals or entities who receive water from groundwater sources, Chemours has already identified over 6,100 qualifying properties (as mandated by its Consent

Order with NCDEQ, *see* Ex. 32, ¶¶ 21, 24(a)), and is embarking on a plan to sample (and identify) thousands more by testing for the presence of FW PFAS. *See* Ex. 30 at 12; Ex. 31 at 6-7.

Where, as here the "plaintiff proposes objective criteria capable of identifying those individuals described in the class definition, the ascertainability requirement is satisfied." *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 199 (E.D. Va. 2015); *see also Bell v. WestRock CP, LLC*, 2019 WL 1874694, at *6 (E.D. Va. Apr. 26, 2019) (finding ascertainability requirement met where "the class definition … objectively identifies members of the [c]lass" and where "public property records can identify all members of the class"); *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1305 (N.D. Fla. 2017) (finding ascertainability requirement met where "proposed class boundaries are defined in objective terms" and "names and addresses of the proposed class members are easily ascertainable by reference to the real property records").

## B. The Rule 23(a) Factors Are Satisfied

Rule 23(a) creates "four threshold requirements applicable to all class actions: (1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical ... of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')." *Amchem*, 521 U.S. at 613 (quoting Fed. R. Civ. P. 23(a)). Each of these requirements is satisfied here.

### 1. Numerosity

"Rule 23(a)(1) requires that a class be 'so numerous that joinder of all members is impracticable.'" *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (quoting Fed. R. Civ. P. 23(a)(1)). While numerosity "depends on many factors," *Baltimore v. Laborers' Int'l Union of N. Am.*, 67 F.3d 293, 1 (4th Cir. 1995) (quoting *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986)), as "a general guideline, ... a class of 40 or more members raises a

presumption of impracticability of joinder based on numbers alone." *Zetia*, 7 F.4th at 234 (quoting 1 Newberg on Class Actions § 3:12 (5th ed. 2021)). Plaintiffs easily clear that hurdle: as Mr. Gamble explains, well over 100,000 residential properties fall within the proposed Class. *See* Ex. 28 ¶¶ 30-36.

### 2. Commonality

"Rule 23(a)(2) requires a plaintiff to show that 'there are questions of law or fact common to the class.'" *EQT*, 764 F.3d at 360 (quoting Fed. R. Civ. P. 23(a)(2)). "Although the rule speaks in terms of common questions, 'what matters to class certification ...' is 'the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.'" *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011)). "A single common question will suffice," *id.* (citing *Wal-Mart*, 564 U.S. at 359), "but it must be of such a nature that its determination 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* (quoting *Wal-Mart*, 564 U.S. at 350).

Here, there are numerous common questions, of both law and fact, that will resolve important issues in this action for Plaintiffs and all Class Members. These include at least:

a. whether Defendants released FW PFAS;

b. whether and for how long Defendants knew of the release of FW PFAS;

c. whether FW PFAS have contaminated Class Members' properties;

d. whether Defendants owed and breached a duty of care to Plaintiffs by allowing FW PFAS to be released into the Cape Fear River and surrounding groundwater and air;

e. whether Defendants owed and breached a duty of care to Plaintiffs and the Class to act reasonably to remediate, contain, and eliminate FW PFAS contamination before it injured Class Members' properties;

f. whether Defendants' release of FW PFAS into Plaintiffs' properties is an objectively unreasonable interference with Plaintiffs' use and enjoyment of their properties;

g. whether Defendants' contamination of the Class Area with FW PFAS such that FW PFAS will continue to enter Plaintiffs' properties is a continuing trespass;

h. whether reverse osmosis filters and new water heaters are the appropriate remedy to restore Plaintiffs' properties to a condition free from Defendants' contamination; and

i. whether reverse osmosis filters and new water heaters are the appropriate remedy to prevent future FW PFAS contamination caused by Defendants' discharges.

These common questions, which will generate common answers applicable to Plaintiffs and Class Members, satisfy the commonality requirement of Rule 23(a)(2). "[T]he putative class members allege that they each lived within the Class Area during the Class Period and were each exposed to PFAS that contaminated their water [sources] as a result of [Defendants' conduct]." *In re Aqueous Film-Forming Foams Prods. Liab. Litig.* ("*AFFF*"), 2021 WL 248471, at *3 (D.S.C. Jan. 25, 2021). "These common allegations raise common answers likely relevant to resolving the claims, therefore satisfying the commonality requirement." *Id.*; *see also Rowe v. E.I. du Pont de Nemours & Co.*, 262 F.R.D. 451, 456 (D.N.J. 2009) (finding commonality satisfied where there were "issues relevant to Plaintiffs' common law claims that are common to all class members, such as whether DuPont released PFOA from its Chambers Works Plant in New Jersey into the surrounding air and water"); *Sullivan v. Saint-Gobain Performance Plastics Corp*., 2019 WL 8272995, at *5 (D. Vt. Aug. 23, 2019) (finding commonality where proof "offered to reach [answers regarding the source of contaminants] may involve complex issues of chemistry, air modeling, and hydrogeology, but the answers are common to all property owners"); *Bruzek v. Husky Oil Operations Ltd.*, 520 F. Supp. 3d 1079, 1094 (W.D. Wis. 2021) (allegations that "defendants' operation of the Refinery was negligent . . . leading to common claims of economic loss and loss of enjoyment of their property" satisfied commonality requirement because "plaintiffs' claims depend on a common contention capable of classwide resolution").

Class Members' damages can also be calculated with common methodologies for each subclass. As their primary damages model, Class Members' have provided a simple method for calculating remediation damages for the Owner-Occupier/Renter Damages Subclass, as well as a

method for reimbursing the Purchaser Subclass for their purchases of bottled water, water filters, and/or new water heaters, *see* Ex. 28 (Gamble Rpt.) ¶¶ 37-51.[2] Plaintiffs have also provided a methodology that members of the Long-Time Property Owner Damages Subclass can use on a classwide basis to calculate each Class Member's diminution in property value. *See* Ex. 29 (Sunding Rpt.) ¶¶ 45-69.

### 3. Typicality

Rule 23(a)(3) requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3). "The typicality requirement goes to the heart of [] representative parties' ability to represent a class, particularly as it tends to merge with the commonality and adequacy-of-representation requirements." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (citing, *e.g.*, *Amchem*, 521 U.S. at 626 n.20). To establish typicality, "[t]he representative party's interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class members." *Deiter*, 436 F.3d at 466. Typicality does not require "that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned." *Id.* at 467. But the "plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim." *Id.* at 466-67.

"The threshold requirements of commonality and typicality are not high; Rule 23(a) requires only that resolution of the common questions affect all or a substantial number of the class members." *Velasquez-Monterrosa v. Mi Casita Rests.*, 2016 WL 1703351, at *5 (E.D.N.C. Apr.

---

[2] Even if there were a need for some individualized damage determinations—and there is no such need here—that does not destroy commonality. *See Gunnells*, 348 F.3d at 427-28 ("Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification. In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations.") (citing Fed. R. Civ. P. 23 advisory committee's note (1966 Amendment, subdivision (c)(4))).

27, 2016) (citation and quotations omitted). To determine whether typicality is satisfied, the Court must compare the "elements of plaintiffs' *prima facie* case and the facts on which the plaintiff would necessarily rely to prove it" with "the claims of the absent class members." *Deiter*, 436 F.3d at 467. Doing so here, it is evident that Plaintiffs' claims for negligence, gross negligence, private nuisance, and trespass are typical of Class Members' claims.

### a. Negligence

"The traditional elements of actionable negligence are the existence of a legal duty or obligation, breach of that duty, proximate cause and actual loss or damage." *McMurray v. Sur. Fed. Sav. & Loan Ass'n*, 348 S.E.2d 162, 164 (N.C. Ct. App. 1986) (citing W. Keeton, Prosser and Keeton on Torts, § 30 (5th ed. 1984)). Here, Defendants owed the same legal duty to Plaintiffs and Class Members to exercise reasonable care (FAC ¶ 150), and breached that duty by:

a. discharging FW PFAS into the Class Area (*id.* ¶ 151);

b. failing to remediate, contain, and eliminate FW PFAS contamination before it injured Class Members' property (*id.* ¶ 152);

c. failing to minimize the damage to Class Members and their property (*id.*);

d. continuing to contaminate the Class Area and failing to act reasonably in providing Class Members with clean water (*id.* ¶ 153); and

e. failing to take reasonable, adequate and sufficient steps or action to eliminate, correct, or remediate the contamination after it occurred (*id.*).

As a result of Defendants' breaches of their duty to exercise reasonable care, Class Members have expended and/or will be forced to expend significant resources. *Id.* ¶ 155. By causing toxic PFAS to flow onto and into Class Members' properties (including wells, fixtures, and appliances), Defendants proximately caused damages to Class Members' properties by making them less valuable; requiring Class Members to: spend money to repair their properties; buy

bottled water; and install and maintain filtration systems in order to prevent and avoid ongoing contamination of their drinking water with FW PFAS. *Id.* ¶ 156.

As explained further below, Plaintiffs' negligence claims are typical of Class Members' negligence claims because they "arise from the same alleged" conduct with respect to "the same chemicals in the same geographical area during same time period, as do the putative members' claims." *AFFF*, 2021 WL 248471, at *4 (finding typicality for negligence). The same evidence underlies and is common to Plaintiffs' claims. Such evidence shows Defendants allowed contaminants to be released into the Cape Fear River, the groundwater, and the air and soil around the Fayetteville Works plant. Ex. 8 (Albright Rpt.) ¶¶ 2, 6-12, 16, 18, 33-35, 96, 142-44, 185-86; Ex. 21 (Duncklee Rpt.) ¶¶ 2, 7-9, 130-31. Defendants discharged FW PFAS from the Fayetteville Works plant even after Defendants learned of potential dangers associated with them. Ex. 8 (Albright Rpt.) ¶¶ 3, 36, 93, 106-08; Ex. 2 (DeGrandchamp Rpt.) ¶¶ 80-122. Defendants' conduct caused FW PFAS to flow onto and contaminate Class Members' properties, fixtures, plumbing, and appliances. Ex. 8 (Albright Rpt.) ¶¶ 6-12; 16, 18, 117-19, 162, 183; Ex. 21 (Duncklee Rpt.) ¶¶ 9-11, 29-31, 76-77, 93, 97-99, 131; Ex. 22 (Gidlow Rpt.) ¶¶ 1, 34, 57. Defendants failed to contain, remediate, or eliminate FW PFAS contamination. Ex. 8 (Albright Rpt.) ¶¶ 21, 24, 91, 96, 98-99, 109-11, 186; Ex. 21 (Duncklee Rpt.) ¶¶ 2, 17-18, 101-29, 131; Ex. 2 (DeGrandchamp Rpt.) ¶¶ 140-46. And Defendants have failed to provide Class Members with usable water despite causing the contamination. Ex. 8 (Albright Rpt.) ¶ 186.

The individual damages suffered by Plaintiffs and Class Members are also uniform and common: the costs of remediation and prevention (or, in the alternative, diminution in value), and the costs of obtaining clean water. But even some variation in "[p]otential individual damages calculations do not destroy typicality because 'Rule 23 explicitly envisions class actions with' 'individualized damage determinations.'" *AFFF*, 2021 WL 248471, at *4 (quoting *Gunnells*, 348

F.3d at 428). Here, the same evidence demonstrates that Plaintiffs and Class Members were injured by Defendants' negligence, which caused FW PFAS contamination that must be cleaned from existing properties and prevented from re-contaminating properties in the future. Ex. 2 (DeGrandchamp Rpt.) ¶¶ 147-68; Ex. 25 (Savitz Rpt.) ¶¶ 4-5, 18; Ex. 23 (DeWitt Rpt.) ¶¶ 5, 24. The FW PFAS contamination also harms property values. Ex. 29 (Sunding Rpt.) ¶¶ 53, 46-52. This common evidence concerning the harms of Defendants' FW PFAS will advance the claims of both Plaintiffs and Class Members.

Because Plaintiffs' negligence claims are typical of Class Members' negligence claims such that advancing Plaintiffs' claims will necessarily advance the claims of Class Members, the typicality requirement of Rule 23(a)(3) is satisfied.

### b. Gross Negligence

"'Gross negligence' has the same basic elements as negligence, but requires either 'intentional wrongdoing or deliberate misconduct affecting the safety of others,' such as 'when the act is done purposely and with knowledge that such act is a breach of duty to others.'" *Boykin Anchor Co., Inc. v. AT&T Corp.*, 825 F. Supp. 2d 706, 712 n.6 (E.D.N.C. 2011) (quoting *Yancey v. Lea*, 354 N.C. 48, 53, 550 S.E.2d 155, 158 (2001)). "Two factors are especially relevant: purposeful conduct and disregard for the safety of others." *Nix v. Chemours Co. FC, LLC*, 456 F. Supp. 3d 748, 760 (E.D.N.C. 2019).

Evidence regarding Defendants' "purposeful conduct and disregard for the safety of others," *id.*, will be shown using the same proof. To provide only a few examples: Defendants discharged PFAS from Fayetteville Works despite knowing these chemicals pose a cognizable risk to water quality and safety and, even at a low level of exposure, pose a cognizable risk to property values and personal health. *See, e.g.*, Ex. 19 (Internal Messaging Tr.) at 703; Ex. 2 (DeGrandchamp Rpt.) ¶¶ 82-101, 112-14; Ex. 8 (Albright Rpt.) ¶¶ 2-4, 93, 105-07, 185-86; Ex. 21 (Duncklee Rpt.)

¶¶ 2-3, 7-19; Ex 23 (DeWitt Rpt.) ¶ 159. Class Members' gross negligence claims, just like their negligence claims, will be advanced by Plaintiffs' prosecution of their own gross negligence claims, satisfying the typicality requirement.

### c. Private Nuisance

A private nuisance is an "unreasonable interference with the use and enjoyment of" property. *Kent v. Humphries*, 303 N.C. 675, 677, 281 S.E.2d 43, 45 (1981) (citing *Barrier v. Troutman*, 231 N.C. 47, 55 S.E.2d 923 (1949)). The interference must amount to "a substantial non-trespassory invasion of another's interest in the private use and enjoyment of property." *Watts v. Pama Mfg. Co*., 256 N.C. 611, 617, 124 S.E.2d 809, 813 (1962) (citation omitted). And it "must affect the health, comfort or property of those who live near[by]. It must work some substantial annoyance, some material physical discomfort to the plaintiffs, or injury to their health or property." *Id*. at 813-14 (citations omitted). "[T]he discharge or release of harmful pollutants or substances may constitute a nuisance." *Johnson v. 3M*, 2021 WL 4745421, at *59 (N.D. Ga. Sept. 20, 2021) (citations omitted).

Plaintiffs' nuisance claims are typical of the nuisance claims of Class Members. Whether Defendants' interference with the use and enjoyment of Plaintiffs' and Class Members' property was unreasonable is an objective inquiry: "The question is not whether a reasonable person in plaintiffs' … position would regard the invasion as unreasonable, but whether reasonable persons generally, looking at the whole situation impartially and objectively, would consider ['defendants' conduct'] unreasonable." *Watts*, 256 N.C. at 618. Facts bearing on "whether or not defendant's conduct is unreasonable" are generalized and common, including "the surroundings and conditions under which defendant's conduct is maintained, the character of the neighborhood, the nature, utility and social value of defendant's operation, the nature, utility and social value of plaintiffs' use and enjoyment which have been invaded, the suitability of the locality for defendant's

operation, the suitability of the locality for the use plaintiffs make of their property, the extent, nature and frequency of the harm to plaintiffs' interest, [and] priority of occupation as between the parties." *Id.* Here, the evidence showing the objective unreasonableness of Defendants' conduct will be common as to Plaintiffs and the Class, including proof that Defendants unnecessarily released FW PFAS, Ex. 8 (Albright Rpt.) ¶¶ 2, 6-12, 16, 18, 33-35, 96, 142-44, 185-86; Ex. 21 (Duncklee Rpt.) ¶¶ 2, 7-9, 130-31, thereby causing harms to properties owned by Plaintiffs and the Class, *see* Ex. 29 (Sunding Rpt.) ¶¶ 53, 46-52; Ex. 28 (Gamble Rpt.) ¶ 38-39, 49; Ex. 19 (Internal Messaging Tr.) at 703, Ex. 2 (DeGrandchamp Rpt.) ¶¶ 82-101, 112-14; Ex. 8 (Albright Rpt.) ¶¶ 2-4, 93, 105-07, 185-86; Ex. 21 (Duncklee Rpt.) ¶¶ 2-3, 7-19.

Whether the interference is substantial and affects the health, comfort or property of Plaintiffs and Class Members is also subject to the same proof. Any non-zero level of FW PFAS exposure poses a cognizable risk to water quality and safety. Ex. 2 (DeGrandchamp Rpt.) ¶¶ 147-68; Ex. 25 (Savitz Rpt.) ¶¶ 4-5, 18; Ex. 23 (DeWitt Rpt.) ¶¶ 5, 24. And common evidence shows that all Class Members' properties have in fact been injured by FW PFAS contamination. Ex. 33 (Chemours Quarterly Progress Rpt. (2022)) at 3; Ex. 22 (Gidlow Rpt.) ¶¶ 1, 34, 57. The same evidence will advance the claims of Plaintiffs as well as the claims of Class Members. Plaintiffs' nuisance claims are therefore typical of the nuisance claims of Class Members.

### d. Trespass

"'[T]respass is a wrongful invasion of the possession of another.'" *Singleton v. Haywood Elec. Membership Corp.*, 357 N.C. 623, 627, 588 S.E.2d 871, 874 (2003) (quoting *State ex rel. Bruton v. Flying "W" Enterprises, Inc.*, 273 N.C. 399, 415, 160 S.E.2d 482, 493 (1968)). A "'claim of trespass requires: (1) possession of the property by plaintiff when the alleged trespass was committed; (2) an unauthorized entry by defendant; and (3) damage to plaintiff.'" *Id.* (quoting *Fordham v. Eason*, 351 N.C. 151, 153, 521 S.E.2d 701, 703 (1999)).

As with the negligence, gross negligence, and nuisance claims, the same evidence used to prove Plaintiffs' trespass claims will also advance the trespass claims of Class Members. All Class Members must either own or rent a contaminated property. Defendants cannot dispute that aggregate public records—for example, utility records for water customers or other public records—show properties in Class Members' possession. *See, e.g.*, Ex. 34 (Irick Decl.); Ex. 35 (Nichols Decl.); *U.S. v. Dargan*, 738 F.3d 643, 648 (4th Cir. 2013) ("Indicia of occupancy, residency, of the premises ... includ[e] … utility and telephone bills"). Nor can Defendants reasonably claim that their contamination of Plaintiffs' properties with FW PFAS was authorized, given that the public first learned of the presence of only *one* of the FW PFAS—GenX—in drinking water in June 2017, *see* Ex. 17 (2017 *Wilmington Star-News* article), and it wasn't "[u]ntil the past couple of years" that labs were even able to detect or "measure" other FW PFAS. Ex. 30 (DEQ PPT) at 5. No Class Member even **could have** authorized the presence of unknown PFAS on their property. Finally, as noted above with respect to negligence, the categories of damages to Plaintiffs and Class Members' properties are common to each subclass, including the costs of remediating past FW PFAS trespasses and preventing future FW PFAS trespasses through water filtration and water heater replacement. *See* Ex. 28 (Gamble Rpt.) ¶¶ 37-51. For the Purchaser Subclass, these harms are also common with respect to the costs of bottled water. *Id*. ¶ 49.

In sum, typicality is satisfied. *AFFF*, 2021 WL 248471, at *4 (finding typicality for trespass where "the proposed class representatives' claims arise from the same alleged exposure to the same chemicals in the same geographical area during same time period, as do the putative members' claims"); *Bell*, 2019 WL 1874694, at *4 (finding plaintiffs' nuisance and trespass claims were typical of the class members' claims where "plaintiffs intend to introduce facts showing that wood dust escapes from the paper mill and wood chipper facility, which invades or interferes with their enjoyment of their homes and properties").

### 4. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The purpose of this requirement is to "'uncover conflicts of interest between named parties and the class they seek to represent.'" *Sharp Farms v. Speaks*, 917 F.3d 276, 295 (4th Cir. 2019) (quoting *Amchem*, 521 U.S. at 625). The "'class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members.'" *Id.* (cleaned up). Only "fundamental" conflicts defeat adequacy. *Id.* "A conflict is not fundamental when … all class members 'share common objectives and the same factual and legal positions' and 'have the same interest in establishing the liability of defendants.'" *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) (cleaned up).

As demonstrated by the proposed Class Representatives' satisfaction of Rule 23(a)'s commonality and typicality requirements, the interests of the proposed Class Representatives—Plaintiffs Victoria Carey, Marie Burris, and Brent Nix—and Class Members are coextensive. There are no conflicts of interest between them as they all have a common objective of establishing the liability of Defendants for contaminating their properties.

Plaintiff Victoria Carey lives in Leland, North Carolina where her home is supplied with tap water sourced from the Cape Fear River. *See* Ex. 36 (Carey Dep. Tr.) at 70:11-21, 72:1-73:10; Ex. 37 (Carey ROG Responses) at 2, 5-6. Since 2002, Plaintiff Carey and her family have regularly used the water for drinking, cooking, cleaning, bathing, and clothes washing. Ex. 37 at 6-7; Ex. 36 (Carey Dep. Tr.) at 39:2-4, 71:19-72:221. In July 2017, Plaintiff Carey began purchasing bottled water as an alternate source of water to avoid drinking water contaminated with FW PFAS. *See* Ex. 36 (Carey Dep. Tr.) at 69:24-70:10, 73:6-10; Ex. 37 at 3. Testing has revealed Ms. Carey's

home and hot water heater are contaminated with FW PFAS.[3] Ex. 48 (Gel Labs Rpt.) at 2-21.

Plaintiff Marie Burris owns and formerly resided at a home in Fayetteville, North Carolina. *See* Ex. 38 (Burris ROG Responses) at 4-6; Ex. 39 (Burris Dep. Tr.) at 27:22-28:2. Her well water tested 322 ng/L in 2017, *see* Ex. 39 (Burris Dep. Tr.) at 65:10-21, resulting in the DEQ recommending that the water not be used for drinking, *see* Ex. 38 at 3-4, 9-10; Ex. 39 (Burris Dep. Tr.) at 82:18-83:8. As a result, the tenant currently residing at Plaintiff Burris's property must rely on bottled water for drinking. *See* Ex. 38 at 3-4, 9-10; Ex. 39 (Burris Dep. Tr.) at 90:3-12.

Plaintiff Brent Nix lived in Wilmington, North Carolina and owned his home since 2016. *See* Ex. 40 (Nix 1st ROG Responses) at 4, 6; Ex. 42 (Nix Dep. Tr.) at 12:14-13:13. While living in Wilmington, he received residential water from the CFPUA. *See* Ex. 40 at 7; Ex. 42 (Nix Dep. Tr.) at 21:8-15. Plaintiff Nix used bottled water from approximately June 2017 through August 2018, at which time he purchased and installed a water filtration system. *See* Ex. 40 at 3; Ex. 42 (Nix Dep. Tr.) at 143:21-144:25; Ex. 41 (Nix 2nd ROG Responses) at 5-6.[4]

Additionally, during this litigation, "Plaintiffs have demonstrated a willingness to prosecute the claims through participation in the discovery process," which supports a finding that they will fairly and adequately protect the interests of the Class. *Foster v. CEVA Freight, LLC*, 272 F.R.D. 171, 175 (W.D.N.C. 2011).

And, Plaintiffs are represented by counsel with extensive experience in class litigation, including complex environmental litigation, who will adequately represent the interests of both Plaintiffs and Class Members. Cohen Milstein and Susman Godfrey, as Interim Co-Lead Counsel,

---

[3] As is relevant for the issue class only, Plaintiff Carey has also been diagnosed with thyroid nodules, a goiter, hyperthyroidism, and an idiopathic immune condition. Ex. 36 (Carey Dep. Tr.) at 82:15-38:18, 102:14-20.

[4] As is relevant for the issue class only, Plaintiff Nix has been diagnosed with ulcerative colitis and diverticulitis. *See* Ex. 42 (Nix Dep. Tr.) at 76:4-77:5.

have been litigating claims on behalf of the many victims of the Flint, Michigan water crisis for over five years, recently achieving a landmark partial settlement in excess of $626 million, which was granted final approval by the U.S. District Court for the Eastern District of Michigan in November 2021. The firm resumes of Plaintiffs' counsel set forth the extensive class litigation experience of each firm, including their numerous appointments as class counsel in cases across the county. *See* Ex. 49 (Cohen Milstein Resume); Ex. 50 (Susman Godfrey Resume).

In addition to satisfying the adequacy prong of Rule 23(a)(4), Cohen Milstein and Susman Godfrey also satisfy the considerations of Rule 23(g) and should be appointed Co-Lead Class Counsel. Cohen Milstein and Susman Godfrey attorneys have been appointed class counsel in hundreds of class actions. Courts in this Circuit and around the country have recognized the expertise and ability of Cohen Milstein and Susman Godfrey attorneys to effectively litigate complex class actions. *See* Exs. 49 and 50 (firm resumes). In appointing class counsel pursuant to Rule 23(g), a court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class[.]" Rule 23(g)(1)(A). Consideration of all these factors supports the appointment of Cohen Milstein and Susman Godfrey as Co-Lead Class Counsel. In light of the firms' expertise and the absence of any conflict between the firms and the Class, the Court should honor Plaintiffs' choice of counsel and appoint Cohen Milstein and Susman Godfrey as Co-Lead Class Counsel.

The adequacy requirement of Rule 23(a)(4) is satisfied by the proposed Class Representatives and their proposed Co-Lead Class Counsel, and the proposed Co-Lead Class Counsel satisfy the requirements of Rule 23(g).

### C. The Rule 23(b)(3) Factors Are Satisfied

#### 1. Common Issues Predominate Over Individual Ones

Rule 23(b)(3) requires that the class share common issues of law or fact that predominate over the questions affecting individual class members. "In a mass tort case such as this, where the same evidence would resolve the question of liability for all class members, common issues of law and fact have been held to predominate." *Beaulieu v. EQ Indus. Servs., Inc.*, 2009 WL 2208131, at *20 (E.D.N.C. July 22, 2009). "[T]o satisfy the predominance requirement the court generally needs to determine only whether the common questions predominate over individual questions as to liability." *Id* at 21. (citing *Gunnells*, 348 F.3d at 428). And although "[t]he need for individualized determination of the amount of compensatory damages suffered by the putative class members will not alone defeat certification," *id..* in this case all damages may be established on an aggregate basis for the entire Class through common proof.

As noted above, Plaintiffs' causes of action are: negligence, gross negligence, private nuisance, and trespass. Negligence requires a showing of a duty not to contaminate, breach, causation and damages. Gross negligence requires those same elements, along with intentional wrongdoing or deliberate misconduct. Nuisance requires a showing of an objectively unreasonable and substantial interference with use and enjoyment of property. And trespass rests on an invasion of plaintiff's possession of land. An overarching common element of each of these legal claims is that DuPont and its successor, Chemours, contaminated Plaintiffs' property with FW PFAS. *Watts*, 256 N.C. at 616 ("The same act or omission may constitute negligence and also may give rise to a private nuisance *per accidens*."). And as shown below, all other elements may also be established

by common proof.[5]

### a. Negligence and Gross Negligence

All of the elements of negligence and gross negligence "can be resolved for each class member in a single hearing" and do not "turn[ ] on a consideration of the individual circumstances of each class member." *Krakauer v. Dish Network LLC*, 311 F.R.D. 384, 399 (M.D.N.C. 2015), *aff'd*, 925 F.3d 643 (4th Cir. 2019). The duty, breach, causation and (for gross negligence) intent elements of putative Class Members' claims all concern *Defendants'* obligations and actions (which did not vary from one Class Member to the next): whether Defendants owed a duty (to not contaminate), whether the duty was breached (by contamination), whether Defendants caused the contamination, and (for gross negligence) whether the negligence was intentional or reckless. *See* p. 18-20, *supra*. Defendants' documents, testimony, and Plaintiffs' experts all confirm that each of these elements is satisfied—and will be satisfied—for every member of the Class in the same way. *See, e.g.*, Ex. 8 (Albright Rpt.) ¶¶ 2, 6-12, 16, 18, 33-35, 96, 142-44, 185-86; Ex. 21 (Duncklee Rpt.) ¶¶ 2, 7-9, 130-31; Ex. 2 (DeGrandchamp Rpt.) ¶¶ 80-122, 140-46; Ex. 22 (Gidlow Rpt.) ¶¶ 1, 34, 57. In addition, the harm element will also be established by common proof. Every Class Member who is a utility customer suffered at least three ***independent***, common harms, which will be established through expert testimony: (**1**) every property's water supply has been contaminated with FW PFAS, Ex. 22 (Gidlow Rpt.) ¶¶ 1, 34, 57; (**2**) every property's water heater and plumbing has been contaminated with FW PFAS, *see* Ex. 26 (Gray Rpt.) ¶¶ 3, 11, 15, Ex. 27

---

[5] *Accord Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 487 (S.D. Ohio 2004) (finding Rule 23(b)(3) satisfied in environmental contamination case alleging negligence, private nuisance, and trespass); *Ludwig v. Pilkington N. Am., Inc.*, 2003 WL 22478842, at *5 (N.D. Ill. Nov. 4, 2003) (same); *LeClercq v. Lockformer Co.*, 2001 WL 199840, at *7 (N.D. Ill. Feb. 28, 2001) (same); *Muniz v. Rexnord Corp.*, 2005 WL 1243428, at *4 (N.D. Ill. Feb. 10, 2005) (same); *Mejdreck v. Lockformer Co.*, 2002 WL 1838141, at *7 (N.D. Ill. Aug. 12, 2002), *aff'd sub nom. Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910 (7th Cir. 2003) (same).

(Griffith Rpt.) ¶¶ 25-26, 44, 53; Ex. 44 (Gidlow Rebuttal Rpt.) ¶ 5; **(3)** every home continues to suffer the ongoing threat of harm, as FW PFAS will continue to enter and contaminate each home, water supply, water heater, and plumbing system for years to come, *see* Ex. 21 (Duncklee Rpt.) ¶¶ 2, 13, 17, 19, 27, 43, 54, 64, 75, 85, 101-102, 110, 120, 127; Ex. 22 (Gidlow Rpt.) ¶¶ 10, 34, 57 & Fig. 5 and Fig. 12; Ex. 27 (Griffith Rpt.) ¶¶ 25-26, 44, 53.

Common evidence also shows that every Class Member who is a well owner also suffered at least four ***independent***, common harms: **(1)** Chemours' own testing proves that every Class Member's home's wells are contaminated with FW PFAS, *see* Ex. 33 (Chemours Quarterly Progress Rpt. (2022)) at 3; **(2)** water heaters and plumbing connected to those wells are contaminated, *see* Ex. 26 (Gray Rpt.) ¶¶ 3, 11, 15, Ex. 27 (Griffith Rpt.) ¶¶ 25-26, 44, 53; Ex. 44 (Gidlow Rebuttal Rpt.) ¶ 5; **(3)** the well contamination will continue to contaminate each home's water supply, water heater, and plumbing system with FW PFAS, *see* Ex. 21 (Duncklee Rpt.) ¶¶ 2, 13, 17, 19, 27, 43, 54, 64, 75, 85, 101-102, 110, 120, 127; Ex. 27 (Griffith Rpt.) ¶¶ 25-26, 44, 53; and **(4)** FW PFAS depositions in soil and groundwater will continue to serve as a reservoir that will spew additional contamination into the wells for years to come, Ex. 21 (Duncklee Rpt.) ¶¶ 2, 13, 17, 19, 27, 43, 54, 64, 75, 85, 101-102, 110, 120, 127.

The "same evidence will suffice for each member to make a *prima facie* showing" as to the harm element without needing "evidence that varies from member to member." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016); *accord AFFF*, 2021 WL 248471, at *4 (finding predominance satisfied for class bringing negligence, trespass, and nuisance claims for PFAS contamination given that "all putative members contend that PFAS entered groundwater from … the [same facility] and infiltrated their drinking water wells").

### b. Private Nuisance

Common proof will also establish Plaintiffs' nuisance claim, which requires "show[ing] a

substantial and unreasonable interference with the use and enjoyment of their property." *Nix*, 456 F. Supp. 3d at 762.

As explained with respect to ascertainability, the "property" element is susceptible to common proof because the Class only includes properties that can be identified by one or more utility records, tax records, deeds, or other proof of residency. As explained above with respect to the "harm" element of negligence, *see* p. 19-20, the "interference" is identical for each plaintiff, and the proof that will be used to establish it will be common for all members of the Class.

And as this Court recognized in denying Defendants' motion to dismiss, the "substantial and unreasonable interference" element "is judged by an ***objective standard*** and balances the relative benefit to defendants and harm to plaintiffs." *Id.* Thus, "[w]hether a defendant's interference was unreasonable is a question not only of fact, but also of values to be decided by the jury in light of all the circumstances of the case." *Freeman v. Blue Ridge Paper Prod., Inc.*, 229 S.W.3d 694, 705 (Tenn. Ct. App. 2007) (applying North Carolina law in affirming class action verdict of nuisance and citing *Pendergrast v. Aiken*, 293 N.C. 201, 236 S.E.2d 787, 797 (1977)).

In sum, for the "common law private nuisance [claims] pursuant to North Carolina law," "common issues of law and fact predominate over individual issue[s]" and "individualized hearings" are not required "to prove the elements of nuisance." *Freeman v. Blue Ridge Paper Prod., Inc.*, 2011 WL 13098808, at *4, *7 (E.D. Tenn. Sept. 30, 2011) (certifying nuisance class and applying North Carolina law).

### c. Trespass

A claim of trespass to real property requires "(1) possession of the property by plaintiff when the alleged trespass was committed; (2) an unauthorized entry by defendant; and (3) damage to plaintiff." *Nix*, 456 F. Supp. 3d at 763. Each of these elements may be established by common proof for all members of the class.

For possession, "[t]here is a reliable and administratively feasible mechanism for determining" it, as "[t]ax records, property records, deeds, and mortgages are just a few examples of the kinds of documentation that class members could produce, if [even] deemed necessary," for this purpose. *Gonzalez v. Corning*, 317 F.R.D. 443, 506 (W.D. Pa. 2016); *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 609 (E.D. La. 2006); *Adair v. EQT Prod. Co.*, 320 F.R.D. 379, 403 (W.D. Va. 2017) (finding that all "owners possess the same rights of ownership under the common law"); *Rosas v. Sarbanand Farms, LLC*, 329 F.R.D. 671, 693 (W.D. Wash. 2018) (finding predominance for class whose claims required proof of "a party in actual possession of real property"). And because the trespass remains ongoing, possession is coterminous with the occurrence of the trespass. *See* Ex. 21 (Duncklee Rpt.) ¶¶ 2, 13, 17, 19, 27, 43, 54, 64, 75, 85, 101-102, 110, 120, 127; Ex. 22 (Gidlow Rpt.) ¶¶ 10, 34, 57 & Fig. 5 and Fig. 12.

For authorization, no class member *could have* authorized a trespass because even Defendants did not know the identity of the FW PFAS they were discharging into the water, nor were there methods to detect and identify them. *See* p. 23-24, *supra*. It was not until 2018—after the complaint in this case was filed—that Defendants first even identified what are now referred to as the full slate of "Table 3+" FW PFAS. Ex. 51 (Chemours PFAS Characterization Sampling Plan) at 2; *see Reichert v. Keefe Commissary Network, LLC*, 331 F.R.D. 541, 555 (W.D. Wash. 2019) (finding predominance for takings claim that required showing of involuntariness because plaintiffs could show that their lack of information gave them "no choice but to give up a property right"). Regardless, consent is an "affirmative defense" that the "defendant may assert that the entry was lawful." *Singleton*, 357 N.C. at 628. Here, Defendants forfeited any such defense by failing to plead it in their Answer. *See generally* Dkt. No. 75 (Defendants' Answer).

Finally, as explained with respect to the "harm" element of negligence, the "damages" proof will be identical for each plaintiff, and the proof that will be used to establish it will be

common for all members of the Class. *See infra*, p. 33-38. Furthermore, because "nominal damages" are available in trespass, *Nix*, 456 F. Supp. 3d at 763-64, only common issues predominate as to such damages. *Goldstein v. ExxonMobil Corp.*, 2019 WL 7165919, at *8 (C.D. Cal. Oct. 15, 2019) (finding Rule 23(b)(3) satisfied as to trespass).

In sum, the elements of trespass may all be met by common proof. *See Andrews v. Plains All Am. Pipeline, L.P.*, 2018 WL 2717833, at *10 (C.D. Cal. Apr. 17, 2018) (certifying class); *Olden v. LaFarge Corp.*, 203 F.R.D. 254, 271 (E.D. Mich. 2001), *aff'd*, 383 F.3d 495 (6th Cir. 2004) (certifying class of "all owners of single family residences … whose … property was damaged by toxic pollutants and contaminants which originated from the LaFarge cement manufacturing"); *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 487 (S.D. Ohio 2004) (certifying trespass class); *Turner*, 234 F.R.D. at 609 (same); *McKenzie v. City of Chicago*, 175 F.R.D. 280, 289 (N.D. Ill. 1997) (same).

### d. Damages

The "[Fourth] [C]ircuit has embraced the view that 'the mass tort action for damages may ... be appropriate for class action.'" *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir. 1993) (citation omitted). That is particularly so where, as here, "the damage calculations … [are not] particularly complex." *Gunnells*, 348 F.3d at 429 Here, for "Plaintiffs' claims for property damages, including … negligence, … nuisance, [and] trespass," Plaintiffs seek "damages for diminution of property value, costs of remediation [and prevention], costs of obtaining alternative water supplies," and nominal damages. *See Curl v. Am. Multimedia, Inc.*, 187 N.C. App. 649, 651, 654 S.E.2d 76, 78 (2007). Each category may be proven through a simple set of calculations. *See Hermens v. Textiles Coated, Inc.*, No. 16-cv-524, Order Granting Class Certification (N.H. Sup. Ct. Jul. 30, 2019) (finding predominance satisfied for residential property

damages in trespass, nuisance, and negligence arising out of PFAS contamination by manufacturing facility) (attached as Ex. 43).[6]

[i.] Primary Property Damage Model: Remediation, Repair, and Prevention: Plaintiffs propose two methods for measuring classwide damages relating to harm to property. The first is Plaintiffs' primary model, and can be used for the Owner-Occupier/Renter Damages Subclass. Plaintiffs' first method is to calculate the reasonable costs of remediation, repair, and prevention to remove existing FW PFAS and prevent future FW PFAS from entering homes. These damages comprise the costs of: (1) water filtration, and (2) water heater replacement. The first is restorative *and* preventive by clearing existing PFAS while also preventing ongoing discharges from reaching the home's finished water.[7] The second is restorative.

Both remedies may be independently awarded based on Plaintiffs' claims. *See Whiteside Ests., Inc. v. Highlands Cove, LLC*, 169 N.C. App. 209, 212, 609 S.E.2d 804, 806 (2005) (affirming jury award of damages for cost of repairs required to prevent ongoing and future silt deposition into creek, as well as the costs of repairing existing silt depositions); *Phillips v. Chesson*, 231 N.C. 566, 571, 58 S.E.2d 343, 348 (1950) (holding that "reasonable costs of replacement or repair, or restoring the property to its original condition" are appropriate measures of damages).

---

[6] Plaintiffs do not presently seek certification of classwide punitive damages. Although punitive damages may be certified for classwide resolution where, as here, the "[p]unitive damages award will be based largely on the misconduct of the Defendant," *Iorio v. Allianz Life Ins. Co. of N. Am.*, 2009 WL 3415703, at *6 (S.D. Cal. Oct. 21, 2009), North Carolina district courts have generally reserved the question of certification for punitive damages to a second proceeding following trial on liability, because a predicate to punitive damages is "proving liability and actionable harm." *Scott v. Fam. Dollar Stores, Inc.*, 2010 WL 143725, at *6 (W.D.N.C. Jan. 7, 2010) ("punitive damages claim would instead need to be certified, if at all, after liability … has been determined").
[7] Defendants are not ignorant of such remedies: they have already installed at least 3,214 reverse osmosis filters in order to comply with their Consent Decree obligations with the State of North Carolina. *See* Ex. 33 (Chemours Quarterly Progress Report (2022)) at 3.

And Plaintiffs' experts provide a simple way to calculate these damages for all Class Members on an aggregate basis. For filters, multiply: [1] the number of metered connections, by [2] the number of filters per metered unit, by [3] a standardized price of the cost to buy, install, and maintain each filter. Ex. 28 (Gamble Rpt.) ¶ 46 & Ex. 4; *see also* Ex. 45 (Michaels Rpt.) ¶¶ 3, 28-31; 40; Ex. 27 (Griffith Rpt.) ¶¶ 54. For water-heater replacement, multiply: [1] the number of metered connections, by [2] the standardized cost to replace a single water heater per connection. Ex. 28 (Gamble Rpt.) ¶ 47 & Ex. 5; *see* Ex. 45 (Michaels Rpt.) ¶¶ 3, Ex. 27 (Griffith Rpt.) ¶¶ 25-26, 44, 53.

These damages require a single set of data which does not differ across Class Members, demonstrating the predominance of common issues for this damages category. *See, e.g.*, *Childress v. JPMorgan Chase & Co.*, 2019 WL 2865848, at *8 (E.D.N.C. July 2, 2019) (certifying "remediation" damages class even where individual damages differ; "that damages calculations would be individualized does not result in a predominance of individual claims over those of the class"); *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1421627, at *20 (E.D. La. Apr. 21, 2017) (finding predominance satisfied for remediation-and-repair damages where the cost of remediation could be determined by a simple calculation based on the "under-square footage of the contaminated property"); *Good v. W. Virginia-Am. Water Co.*, 2017 WL 2884535, at *13 (S.D. W. Va. July 6, 2017) (finding "predominance and superiority are satisfied" for class of "renters and homeowners" for "claims for damages arising from physical damage to their property caused by the presence of contaminated water within their pipes"; class was "224,000 class members in some 105,000 households and over 7,000 businesses and governmental" properties).

In the alternative, remediation, restoration, and prevention damages for the costs of water filters and replacement of water heaters may also be certified under Rule 23(b)(2). *See infra*, p.

40-41. As noted below, in *Rowe v. E.I. du Pont de Nemours and Co.*, the parties agreed to provide class members the option of installing a "Culligan RC–EZ–4 Undersink Water Filtration System" or receiving its "cash equivalent" including installation costs. 2011 WL 3837106, at *2, *16 (D.N.J. Aug. 26, 2011).

[ii.] <u>Secondary Property Damages Model: Diminution in Value</u>: For the Long-Term Property Owner Damages Subclass, Plaintiffs have offered a second means of calculating damages that subclass members may choose as an *alternative* to remediation, repair, and prevention damages. This second method is a straightforward calculation of diminution-in-value damages for all properties within the Class Area on a classwide basis. In North Carolina, diminution-in-value damages provide an alternative form of damages as an alternative to remediation, repair, and prevention damages. *BSK Enters., Inc. v. Beroth Oil Co.*, 246 N.C. App. 1, 16, 783 S.E.2d 236, 247 (N.C. Ct. App. 2016).

Plaintiffs' expert David Sunding explains that a "repeat sales model[] can be used to determine class-wide property diminution." Ex. 29 (Sunding Rpt.) at 27. Specifically, the "approach compares how the sale price of a parcel changes after contamination is revealed relative to prevailing trends in market prices." *Id.* ¶ 54. The "repeat sales model is implemented using a standard linear model (or 'regression') approach," which "predicts the natural logarithm of the property sale price as a function of whether the sale is of a property revealed to be contaminated." *Id*. ¶ 58. It "controls for property-specific characteristics by including variables that identify the particular property"—also called "fixed effects"—which also include "the month-year of the sale to capture trends in real estate prices." *Id.* Dr. Sunding's approach "is a widely used approach in the economics profession and fits within the broader class of difference-in-difference models." *Id.* ¶ 54.

Reliance on experts to present a "diminution in value damages model" for calculating classwide damages satisfies Rule 23(b)(3)'s predominance requirement. *See* Ex. 43 (*Hermens* Class Certification Order) at 15 ("all plaintiffs allege the same claims resulting from the same source and seek the same type of damages" arising from PFAS contamination); *Grace v. Apple, Inc.*, 328 F.R.D. 320, 343 (N.D. Cal. 2018) (certifying damages class and finding predominance); *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 341 (C.D. Cal. 1998) (certifying damages class and finding predominance requirement met where expert testified that diminution in value of contaminated properties could be established using a "hedonic price model" following a "multiple regression analysis" to "assess the loss of property values on an area-wide basis"); *Wixon v. Wyndham Resort Dev. Corp.*, 2009 WL 3353445, at *7 (N.D. Cal. Oct. 19, 2009) (same); *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1139 (D. Colo. 2006) (finding expert's "mean discount[]" damages model adequate under Rule 702 and *Daubert* to "estimate class-wide diminution in value" for property damage caused by contamination).

[iii.] <u>Economic Loss for Costs of Obtaining Alternative Water Supplies (Bottled Water, Water Heaters, and Filters)</u>: For the Purchaser Damages Subclass, Plaintiffs also seek damages for "economic loss resulting from … the cost of bottled water" purchased to avoid using tap water contaminated with FW PFAS. *See England v. Fifth Louisiana Levee Dist.*, 167 So. 3d 1105, 1108-09 (La. App. 2 Cir. 2015). Plaintiffs seek an allowance for bottled water from the date of disclosure of the contamination in June 2017 through trial. Likewise, Plaintiffs who have already purchased reverse osmosis filters and new water heaters to rid their water supplies and homes of PFAS seek reimbursement for those expenses (to the extent they have not already been reimbursed by Chemours pursuant to any legal settlement).

Plaintiffs' expert, Mr. Gamble, has provided a methodology to "quantif[y] the cost of providing bottled water from the date of contamination disclosure (June 2017) through June 2021,"

Ex. 28 (Gamble Rpt.) ¶ 49, which can be extended through trial based on a *pro rata* monthly calculus. Mr. Gamble likewise explains that the one-time costs of reverse osmosis filters and water heaters fall within a narrow range and are easily quantifiable. *Id.* ¶¶ 46-50 & Exs. 5-7.

Such damages may be awarded classwide. In *England*, for example, the Second Circuit Court of Appeal of Louisiana affirmed a per person damages award of $600 as a "representative damage award" for the past costs of "laundry facilities, daily trips to the homes of friends for personal hygiene care and bathing[,] daily trips to purchase bottled water," and the "direct expenses for the cost of additional water supplies." *England*, 167 So. 3d at 1108; *Stepp v. Monsanto Rsch. Corp.*, 2012 WL 604328, at *8 (S.D. Ohio Feb. 24, 2012) (finding predominance satisfied where plaintiffs claimed cost of bottled water); *accord Tyson Foods*, 136 S. Ct. at 1046 ("representative evidence" is a "permissible means" of establishing classwide proof of hours worked (citing Manual of Complex Litigation § 11.493, p. 102 (4th ed. 2004) (in many cases, a representative sample is "the only practicable means to collect and present relevant data")); *Sullivan v. Saint-Gobain Performance Plastics Corp.*, 2019 WL 12323322, at *21 (D. Vt. July 15, 2019) (allowing expert to assess damages with "average costs rather than determining these costs one property at a time").

[iv.] <u>Nominal Damages</u>: Nominal damages—which are the same for every member of the class—"can be determined on a classwide basis." *Opperman v. Path, Inc.*, 2016 WL 3844326, at *16 (N.D. Cal. July 15, 2016); *see Goldstein*, 2019 WL 7165919, at *8.

### 2. Classwide Resolution Is Superior to Alternative Methods for Fairly and Efficiently Adjudicating the Controversy

A proposed class must also meet Rule 23(b)(3)'s superiority requirement that a class proceeding be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Courts evaluating superiority must consider:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. *Id.*

"The first factor (*i.e.*, the burden and expense of individual litigation, and the legal and practical difficulty of proving individual claims) makes it unlikely that individual class members could obtain the relief sought if they were forced to proceed on their own." *Pontones v. San Jose Rest. Inc.*, 2019 WL 5680347, at *9 (E.D.N.C. Oct. 31, 2019) (Dever, J.). Here, no individual suits have been filed on behalf of any utility customers, and the damages sums per Class Member are sufficiently small such that full relief will be precluded if individual litigation is required for each Class Member. For example, the per-unit cost for the recommended K5 Kinetico Reverse Osmosis system, including installation, annual filter replacement costs and service, amounts to $3,980. Ex. 28 (Gamble Rpt.) ¶ 46 & Ex. 4. The per-property water-heater replacement cost including installation is approximately $1,818.15. *Id.* ¶ 47 & Ex. 5 (as corrected by Ex. 47 (Gamble Dep. Tr.) at 11:11-16). And the per-annum cost for bottled water (from 2017 to present) is $405. *Id.* ¶ 49 & Ex. 6. "[F]or many [if not all] of these claimants, collective action may offer the only realistic opportunity to recover." *EQT Prod.*, 764 F.3d at 371.

For the second factor, as noted above, no individual cases are pending for any Class Member who receives their water from a utility, favoring a finding of superiority at least as to them. *Id.* Although other later-filed copycat class actions have been filed,[8] where, as here, "it [is] so clear that the first-filed suit is the superior vehicle … it would be an abuse of discretion for the court in the second-filed suit to press forward." *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832,

---

[8] *See, e.g.*, *Priselac v. Chemours Co.*, No. 7:20-CV-190-D, Dkt. No. 1 (E.D.N.C. Sept. 15, 2020); *Kinlaw v. Chemours Co. FC, LLC*, No. 7:20-CV-188-D, Dkt. No. 1 (E.D.N.C. Sept. 15, 2020).

838 (7th Cir. 1999); *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 909 (N.D. Iowa 2008)

("The alternatives to class action litigation in this case are individual lawsuits by class members.

There is no doubt this would be more burdensome on the class members, and it would likely be

[a] less efficient use of judicial resources."). As for well owners who have already been identified

and are represented by their own counsel, *see Dew v. E.I. du Pont de Nemours and Co.*, No. 5:17-

cv-0073-D (E.D.N.C.), they may utilize other mechanisms to pursue their claims which does not

detract from the efficiency of classwide resolution for all other well owners. Indeed, this is

precisely what the court held in denying defendants' motion to decertify in the Synthetic Stucco

class litigation, permitting the class action to proceed notwithstanding that "owners of over 600

homes have expressed willingness and desire to pursue their own claims against the defendant

manufacturers." Ex. 46 (Order Denying Motion to Decertify, *Ruff v. Parex, Inc.*, No. 96-CVS-

0059 (New Hanover Cty. Sup. Ct. June 17, 1999) ("Synthetic Stucco" Class Certification Order)

at ¶ 46; *see also id.* at ¶ 20 ("the individual lawsuits are likely to exist in any event. …. [t]he Court

views the granting of the opt-out motions as a benefit rather than a detriment to the defendants").

"As for the third factor, this court presents a desirable forum for litigating these claims.

The claims arose in the Eastern District of North Carolina and many of the relevant records are in

the Eastern District of North Carolina." *Pontones*, 2019 WL 5680347, at *9.

Finally, there are no particular "difficult[ies] in managing this class action" as distinct from

any other class action. *Id.*

### D.  The Rule 23(b)(2) Factors Are Satisfied for Plaintiffs' Epidemiological Study

Rule 23(b)(2) permits class certification when "the party opposing the class has acted or

refused to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P.

23(b)(2). A Rule 23(b)(2) class means that the alleged wrongful conduct "is such that it can be

enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360. "[T]he (b)(2) class is, by its very nature, assumed to be a homogenous and cohesive group with few conflicting interests among its members." *Berry v. Schulman*, 807 F.3d 600, 608-09 (4th Cir. 2015).

Plaintiffs have "sufficiently shown that the defendants acted in a manner that affects the class members generally such that injunctive relief would be appropriate for all." *Hardwick v. 3M Co.*, 2022 WL 668339, at \*24 (S.D. Ohio Mar. 7, 2022). In *Hardwick*, the court certified a Rule 23(b)(2) class for the injunctive remedy of an epidemiological science panel to ascertain the harms associated with PFAS contamination in Ohio. The remedy sought there—a "panel of scientists to study the harmful effects [of] PFAS," 2022 WL 668339, at \*4—is indistinguishable from the epidemiological study proposed here. Dr. David Savitz—an epidemiologist and one of three panelists to lead the DuPont C8 Science Panel[9]—opines that such a remedy is both administrable and necessary to "assess[] and quantify[] the causal relationship between PFAS exposure and health outcomes" in a community "with a distinct source of elevated PFAS" and a "unique mix of PFAS." Ex. 25 (Savitz Rpt.) ¶¶ 16, 19, 20. Thus, regardless of whether damages classes are certified under Rule 23(b)(3), a Rule 23(b)(2) class should be certified for purposes of the injunctive and declaratory relief sought in the form of an epidemiological study as proposed by Plaintiffs here. Such a study is particularly important because, as explained above, all Plaintiffs have PFAS on their property and likely in their blood.

---

[9] The C8 Health Project was a toxicological and epidemiological "study of nearly 70,000 people" to determine the existence of a "probable link" between exposure to PFAS (specifically PFOA) and six health outcomes—hypercholesterolemia (elevated cholesterol), preeclampsia and pregnancy-induced hypertension, thyroid disease, ulcerative colitis, testicular cancer, and kidney cancer. *See* Ex. 25 (Savitz Rpt.) ¶¶ 13-14.

In addition—and as an alternative—the remediation, restoration, and prevention damages remedy described above for the costs of water filters and replacement of water heaters, *see supra* p. 33-35, may be certified in the alternative as a Rule 23(b)(2) class. In *Rowe*, a case concerning claims for negligence, nuisance, and trespass arising out of DuPont's contamination of groundwater (well owners) and surface water (utility customers) with PFAS, the parties agreed to provide class members the option of installing a "Culligan RC–EZ–4 Undersink Water Filtration System" or receiving its "cash equivalent" including installation costs. 2011 WL 3837106, at *2, *15 (D.N.J. Aug. 26, 2011). The court found these remedies satisfied Rule 23(b)(2), because "the payment option offered here aims at accommodating class members' personal preferences with regard to how they obtain their drinking water." *Id.*

### E. Alternatively, Particular Issues Are Certifiable Under Rule 23(c)(4)

Federal Rule of Civil Procedure 23(c)(4) provides that, "[w]hen appropriate," a court may certify a class to resolve "particular issues." This provision recognizes that individual issues can meet the requirements of Rule 23(a) and Rule 23(b), even if the case as a whole does not. *Gunnells*, 348 F.3d at 439. The Fourth Circuit "has admonished district courts to 'take full advantage of the provision in [Rule 23(c)(4)] permitting class treatment of separate issues' in order 'to promote the use of the class device and to reduce the range of disputed issues' in complex litigation." *Cent. Wesleyan Coll.*, 6 F.3d at 185 (citation omitted) (brackets in original).

Here, two types of issues, common to all residents receiving contaminated water from the Cape Fear River or private wells near Fayetteville Works, are appropriate for classwide resolution: (1) issues related to property damage claims; and (2) issues related to personal injury claims.

#### 1. Property Damage Issues

For the reasons explained above, several issues common to Class Members' negligence, nuisance, and trespass claims are susceptible to classwide resolution because they are common to

41

all Class Members, who will rely on the same evidence to establish each point:

a. whether Defendants owed a duty of care to property owners and renters within the Class Area, c*f. Turner*, 234 F.R.D. at 607 (permitting an issue class to identify "proof that the defendant had a duty to conform its conduct to a specific standard (the duty element)");

b. whether Defendants breached their duties of care to property owners and renters by failing to take adequate steps to control the release of PFAS from their facilities, c*f. Turner*, 234 F.R.D. at 607 (permitting an issue class to identify "proof that the defendant's conduct failed to conform to that [reasonable care] standard (the breach element)");

c. whether Defendants breached their duties of care to property owners and renters by failing to investigate and remediate PFAS contamination caused by Fayetteville Works' operations, *cf. Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 410 (6th Cir. 2018) (permitting an issue class to determine "[w]hether Defendants negligently failed to investigate and remediate the contamination at and flowing from their respective Facilities");

d. whether Defendants were the sole entities releasing FW PFAS into the environment, *cf. Martin*, 896 F.3d at 410, *cert. denied*, 139 S. Ct. 1319 (2019) (permitting an issue class to determine "[e]ach Defendant's role in creating the contamination within their respective Plumes, including their historical operations, disposal practices, and chemical usage");

e. whether all properties in the Class Area were affected by Defendants' PFAS contamination, c*f. Martin*, 896 F.3d at 410 (permitting an issue class to determine "[w]hether contamination from the Chrysler-Behr Facility underlies the Chrysler-Behr and Chrysler-Behr-Aramark Class Areas");

f. whether a reverse osmosis filter is an appropriate remedy to remediate properties contaminated with FW PFAS and prevent future FW PFAS contamination;

g. whether replacement of water heaters is an appropriate remedy to remediate properties contaminated with FW PFAS;

h. whether FW PFAS contamination has caused diminution in property values in the Class Area; and

i. whether Defendants' conduct justifies the imposition of punitive damages, *cf. Cent. Wesleyan Coll.*, 6 F.3d at 184 (permitting an issue class to determine "whether defendants' conduct justifies the imposition of punitive damages").

## 2. Health Issues:

It is possible that Class Members (all of whom likely have PFAS in their blood) will seek to bring personal injury claims (in addition to their property damage claims), and resolution of

those personal injury claims could be greatly expedited if certain issues were decided on a classwide basis, including:

    a. whether PFAS are toxic to humans and the diseases PFAS are capable of causing;

    b. whether and when Defendants knew that PFAS were or could be toxic, *cf. Cent. Wesleyan Coll.*, 6 F.3d at 184 (permitting an issue class to determine "whether defendants knew or had reason to know of the health hazards of asbestos");

    c. whether Defendants breached their duties of care/were negligent by failing to conduct adequate toxicity testing before releasing PFAS into the environment, *cf. Cent. Wesleyan Coll.*, 6 F.3d at 184 (permitting an issue class to determine "whether defendants failed adequately to test their products for fiber release potential"), *Turner*, 234 F.R.D. at 607 (permitting an issue class to identify "proof that the defendant's conduct failed to conform to that [reasonable care] standard (the breach element)");

    d. whether Defendants owed a duty of care to individuals living within New Hanover, Brunswick, Bladen, Cumberland, or Pender Counties, *cf. Turner*, 234 F.R.D. at 607 (permitting an issue class to identify "proof that the defendant had a duty to conform its conduct to a specific standard (the duty element)");

    e. whether Class Members need blood tests to measure the quantity of FW PFAS in their blood;

    f. whether Class Members with PFAS in their blood need a community-wide epidemiological study to determine the extent of the damage to their bodies caused by ingesting FW PFAS;

    g. whether Defendants' conduct justifies the imposition of punitive damages, *cf. Cent. Wesleyan Coll.*, 6 F.3d at 184 (permitting an issue class to determine "whether defendants' conduct justifies the imposition of punitive damages").

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their Motion for Class Certification and for appointment of Class Representatives and Co-Lead Class Counsel be granted.

Dated: May 18, 2022

                                         /s/ *Theodore J. Leopold*
                                         Theodore J. Leopold
                                         Leslie M. Kroeger
                                         **COHEN MILSTEIN SELLERS**
                                           **& TOLL PLLC**
                                         11780 U.S. Highway One
                                         Suite N500
                                         Palm Beach Gardens, FL 33408

(561) 515-1400 Telephone
(561) 515-1401 Facsimile
tleopold@cohenmilstein.com
lkroeger@cohenmilstein.com

/s/ *Jay Chaudhuri*
Jay Chaudhuri
N.C. Bar No. 27747
**COHEN MILSTEIN SELLERS
 & TOLL PLLC**
407 N. Person St.
Raleigh, NC 27612
(919) 890-0560 Telephone
(919) 890-0567 Facsimile
jchaudhuri@cohenmilstein.com

Andrew Whiteman
N.C. Bar No. 9523
**WHITEMAN LAW FIRM**
5400 Glenwood Ave.
Suite 225
Raleigh, NC 27612
(919) 571-8300 Telephone
(919) 571-1004 Facsimile
aow@whiteman-law.com

S. Douglas Bunch
Douglas J. McNamara
Alison Deich
**COHEN MILSTEIN SELLERS
 & TOLL PLLC**
1100 New York Ave., N.W.
Suite 500
Washington, D.C. 20005
(202) 408-4600 Telephone
(202) 408-4699 Facsimile
dbunch@cohenmilstein.com
dmcnamara@cohenmilstein.com
adeich@cohenmilstein.com
Vineet Bhatia
**SUSMAN GODFREY, L.L.P.**
1000 Louisiana St.
Suite 5100
Houston, TX 77002
(713) 651-3666 Telephone
(713) 654-6666 Facsimile
vbhatia@susmangodfrey.com

Stephen Morrissey
Jordan Connors
Steven Seigel
**SUSMAN GODFREY, L.L.P.**
1201 Third Ave.
Suite 3800
Seattle, WA 98101
(206) 516-3880 Telephone
(206) 516-3883 Facsimile
smorrissey@susmangodfrey.com
jconnors@susmangodfrey.com
sseigel@susmangodfrey.com

Gary W. Jackson
N.C. Bar No. 13976
**THE LAW OFFICES OF
JAMES SCOTT FARRIN, P.C.**
280 South Mangum St.
Suite 400
Durham, NC 27701
(919) 688-4991 Telephone
(800) 716-7881 Facsimile
gjackson@farrin.com

Neal H. Weinfeld
**THE DEDENDUM GROUP**
1956 Cloverdale Ave.
Highland Park, IL 60035
(312) 613-0800 Telephone
(847) 478-0800 Facsimile
nhw@dedendumgroup.com

*Attorneys for Plaintiffs Brent Nix,
Victoria Carey, Marie Burris, and
Michael Kiser*

## CERTIFICATE OF SERVICE

I hereby certify that the undersigned electronically filed the foregoing document with the Clerk of Court using the ECF system, with notices of case activity to be generated and sent electronically and by email to counsel of record who are registered to receive such service.

Dated: May 18, 2022

/s/ Steven Seigel

Steven Seigel