## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION

| | |
|---|---|
| BRENT NIX, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>THE CHEMOURS COMPANY FC, LLC, THE CHEMOURS COMPANY, E.I. du PONT de NEMOURS AND COMPANY, INC., E.I. DUPONT CHEMICAL CORPORATION, ELLIS H. MCGAUGHY, and MICHAEL E. JOHNSON,<br><br>    Defendants. | Civil Action No. 7:17-CV-00189-D |
| ROGER MORTON, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>THE CHEMOURS COMPANY FC, LLC, THE CHEMOURS COMPANY, E.I. du PONT de NEMOURS AND COMPANY, INC., E.I. DUPONT CHEMICAL CORPORATION, ELLIS H. MCGAUGHY, AND MICHAEL E. JOHNSON;<br><br>    Defendants. | Civil Action No. 7:17-cv-00197-D |
| VICTORIA CAREY, MARIE BURRIS, MICHAEL KISER, and BRENT NIX, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>E.I. du PONT de NEMOURS AND COMPANY and THE CHEMOURS COMPANY FC, LLC,<br><br>    Defendants. | Civil Action No. 7:17-CV-00201-D |

## PLAINTIFFS' REPLY IN SUPPORT OF CLASS CERTIFICATION

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

I.    Predominance: Common Questions of Law and Fact Predominate ................ 2

    A.    Ascertainability: Membership in the Class is easily determined by reference to existing evidence and objective criteria ...................... 2

    B.    Causation in fact: The only cause of Plaintiffs' injuries from FW PFAS contamination is Defendants' tortious operation of Fayetteville Works. ............................................................................. 4

    C.    Legal causation: DuPont and Chemours are jointly liable for the tortious course of conduct resulting in contamination from Fayetteville Works ................................................................................ 5

    D.    Injury and Damages: Common evidence shows class-wide injury and damages ............................................................................... 8

    E.    Nuisance: Defendants' liability for unreasonable interference with Class Members' land will be established with common evidence ........................................................................................... 14

    F.    Affirmative defenses: Defendants' timeliness defenses are inapplicable based on the undisputed facts of this case and do not require individualized inquiries ................................................... 15

    G.    Defendants' invented "individual inquiries" do not bear on the merits of the case .............................................................................. 16

II.    Superiority ...................................................................................................... 16

    A.    The burden and expense of individual litigation, and the legal and practical difficulty of proving individual claims, makes individual litigation unlikely ............................................................ 16

    B.    The regulatory process cannot resolve Plaintiffs' claims ................. 17

    C.    Plaintiffs are not pursuing an "immature tort" ................................. 17

III.    Plaintiffs Are Adequate and Typical Class Representatives ......................... 18

    A.    Plaintiffs' interests are not in "fundamental" conflict with the putative Class ..................................................................................... 18

B.     Plaintiffs' interest, credibility, and understanding of the case prove adequacy ................................................................. 22

C.     Defendants' course of conduct caused claims typical of the putative Class ................................................................. 22

IV.    The Court Should Certify Plaintiffs' Rule 23(b)(2) Class for an Epidemiological Study ................................................................. 23

V.    Plaintiff's Proposed Issue Class Presents Common Issues Resolvable with Common Proof ................................................................. 23

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Int'l Paper Co.*,
  2017 WL 1828908 (S.D. Ala. May 5, 2017) ............................................................6

*Adinolfe v. United Techs. Corp.*,
  768 F.3d 1161 (11th Cir. 2014) ...........................................................................10

*In re Aqueous Film-Forming Foams*,
  2021 WL 248471 (D.S.C. Jan. 25, 2021)....................................................7, 8, 9, 14

*Baker v. Saint-Gobain Performance Plastics Corp.*,
  2021 WL 2548825 (N.D.N.Y. May 7, 2021).........................................................14

*Beaulieu v. EQ Indus. Servs., Inc.*,
  2009 WL 2208131 (E.D.N.C. July 22, 2009) ........................................................21

*In re Behr Dayton Thermal Prod., LLC Litig.*,
  2012 WL 559913 (S.D. Ohio Feb. 21, 2012)........................................................21

*Bell v. WestRock CP, LLC*,
  2019 WL 1874694 (E.D. Va. Apr. 26, 2019) ....................................................4, 14

*Bentley v. Honeywell Int'l, Inc.*,
  223 F.R.D. 471 (S.D. Ohio 2004)...............................................................7, 14, 21

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988)...........................................................................................23

*Branch v. Gov't Emps. Ins. Co.*,
  323 F.R.D. 539 (E.D. Va. 2018) .........................................................................18

*Brooks v. E.I. du Pont de Nemours & Co.*,
  944 F. Supp. 448 (E.D.N.C. 1996).....................................................................9, 10

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
  155 F.3d 331 (4th Cir. 1998) .............................................................................19

*Bruzek v. Husky Oil Operations Ltd.*,
  520 F. Supp. 3d 1079 (W.D. Wis. 2021) .............................................................16

*Castano v. Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) ..........................................................................17, 18

*Childress v. JPMorgan Chase & Co.*,
  2019 WL 2865848 (E.D.N.C. July 2, 2019) ....................................................................18

*Cook v. Rockwell Int'l Corp.*,
  151 F.R.D. 378 (D. Colo. 1993) ..................................................................................6

*Cook v. Rockwell Int'l Corp.*,
  273 F. Supp. 2d 1175 (D. Colo. 2003)........................................................................10

*Corley v. Orangefield Indep. Sch. Dist.*,
  152 F. App'x 350 (5th Cir. 2005) ..............................................................................14

*Daffin v. Ford Motor Co.*,
  458 F.3d 549 (6th Cir. 2006) .......................................................................................7

*DeLoach v. Philip Morris Cos., Inc.*,
  206 F.R.D. 551 (M.D.N.C. 2002) ...............................................................................3

*EQT Prod. Co. v. Adair*,
  764 F.3d 347 (4th Cir. 2014) ...............................................................................2, 3, 4

*Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*,
  254 F.R.D. 68 (E.D.N.C. 2008) ........................................................................5, 23, 24

*Flanagan v. Allstate Ins. Co.*,
  228 F.R.D. 617 (N.D. Ill. 2005)...................................................................................7

*In re Flint Water Cases*,
  558 F. Supp. 3d 459 (E.D. Mich. 2021)......................................................................16

*Freeman v. Blue Ridge Paper Prod., Inc.*,
  2011 WL 13098808 (E.D. Tenn. Sept. 30, 2011) .......................................................14

*Freeman v. Blue Ridge Paper Prod., Inc.*,
  229 S.W.3d 694 (Tenn. Ct. App. 2007) ......................................................................14

*Gates v. Rohm & Haas Co.*,
  655 F.3d 255 (3d Cir. 2011)........................................................................................7

*Goldstein v. ExxonMobil Corp.*,
  2019 WL 7165919 (C.D. Cal. Oct. 15, 2019)....................................................9, 11, 13, 16

*Good v. Am. Water Works Co., Inc.*,
  310 F.R.D. 274 (S.D.W. Va. 2015).......................................................................23, 24

*Gunnells v. Healthplan Servs., Inc.*,
  348 F.3d 417 (4th Cir. 2003) ............................................................................ *passim*

*Harnish v. Widener Univ. Sch. of L.*,
   833 F.3d 298 (3d Cir. 2016) ........................................................................10

*Hart v. Louisiana-Pac. Corp.*,
   2013 WL 12143171 (E.D.N.C. Mar. 29, 2013) ...........................................20

*Hatch v. DeMayo*,
   2020 WL 4719632 (M.D.N.C. Aug. 13, 2020) .............................................18

*Haywood v. Barnes*,
   109 F.R.D. 568 (E.D.N.C. 1986) .................................................................22

*Kennedy v. Jackson Nat'l Life Ins. Co.*,
   2010 WL 2524360 (N.D. Cal. June 23, 2010) .............................................21

*Lafferty v. Sherwin-Williams Co.*,
   2018 WL 3993448 (D.N.J. Aug. 21, 2018) ...................................................10

*LeClercq v. Lockformer Co.*,
   2001 WL 199840 (N.D. Ill. Feb. 28, 2001) ...............................................7, 14

*Leib v. Rex Energy Operating Corp.*,
   2008 WL 5377792 (S.D. Ill. Dec. 19, 2008) ................................................21

*Ludwig v. Pilkington N. Am., Inc.*,
   2003 WL 22478842 (N.D. Ill. Nov. 4, 2003) ...............................................14

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
   341 F.R.D. 128 (D. Md. 2022) .....................................................................24

*Martin v. Behr Dayton Thermal Prod. LLC*,
   896 F.3d 405 (6th Cir. 2018) ...................................................................24, 25

*Martin v. Home Depot U.S.A., Inc.*,
   225 F.R.D. 198 (W.D. Tex. 2004) ...............................................................21

*Mejdreck v. Lockformer Co.*,
   2002 WL 1838141 (N.D. Ill. Aug. 12, 2002), *aff'd* 319 F.3d 910 (7th Cir. 2003) .................14

*Monroe v. City of Charlottesville*,
   579 F.3d 380 (4th Cir. 2009) .......................................................................22

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
   725 F.3d 65 (2d Cir. 2013) 725 F.3d at 107 .......................................7, 10, 12, 16

*Mullen v. Treasure Chest Casino, LLC*,
   186 F.3d 620 (5th Cir. 1999) .......................................................................17

iv

*Muniz v. Rexnord Corp.*,
  2005 WL 1243428 (N.D. Ill. Feb. 10, 2005) ....................................................14, 21

*Navelski v. Int'l Paper Co.*,
  244 F. Supp. 3d 1275 (N.D. Fla. 2017)................................................................4

*Parker v. Asbestos Processing, LLC*,
  2015 WL 127930 (D.S.C. Jan. 8, 2015)..............................................................25

*Pontones v. San Jose Rest. Inc.*,
  2019 WL 5680347 (E.D.N.C. Oct. 31, 2019) .......................................................22

*Rhodes v. E.I. du Pont de Nemours & Co.*,
  657 F. Supp. 2d 751 (S.D.W. Va. 2009) ..........................................................9, 10

*Riddle v. Artis*,
  243 N.C. 668, 91 S.E.2d 894 (1956) ...................................................................6

*Rodger v. Elec. Data Sys. Corp.*,
  160 F.R.D. 532 (E.D.N.C. 1995) .......................................................................22

*Romig v. Pella Corp.*,
  2016 WL 3125472 (D.S.C. June 3, 2016) ...........................................................24

*Rudd v. Electrolux Corp.*,
  982 F. Supp. 355 (M.D.N.C. 1997) .....................................................................6

*Sterling v. Velsicol Chem. Corp.*,
  855 F.2d 1188 (6th Cir. 1988) ........................................................................7, 11

*Sullivan v. Saint-Gobain Performance Plastics Corp*,
  2019 WL 8272995 (D. Vt. Aug. 23, 2019)..........................................................5, 9

*Tillman v. Highland Indus., Inc.*,
  2021 WL 4483035 (D.S.C. Sept. 30, 2021)..........................................................5, 7

*Turner v. Murphy Oil USA, Inc.*,
  234 F.R.D. 597 (E.D. La. 2006)........................................................................24

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016)..............................................................................8, 11, 14

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014) ........................................................................11

*Verde v. Stoneridge, Inc.*,
  137 F. Supp. 3d 963 (E.D. Tex. 2015) ................................................................21

*Ward v. Dixie Nat'l Life Ins. Co.*,
595 F.3d 164 (4th Cir. 2010) ...........................................................................................13, 19

*In re WildeWood Litig.*,
52 F.3d 499 (4th Cir. 1995) ...............................................................................................9, 10

**Other Authorities**

6 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 18:14 (4th ed. 2002)............18

Fed. R. Civ. P. 12(c) ...........................................................................................................23

Fed. R. Civ. P. 23...................................................................................................... *passim*

Restatement (Second) of Torts § 821F, cmt. f.............................................................................10

## INTRODUCTION

As Plaintiffs demonstrated in their opening Motion, D.E. 334-1 ("Mot."), Plaintiffs' proposed Class involves a single set of common-law property claims (nuisance, trespass, negligence) for toxic contamination flowing from a single course of conduct (Defendants' operation of Fayetteville Works), involving a discrete set of toxic chemicals ("FW PFAS") whose "chemical fingerprint" is undisputedly unique to a single source: Defendants' Fayetteville Works facility.

These facts—which establish Defendants' liability with a single set of common proofs—also make for a simple class definition: owners and renters of residential property contaminated with a quantifiable level of FW PFAS. The identity of Class Members is reflected in Defendants' own testing records (for those with wells) and utility databases (for those with public water). And the remedies Plaintiffs seek are similarly straightforward and common: clean water, clean water heaters, and reimbursement for out-of-pocket costs spent to obtain clean water in the interim.

Unable to change the simplicity of this case, Defendants try to rewrite it, misrepresenting Plaintiffs' claims, factual allegations, and even their class definition. *See* D.E. 342 ("Opp."). They claim the case involves "5,000 different compounds" from "numerous sources." *Id.* at 1, 2. In fact, it involves only 41 FW PFAS which have a "chemical fingerprint" unique to Defendants' facility. *See* D.E. 338. Defendants also focus on "different exposure pathways," *id.* at 15, 19, & 29, and the "duration and intensity of … exposure" over time, *id.* at 38, even though Plaintiffs do not assert class-wide personal injury claims.

But in their attempt to sow confusion, Defendants also ignore (and leave uncontested) core facts that show why certification is appropriate: (1) Defendants alone are responsible for all FW PFAS contamination on Plaintiffs' properties; (2) Defendants' own testing records show which well properties are contaminated, and Plaintiffs' unchallenged and unrebutted expert testimony shows that all utility properties are contaminated; (3) FW PFAS come only from Fayetteville Works; and

1

(4) the remedies Plaintiffs seek—which are *the same remedies* Defendants already agreed to provide to a narrow subset of individuals—are simple to calculate, implement, and administer.

No matter how many times Defendants say it, this case does not require individual health assessments, property assessments, or scientific evaluations of 5,000 chemicals. Instead, it involves a single, simple action to provide a single, simple remedy: clean water and fixtures for those who, due to Defendants' misconduct, currently lack it.

## ARGUMENT

### I. Predominance: Common Questions of Law and Fact Predominate

#### A. *Ascertainability: Membership in the Class is easily determined by reference to existing evidence and objective criteria*

Rule 23's ascertainability requirement—that "the members of [Plaintiffs'] proposed class [be] 'readily identifiable'" with reference to "objective criteria," *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014)—is met here. The Class is defined by "objective criteria": any owner or renter of residential property from February 1, 2015 to present that: (1) is serviced by a water utility servicing Bladen, Brunswick, Cumberland, New Hanover or Pender Counties that obtains water from the Cape Fear River downstream of Fayetteville Works; or (2) receives drinking water from a groundwater source with quantifiable concentrations of any FW PFAS. D.E. 334-1 (Mot.) at 11.

Defendants do not dispute, and therefore concede, that the first category—residential utility customers—is ascertainable. *See* Opp. at 12-13 (disputing only the "groundwater class").

As to the second category—the "groundwater class," *id.*—Defendants raise only theoretical problems that ignore Plaintiffs' concrete method of ascertaining membership by objective criteria: "quantifiable concentrations of any FW PFAS." Class membership is uniformly established by the properties that *Chemours itself has already tested and will be ordered to test as part of its settlement with NCDEQ. See* Mot. at 13-14 ("Chemours has already identified over 6,100 qualifying properties

… and [will identify] thousands more by testing for the presence of FW PFAS.").

Defendants feign not to understand what "quantifiable" means. Opp. at 12. But quantifiable just means "measurable." *See* Mot. at 23 (using "detect" and "measure" synonymously) And Defendants understand what "measurable" means, because Defendants themselves argue that "there are many homes within the proposed class area with no measurable PFAS." *Id.* Individuals whose homes have "measurable [FW] PFAS" (as shown in Chemours' testing records) are Class Members. Individuals whose homes have "no measurable PFAS" are not. Defendants also question "how [the FW PFAS] is to be measured, by whom, or when." *Id.* But because Chemours' *own testing* records establish Class membership, no such questions arise here. *See* Mot. at 13-14.

Finally, Defendants cite *Adair*, 764 F.3d at 359, to attack damages subclasses 1 to 3 (as to the "groundwater class" only) by claiming that "*property records and financial evidence* will then need to be scrutinized to determine who owned or rented which property when." Opp. at 13. This is false and *Adair* has no application here for two main reasons. First, the challenged *damages subclasses* flow from already ascertainable owner-occupiers of contaminated properties, whose addresses and identities appear in Chemours' testing records. For subclasses 1 and 3 (current owner-occupier; long-time owner) the only question is whether an RO filter and/or new water heater has been installed; no analyses of property or financial records are required. For purchaser subclass 2, plaintiffs seek only a *pro rata* allowance for bottled water and reimbursement for previously purchased filters and water heaters. *See* Mot. at 36. If any further determinations are required, "[P]roof of [such] damages can be done relatively easily by use of claim forms … or by appointing a special master." *DeLoach v. Philip Morris Cos., Inc.*, 206 F.R.D. 551, 566 (M.D.N.C. 2002).

Second, even if property records were needed to ascertain subclasses (and they are not), Defendants offer no response to the cases finding ascertainability satisfied where class members

are identifiable from such records. *See Bell v. WestRock CP, LLC*, 2019 WL 1874694, at *6 (E.D. Va. Apr. 26, 2019) (ascertainability met where "public property records can identify all members of the class"); *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1305 (N.D. Fla. 2017) (ascertainability met where "names and addresses of the proposed class members are easily ascertainable by reference to the real property records"). *Adair* says nothing to the contrary, as it concerned a specific proposed class of "former and current gas estate owners" for whom there was no feasible way to identify them. 764 F.3d at 359. Because the original ownership schedules were 20 years old, had "not been updated to account for changes in ownership," and would require resolution of "heirship, intestacy, and title-defect issues," the class was deemed too uncertain to be identified with certainty. *Id.* No such problems arise here.

### B. Causation in fact: The only cause of Plaintiffs' injuries from FW PFAS contamination is Defendants' tortious operation of Fayetteville Works.

Defendants again resort to fictions in claiming that, as to causation-in fact, "each property must be individually analyzed to determine if the PFAS on that property came from Fayetteville Works," because "it is indisputable that [FW PFAS] includes numerous types of PFAS created by entities *other than defendants*." Opp. at 14. Unsurprisingly, Defendants cite nothing for this allegedly "undisputed" proposition because it is untrue. The FW PFAS that contaminate Class Members' homes are unique to a single source: Defendants' Fayetteville Works plant. And Plaintiffs will rely on common proofs to establish that the existence of any FW PFAS in the environment, in any well, or on any property is by definition caused by *only* the Defendants.[1]

As summarized in Plaintiffs' unchallenged and unrebutted expert testimony: "The PFAS

---

[1] FW PFAS include "Attachment C" and "Table 3+" PFAS. The former are 14 PFAS recited in the Consent Order with NCDEQ. *See* D.E. 336-55, Att. C. "Table 3+ compounds are linked to … Chemours Fayetteville Works Plant by its consultant Geosyntec." [D.E. 336-21 (Duncklee Rpt.) ¶ 72.] Chemours admits these PFAS have "chemical properties unique to Chemours." Seigel Decl., Ex. A (5.6.19 Geosyntec Resp. to NC DWR) at 2; Ex. B (SLEA) at 8 ("Table 3+ PFAS are the PFAS originating from … the [FW] Facility.").

produced at Fayetteville Works [are] unique to [Defendants'] manufacturing process and are not known in the available literature to be components in [other PFAS]." D.E. 336-8 (Albright Rpt.) ¶ 37. "[T]he PFAS releases from the Fayetteville Works to the lower Cape Fear River basin are unique…. *because of their chemical fingerprint*." D.E. 377-3 (Duncklee Rebuttal Rpt.) ¶ 31. There thus is no "alternative cause[]" of the contamination, Opp. at 14, and no alternative source of FW PFAS given their unique "chemical fingerprint." *Id.* Defendants offer no facts showing otherwise.

That FW PFAS are unique to Fayetteville Works renders inapt Defendants' lengthy string-cite to *Farrar*, *Reilly*, *Rolan*, *Fisher*, *Tillman*, and *McCorkmick*. Opp. at 14 n.18. In those cases, there were "numerous potential alternative causes, all of which are eminently plausible and not the subject of mere conjecture." *Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*, 254 F.R.D. 68, 74 (E.D.N.C. 2008). Here, Defendants' factually unsupported claim of unidentified "alternative source[s]" of FW PFAS, Opp. at 14, is nothing *but* "conjecture." This case instead is far more like *Sullivan v. Saint-Gobain Performance Plastics Corp.*, which certified a property-damage class for PFOA contamination of groundwater from a single plant (Saint Gobain's Chem-Fab plant): "the answer to how the groundwater became contaminated lies in a common body of evidence about practices at the Chem-Fab plant." 2019 WL 8272995, at *12 (D. Vt. Aug. 23, 2019).

**C.  *Legal causation: DuPont and Chemours are jointly liable for the tortious course of conduct resulting in contamination from Fayetteville Works***

Defendants next speculate that common evidence cannot show that Defendants are legally responsible for (*i.e.*, the proximate cause of) Plaintiffs' injuries, because Plaintiffs have sued "two companies" instead of one. Opp. at 15. In other words, Defendants posit that because DuPont owned and operated Fayetteville Works from 1971 to 2015, and because Chemours operated Fayetteville Works from 2015 forward (as a result of DuPont's spin-off), there is no way to prove proximate cause by *either* Defendant. Opp. at 17. Defendants are wrong for at least six reasons.

5

"First, the sufficiency of the evidence as to proximate cause presented by Plaintiffs goes to the merits of Plaintiffs' case, which cannot be considered when ruling on a motion for class certification." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 428 (4th Cir. 2003).

Second, even if DuPont and Chemours were "separate" actors—despite that Fayetteville Works' tortious operation is a single course of conduct—under North Carolina law "it is elemental that there may be two or more proximate causes of an injury." *Riddle v. Artis*, 243 N.C. 668, 670-71, 91 S.E.2d 894, 896 (1956). "These may originate from separate and distinct sources … operating independently," "yet if they join and concur in producing the result complained of, … an action may be maintained against any one of the wrongdoers or against all of them as joint tort-feasors." *Id.*; *see Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 385 (D. Colo. 1993) ("[T]he existence of more than one Defendant does not defeat class certification."); *Rudd v. Electrolux Corp.*, 982 F. Supp. 355, 370 (M.D.N.C. 1997) (granting MSJ against the current and former owners of toxic site as "[o]ne or both of defendants may be held liable for trespass as a matter of law").

Third, the tortious acts pleaded here—namely, "the continuous release of toxic pollutants from the [Fayetteville Works] site into the [Cape Fear River] Community over an extended period of time"—*is* "a single course of conduct." *Adams v. Int'l Paper Co.*, 2017 WL 1828908, at *7 (S.D. Ala. May 5, 2017). Whether those actions involve one defendant "caus[ing] the continuous release of … chemicals from that site via its manufacturing activities," or another co-defendant "exacerbat[ing] the discharge," such actions constitute "a single event or occurrence, to-wit: The continuous release of … hazardous chemicals … onto plaintiffs' properties." *Id.*

Fourth, DuPont's and Chemours' contractual relationship allocates responsibility for the single course of conduct of Fayetteville Works' discharges. As Chemours admitted in its verified Complaint against DuPont, "DuPont has … demanded indemnification for, and disclaimed any

obligation to contribute to, all … liabilities" arising from "DuPont's historical contamination" in the Cape Fear River Basin. D.E. 336-14 (1st Amd. Verified Compl.) ¶ 6. "DuPont knew that the Fayetteville plant had been discharging … (PFAS) for 30 years or more into the Cape Fear River, which serves as the source of drinking water for tens of thousands of people." *Id.* ¶ 94.

Fifth, Defendants' tortious operation of Fayetteville Works, is a "single course of conduct which is identical for each of the plaintiffs." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988).[2] Thus, whether this case is tried as a class or as 100,000+ individual actions, the same evidence will establish Defendants' liability. "Defendants' liability can be determined on a class-wide basis because it rests on a common core set of facts[;] … class certification under Rule 23(b)(3) is proper." *Flanagan v. Allstate Ins. Co.*, 228 F.R.D. 617, 620 (N.D. Ill. 2005).

Finally, although Defendants claim to have improved "emission control" over time, Opp. at 17-18, they cannot say how this merits defense bears on any Rule 23 factor. To the contrary, "whether the class members can win on the merits of the issue common to the class is not a factor" under Rule 23. *Daffin v. Ford Motor Co.*, 458 F.3d 549, 553 (6th Cir. 2006).[3]

---

[2] *See also In re Aqueous Film-Forming Foams* ("*AFFF*"), 2021 WL 248471, at *4 (D.S.C. Jan. 25, 2021) (certifying class where "all putative members contend that PFAS entered groundwater from … the [same facility] and infiltrated their … wells"); *Bentley v. Honeywell Int'l, Inc.,* 223 F.R.D. 471, 475, 481 (S.D. Ohio 2004) (finding a "single course of conduct" where "for decades Defendants have released toxic chemicals"); *LeClercq v. Lockformer Co.*, 2001 WL 199840, at *5 (N.D. Ill. Feb. 28, 2001) (certifying class, "Defendants … engaged in a common course of conduct" that "contaminated [the] water source").

[3] The cases Defendants cite  at Opp. at 18-19 & n.21 support Plaintiffs and demonstrate why this Class can establish liability by common proof. *MTBE* denied certification of a *personal injury* class where each class member suffered different amounts and types of exposure. 241 F.R.D. at 449. Here, Plaintiffs present no personal injury claims. The Third Circuit in *Gates* denied certification where, unlike here, (1) plaintiffs "failed to present arguments or propose common proof for each element," (2) their expert admitted his modeling was not probative of contamination "as to individual cases," and (3) their theory was far more complex than classes in "other instances of property contamination … [that] presented simpler theories of contamination." *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 261, 271 (3d Cir. 2011). And in *Tillman v. Highland Indus., Inc.*, the court acknowledged that class-wide treatment of causation **was** possible with expert testimony, but found that because "[p]laintiff did not present this common evidence to the [c]ourt," the court could not determine whether it was "common proof." 2021 WL 4483035, at *12-13 (D.S.C. Sept. 30, 2021). Here, the expert testimony of Dr. Albright, Mr. Duncklee, and Mr. Gidlow, provide common proof showing how Defendants caused FW PFAS to contaminate every one of the Plaintiffs' properties.

### D. Injury and Damages: Common evidence shows class-wide injury and damages

Defendants next argue that, as a matter of law, a property-by-property analysis is required to establish liability under each of Plaintiffs' causes of action. That is wrong. Defendants' argument would effect a *per se* rule against property-damage contamination class actions, which no court has ever established. The cases Defendants rely on to support their position, moreover, are not class certification decisions and do not hold that liability cannot be proven class-wide where, as here, Defendants' own household testing data (for groundwater plaintiffs) and unrebutted expert testimony (for utility customers) proves that *every* home in the Class is contaminated and will continue to receive FW PFAS contamination for years to come. Instead, Defendants resort to theorizing about possible differences in *exposure* and *consumption patterns* for each plaintiff—a factor that is irrelevant because Plaintiffs do not assert class-wide personal injury claims.

To begin, Defendants neither address nor dispute Plaintiffs' argument that common evidence will show that every "Class Member who is a utility customer suffered at least three independent, common harms," and that "every Class Member who is a well owner also suffered at least four independent, common harms." Class Cert. Mot. at 28-29. As Plaintiffs explained at length with citations to actual proof of harm and expert testimony, the "same evidence will suffice for each member to make a *prima facie* showing" as to the harm element without needing "evidence that varies from member to member." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016); *AFFF*, 2021 WL 248471, at *4 (finding predominance for property-related negligence, trespass, and nuisance claims for PFAS contamination given that "all putative members contend that PFAS entered groundwater from … the [same facility] and infiltrated their drinking water wells").

Defendants also do not contest Plaintiff's evidence showing that: (1) for utility plaintiffs, "FW PFAS entering the systems contaminate *every home* connected to these public water supplies," Mot. at 9 (citing D.E. 334-22 ¶¶ 4, 10, 58-59); and (2) for groundwater plaintiffs, Defendants' own

testing data shows that at least 6,100 are contaminated with FW PFAS, *id.* (citing D.E. 334-33). Defendants "do not [even] move to exclude or strike, Plaintiffs' experts' reports" directed to these issues. *Goldstein v. ExxonMobil Corp.*, 2019 WL 7165919, at *7 n.8 (C.D. Cal. Oct. 15, 2019).

Defendants also entirely ignore Plaintiffs' factually analogous PFAS contamination cases certifying property-damage torts under Rule 23. Defendants utterly ignore, *e.g.*: (1) *AFFF*, which certified a class action for negligence, trespass, and nuisance claims for PFAS contamination, 2021 WL 248471, at *4; (2) *Sullivan*, which certified a class of nuisance, trespass, and negligence claims for PFAS contamination emanating from a single plant, 2019 WL 8272995, at *12; and (3) *Hermens v. Textiles Coated, Inc.*, which certified claims of trespass, nuisance, and negligence arising out of PFAS contamination by a New Hampshire manufacturing facility, D.E. 336-43.

Instead, Defendants pivot to *Brooks v. E.I. du Pont de Nemours & Co.*, 944 F. Supp. 448, 449 (E.D.N.C. 1996), and *In re WildeWood Litig.*, 52 F.3d 499, 503 (4th Cir. 1995)—the former a summary-judgment decision and the latter an appeal of a JMOL—to argue that more than a "quantifiable concentration" of FW PFAS is required to prove injury for all of Plaintiffs' causes of action. *See* Opp. at 20. But *Brooks* and *WildeWood* are inapposite for at least four reasons.

*First*, whether a "quantifiable concentration" of FW PFAS will establish Defendants' liability (for both current and future contamination) is a merits question. But because *any* level of FW PFAS in drinking water poses toxicological concern, D.E. 336-23 (DeWitt Rpt.) at 14, even assuming a merits evaluation were appropriate this stage, "there is a question of material fact as to whether the amount of PF[AS]" in the water constitutes negligence, trespass, and nuisance. *Rhodes v. E.I. du Pont de Nemours & Co.*, 657 F. Supp. 2d 751, 764 (S.D.W. Va. 2009).

*Second*, *WildeWood*'s facts are inapposite, as plaintiffs' claims were based on chemicals present only in swimming areas and soil, whereas "[t]he drinking water of the plaintiffs … [was]

*not* contaminated by the TCE at issue." 52 F.3d at 501. Here, the drinking water *is* contaminated.

*Third*, *Brooks* found as a matter of law that no property-based injuries could exist where the amount of contamination *for a contaminant with a legislatively established MCL* fell below that MCL. 944 F. Supp. at 449. Here, however, there is no MCL for FW PFAS because their existence in the water (and their identity) was not even known until mid-2017, and the North Carolina General Assembly has not yet considered an MCL for these toxins. This case is thus far more like *Rhodes*, where the court rejected Defendants' same argument as to PFAS contamination, finding both that contamination below regulatory "guidelines" was actionable, and also that, as here, "plaintiffs have identified other data indicating that a lower concentration might be harmful." 657 F. Supp. 2d 751, 764 (S.D.W. Va. 2009). Similarly, in *In re MTBE Prod. Liab. Litig.*, the Second Circuit affirmed a verdict finding injury in fact for negligence, trespass, and nuisance where the MTBE levels were below MCLs, holding that the question was whether a reasonable water provider "would treat the water to reduce the levels or minimize the effects of the MTBE." 725 F.3d 65, 107 (2d Cir. 2013).

*Fourth*, subsequent courts have rejected *Brooks* in any event, finding that it "set out no authority or rationale for [its] holding," *Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175, 1207 (D. Colo. 2003), and that there is "no basis for imposing [its MCL-based rule]." *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1174 & n.4 (11th Cir. 2014). Indeed, it runs contrary to the foundational premise in nuisance that, "[i]n determining whether the [alleged] harm would be suffered by a normal member of the community, fears and other mental reactions common to the community are to be taken into account." Restatement (Second) of Torts § 821F, cmt. f.

Defendants also rely on *Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298 (3d Cir. 2016), and *Lafferty v. Sherwin-Williams Co.*, 2018 WL 3993448 (D.N.J. Aug. 21, 2018) to argue that Plaintiffs cannot establish "the fact of damage" for liability (as opposed to a "damages calculation"

for the appropriate remedy). But again this is untrue. As noted above, Plaintiffs' "contamination can be proved on a class-wide basis using models prepared by their expert[,] … [t]his same evidence will suffice for each member to make a *prima facie* showing" for their causes of action. *Goldstein*, 2019 WL 7165919, at *7; *id.* at *6 (finding Plaintiff expert's contamination "model *is* evidence of a physical intrusion on [the] property") (citing *Tyson Foods*, 136 S. Ct. at 1045).

Also wrong is Defendants' claim that, at least as to the "groundwater" plaintiffs, possible variations in the *amount* of FW PFAS in each well requires individualized fact-finding for each property. *See* Mot. at 20-21. Not so. Defendants' own sampling records—admissions under Fed. R. Evid. 801(d)(2)—show both *membership* in the Class as well as the *fact of injury* by demonstrating measurable FW PFAS in each well. The existence of any FW PFAS at a measurable level, which is an injury that all Class Members share, is sufficient to establish liability for every Class Member.[4] As explained in *In re Urethane Antitrust Litig.*, certification is not defeated even if "class members experienced varying degrees of injury," particularly where all plaintiffs share a "baseline" injury. 768 F.3d 1245, 1254 (10th Cir. 2014); *see Sterling v. Velsicol Chem. Corp.*, 855 F.2d at 1197 (certifying class where "the nature and amount" of harm differed among properties).

Defendants also attack Plaintiffs' evidence showing that, beyond the water itself, FW PFAS contaminate Plaintiffs' water heaters. *Compare* Opp. at 21 (arguing that "sampling data proves that after a GAC system is installed and the hot water heater is flushed, PFAS are non-detect at the tap"), *with* Mot. at 28-29 (citing reports of Dr. Gray and Mr. Griffith that show "water heaters … are contaminated"). Defendants "flushing" argument concedes that water heaters *are contaminated*

---

[4] The utility plaintiffs experience the same concentration of FW PFAS, as explained by Plaintiffs' expert Mr. Gidlow. *See* D.E. 334-22 ¶¶ 1, 34-38, 57-59 (hydraulic modeling showing that "the concentration of FW PFAS that leave the Brunswick County [] Treatment Plant … and the CFPUA Sweeney Water Treatment Plant … will reach and contaminate the retail connections served by the water treatment plants that deliver water from the Cape Fear River in a timeframe of from between one hour to 14 days").

with FW PFAS. That Defendants argue that "flushing" suffices for remediation matters not to class certification, but goes to the question of whether Plaintiffs are entitled to their remedy (replacement) or the remedy Defendants prefer (flushing). The answer to the remedial question, too, can be resolved for all Class Members together, and does not demand a property-by-property analysis.[5]

Defendants next claim that PFAS may have different "physiochemical properties" necessitating different liability determination for each FW PFAS. Opp. at 22. Setting aside that this is a merits question, Defendants' own internal documents admit to all FW PFAS that "we knew all along it was bad." D.E. 336-19 (IM Transcript) at 5. And Plaintiffs' experts confirm: (1) "no amount of [FW] PFAS in Class Members' drinking water can be considered protective of human health," D.E. 336-23 (DeWitt) ¶ 24; (2) "the only option [to] guarantee safety is to remove 100% of PFAS from the water [plaintiffs] consume," *id.*; (3) "the only safe level of exposure to PFAS is zero," D.E. 336-24 at 299:6-7; and (4) "there is no known safe level of PFAS for Class Members' drinking water, and any additional exposure to PFAS should be avoided," D.E. 336-2 ¶ 147. Such evidence far exceeds what was sufficient to affirm a jury verdict of injury-in-fact for nuisance, negligence, and trespass as to even low levels of MTBE contamination, where plaintiff's experts testified that MTBE was only "a probable human carcinogen," and "a probable human mutagen," and defendants' experts testified that "MTBE is not carcinogenic." *MTBE*, 725 F.3d at 87, 107-09.

Defendants also claim that individual fact-finding will be required as to each "occupant" on the property to assess the nature of their human exposure. Opp. at 23. This is utterly wrong, because the Class does not assert personal injury claims and thus does not need to prove that any physical injuries were caused by consuming FW PFAS (Plaintiffs reserve the right to pursue individual

---

[5] Defendants falsely claim Mr. Gidlow affirmatively opined on the absence of PFAS in heaters and plumbing. False. Mr. Gidlow has no expertise in such matters, did not analyze it, and did not opine on it. D.E. 336-22.

personal injury claims to the extent any are ripe—an unlikely scenario given the need for further epidemiological study). For the same reason it is also irrelevant that Dr. DeWitt, "is offering no causal opinions in this case." *Id.* at 22 n.26.

Defendants next turn to nominal damages in trespass, falsely claiming that Plaintiffs' counsel are "forgo[ing] class members' opportunity to recover … compensatory damages." Opp. at 23-24. This is blatantly untrue. Plaintiffs seek compensatory remediation, repair and prevention damages *as well as* nominal damages. Mot. at 33, 37. In any event, nominal damages merely further support the predominance of common questions in this litigation, as the court recognized in *Goldstein*, 2019 WL 7165919, at *8 (certifying groundwater contamination class).

Defendants also attack Plaintiffs' damages models, asserting (incorrectly) that it "does not even attempt to address damages or injury with respect to the Municipal Utility Subclass." Opp. at 24. Wrong again. Mr. Gidlow's "Hydraulic modeling" confirms injury for "every … home that receives drinking water from the [utilities]." Mot. at 9.[6] That contamination caused FW PFAS to reside in plaintiffs' water heaters and plumbing. *Id.* at 11. And Mr. Gamble, Plaintiffs' damages expert for (i) remediation, repair, and prevention and (ii) economic loss, has provided a simple method to calculate class-wide damages for all utility plaintiffs. *Id.* at 34, 36-37; *see Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) (affirming common damages method).

Defendants next argue that Plaintiffs' diminution-in-value expert, Mr. David Sunding, "cannot meet the *Comcast* standard" because his model does not purport to quantify each parcel's diminution in value but rather establishes that all properties suffered diminution in value attributable to Defendants' conduct. Opp. at 24-25. Defendants are wrong for several reasons.

*First*, as explained further in Plaintiffs' opposition to Defendants' motion to exclude Mr.

---

[6] Defendants have not rebutted, challenged, or sought to exclude Mr. Gidlow's opinions under *Daubert*.

Sunding, his diminution-in-value damages model *is not Plaintiffs' primary damages model* but instead serves as (1) a secondary, in-the-alternative form of damages to Plaintiffs' primary damages model of remediation, prevention, and repair, *see* Mot. at 35-36; and (2) as a rebuttal to any claim by Defendants that the remediation and repair model is excessive. *See* D.E. 383 at 8-11.

*Second*, even if Mr. Sunding's were the primary damages model, courts reject Defendants' cribbed reading of *Comcast—i.e.*, that a damages expert must calculate "actual damages" for each plaintiff—by explaining that "*Comcast* need not be read at this stage to require a court to engage in detailed analysis and speculation of what the outcome of the proposed models will be." *Baker v. Saint-Gobain Performance Plastics Corp*., 2021 WL 2548825, at *7-8 (N.D.N.Y. May 7, 2021).[7]

### E. Nuisance: Defendants' liability for unreasonable interference with Class Members' land will be established with common evidence

Defendants absurdly claim that nuisance claims can never be brought as a class by arguing that "None of these [nuisance] factors can be applied on a classwide basis." Opp. at 27 (referring to the objective factors for assessing an "unreasonable interference" in North Carolina). Defendants are demonstrably wrong. Myriad courts have certified nuisance classes under Rule 23(b), including courts applying North Carolina law in the context of environmental contamination cases.[8]

Additionally, the "individual" questions Defendants hypothesize are required for nuisance

---

[7] Also wrong is Defendants' claim that courts routinely deny certification where only "'an average' damage is calculated." Opp. at 25. The Supreme Court ruled otherwise in *Tyson Foods*, which held that an average calculation of donning and doffing times—based on a sample—could establish predominance. 577 U.S. at 455. *See Corley v. Orangefield Indep. Sch. Dist.*, 152 F. App'x 350, 355 (5th Cir. 2005) ("few" motions succeed in defeating class certification "because of disparities in [] damages").

[8] *Freeman v. Blue Ridge Paper Prod., Inc.*, 2011 WL 13098808, at *4, *7 (E.D. Tenn. Sept. 30, 2011) (certifying nuisance class under North Carolina law); *Bell*, 2019 WL 1874694, at *5 (certifying nuisance class); *AFFF*, 2021 WL 248471, at *4 (certifying nuisance); *Freeman v. Blue Ridge Paper Prod., Inc.*, 229 S.W.3d 694, 705 (Tenn. Ct. App. 2007) (applying North Carolina law in affirming class action verdict of nuisance); *Bentley*, 223 F.R.D. at 487 (certifying nuisance); *Ludwig v. Pilkington N. Am., Inc.*, 2003 WL 22478842, at *5 (N.D. Ill. Nov. 4, 2003) (same); *LeClercq*, 2001 WL 199840, at *7 (same); *Muniz v. Rexnord Corp.*, 2005 WL 1243428, at *4 (N.D. Ill. Feb. 10, 2005); *Mejdreck v. Lockformer Co.*, 2002 WL 1838141, at *7 (N.D. Ill. Aug. 12, 2002), *aff'd* 319 F.3d 910 (7th Cir. 2003) (same).

in fact have no bearing on liability, because nuisance may be proven by showing that ***any*** measurable amount of FW PFAS constitutes a nuisance, thereby requiring remediation, repair, and prevention. Mot. at 29-30, 33-34. Thus, whether certain owners "reduce[d] rent," or "inform[ed] the tenants," or whether vacation-home owners "continue[d] to vacation" at the property, makes no difference, because the remedy required by Defendants' conduct is the same: water filters and new water heaters to remove existing contamination and prevent future FW PFAS contamination.

### F.     *Affirmative defenses: Defendants' timeliness defenses are inapplicable based on the undisputed facts of this case and do not require individualized inquiries*

Defendants next posit that two timeliness "affirmative defenses" (statute of limitations and pre-complaint damages for continuing trespass) preclude certification. *See* Opp. at 28. But both timeliness defenses are inapplicable based on the undisputed facts of this case.

No statute of limitations defense is available because "the public first learned of the presence of only one of the FW PFAS—GenX—in drinking water in June 2017, … and it wasn't '[u]ntil the past couple of years' that labs were even able to detect or 'measure' [the] other FW PFAS." Mot. at 23 (citing D.E. 336-17 (2017 *Wilmington Star-News* article) and D.E. 336-30 (NCDEQ PowerPoint) at 5). For that reason, "[n]o Class Member even could have" known of the existence of injury prior to June 2017, *id.*, *a fact that Defendants do not dispute in their Opposition*. Thus, the same facts will show that June 17, 2017 is Class Members' earliest common answer to the question of "when … 'physical damage to [the] property bec[ame] apparent or ought to have become apparent,'" Opp. at 28, meaning no statute of limitations applies to any Class Member.

The three-year look-back period for continuing nuisance/trespass damages is similarly irrelevant. Plaintiffs do not seek to recover losses incurred prior to June 2017. Instead, Plaintiffs' damages subclasses seek, as relevant here, (1) remediation, repair and prevention, and (2) reimbursement for out-of-pocket losses "from the date of disclosure of the contamination in June

2017 through trial." Mot. at 33, 37. The three-year lookback period is not implicated in the slightest.

### G. Defendants' invented "individual inquiries" do not bear on the merits of the case

Finally, the "individual inquiries" Defendants list in their Opposition at page 29 are neither relevant to nor necessary for resolution of the merits of Plaintiffs' claims.

- Negligence. Defendants owe the same duty of care to all Plaintiffs: to not contaminate their properties with any FW PFAS. Mot. at 15. Defendants' duty not to pollute is common to all members of the Class; it does not change by property or person. "The allegedly wrongful act(s) at issue" are thus "largely, if not completely, the same across the proposed class, giving rise to the same kind of claims." *Bruzek v. Husky Oil Operations Ltd.*, 520 F. Supp. 3d 1079, 1094 (W.D. Wis. 2021); *see also In re Flint Water Cases*, 558 F. Supp. 3d 459, 503 (E.D. Mich. 2021) (certifying lead contamination class; "the Court need go no further than the first two questions raised: whether [defendants] owed a duty to third parties … and whether certain actions—and failures to act— … constituted a breach of that duty."). None of Defendants' affirmative defenses require individualized inquiries. And "exposure pathways" are irrelevant because the Class does not assert personal injury claims.

- Nuisance. Whether current and future contamination by any FW PFAS constitutes an unreasonable interference in the use and enjoyment of all of Plaintiffs' properties—such that a reasonable person "would [want to] treat the water to reduce the levels or minimize the effects of the [FW PFAS]," *In re MTBE*, 725 F.3d at 107—is a common question, based on an objective reasonableness standard, whose answer will be the same for every Class Member. The FW PFAS all came from the same source: Defendants' Fayetteville Works facility. And liability does not turn on any differences among the FW PFAS, as a measurable level of any one of the FW PFAS is sufficient to create a nuisance.

- Trespass. Plaintiffs' evidence shows that "contamination [of measurable levels of FW PFAS] can be proved on a class-wide basis using models prepared by their expert" as well as Defendants' own testing records. *Goldstein*, 2019 WL 7165919, at *7. "This same evidence will suffice for each member to make a *prima facie* showing" of trespass. *Id.* It will also show that FW PFAS—all derived from Defendants' plant—will continue to contaminate each Class Member's property in the future unless filters are installed. None of these questions depend on differences in FW PFAS or differences in levels of FW PFAS.

## II. Superiority

Each of Defendants' three challenges to Plaintiffs' showing of superiority fails.

### A. The burden and expense of individual litigation, and the legal and practical difficulty of proving individual claims, makes individual litigation unlikely.

As explained in Plaintiffs' Motion, no individual lawsuits have been filed by any utility customers, and the individual damages for each Class Member are so small that individual litigation

is impracticable. Mot. at 38. Defendants ignore this, and instead focus on actions filed by utilities seeking to "recover the costs" of "remov[ing] Defendants' [PFAS] from their public drinking water supply.'" Opp. at 31. Even if successful, such actions will not resolve Plaintiffs' claims for water heaters ($1,818.15 per household with installation, Mot. at 38) nor for reimbursement for bottled water or already-purchased filters, thus requiring individual litigation for these small sums. The burden and expense of that litigation, and the legal and practical difficulty of proving such claims under complex, expert-driven facts, far outweighs the benefit of any individual recovery.

### B.       The regulatory process cannot resolve Plaintiffs' claims

Defendants argue that deferring to their voluntary Consent Order is superior to resolving Plaintiffs' claims in class litigation. But as stated in greater detail in Plaintiffs' Opposition to Defendants' Stay Motion, D.E. 380 at 10-13, the Consent Order is not a "regulatory process" and **cannot remedy** any of Plaintiffs' claims. Defendants do not contend otherwise.

### C.       Plaintiffs are not pursuing an "immature tort"

Finally, Defendants argue that Plaintiffs are pursuing a legally and scientifically "immature tort" that will create significant difficulties for the Court. But Defendants' chosen case, *Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996), is inapposite. There, the court was dealing with mass personal injury claims governed by multiple state laws prescribing differing standards of liability. The court faced complex choice of law problems spread across millions of plaintiffs, and a cause of action that claimed, for the first time, that nicotine addiction amounted to injury. *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 628 (5th Cir. 1999). The "extensive manageability problems" that defeated superiority, including "difficult choice of law determinations, subclassing of eight claims with variations in state law, *Erie* guesses, notice to millions of class members, further subclassing to take account of transient plaintiffs, and the difficult procedure for determining who is nicotine-dependent," *Castano*, 84 F.3d at 747, are entirely absent here. Plaintiffs' common

law torts are not novel. There are no choice of law determinations; only North Carolina law applies. And, unlike in *Castano*, which confronted individualized determinations for each class member's nicotine dependence, no individualized determinations are required here. *See supra* at I(D).

Defendants also argue that the lack of other trials involving most of the PFAS on Plaintiffs' list militates against superiority. But the toxicity of these forever chemicals will be demonstrated by common proof, *see supra* at I(B), and will not create any difficulties for the Court in managing Plaintiffs' claims as a class action. Nor does this case involve "thousands of substances," Opp. at 33, but a manageable, discrete, and uniform set of toxic FW PFAS unique to Defendants.

## III. Plaintiffs Are Adequate and Typical Class Representatives

Defendants contest Plaintiffs' adequacy and typicality as class representatives through character attacks and fabricated conflicts. Opp. at 33–40. But in parsing granular details of each Plaintiff's circumstances and pointing to immaterial "individualized inquiries," Defendants fail to defeat adequacy. Furthermore, Plaintiffs' interest, credibility, and understanding of the case plainly demonstrate their adequacy as class representatives. And despite Defendants' attempt to complicate the typicality requirement, Plaintiffs' claims are typical of the putative Class because Defendants' course of conduct gave rise to identical legal claims, regardless of individual factual differences.

### A. *Plaintiffs' interests are not in "fundamental" conflict with the putative Class*

Rule 23(a)'s adequacy requirement imposes a "low bar," and does not demand perfect alignment of the named plaintiffs' and proposed class's interests. *Hatch v. DeMayo*, 2020 WL 4719632, at *7 (M.D.N.C. Aug. 13, 2020); *see also Childress v. JPMorgan Chase & Co.*, 2019 WL 2865848, at *7 (E.D.N.C. July 2, 2019); *Branch v. Gov't Emps. Ins. Co.*, 323 F.R.D. 539, 549 (E.D. Va. 2018). Refuting adequacy requires the defendant to show a "fundamental" conflict of interest that is at "the heart of the litigation." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430-31 (4th Cir. 2003) (quoting 6 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 18:14 (4th

ed. 2002)). A purported conflict "will not defeat the adequacy requirement if it is 'merely speculative or hypothetical.'" *Ward*, 595 F.3d at 180 (quoting *Gunnells*, 348 F.3d at 430). And so long as proposed class representatives and the putative class share a common interest in establishing defendant's liability, no fundamental conflicts exist. *Gunnells*, 348 F.3d at 430-31.

Defendants rely on speculative conflicts that fall far short of a "fundamental" disqualifying conflict. Defendants *assert* inadequacy because Ms. Burris and Ms. Carey did not sell or attempt to sell their properties during the Class Period and Ms. Burris does not charge rent for use of her property. Opp. at 37. But Defendants do not even attempt to *substantiate* how these minor factual differences present a fundamental conflict. Nor could they. Plaintiffs' in-the-alternative diminution-in-value damages model does not hinge on "us[ing]" the individual Plaintiffs "as a basis for calculating classwide diminution in value," as Defendants incorrectly suggest. *Id.* Rather, Plaintiffs' proposed model calculates "diminution-in-value damages of *all properties* within the Class Area on a classwide basis." Mot. at 35 (emphasis added).

As sparse support for their claim that Plaintiffs cannot adequately represent the interests of current and former property owners, Defendants (Opp. at 35) cite *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998) where the defendant argued that the interests of current and former Meineke franchisees were in conflict. But the court explicitly recognized that this "*potential* conflict" between current and former franchisees "apparently did not materialize." *Id.* (emphasis added). Likewise, Defendants have shown no *actual* (let alone fundamental) conflict between current and former property owners' interests. And unlike *Broussard* where some plaintiffs were wholly precluded from receiving compensatory damages (having contractually waived them), all putative Class Members here may receive relief applicable to their respective subclasses.

Defendants also erroneously suggest that "individualized questions" engender significant

conflicts between various putative Class Members. First, Defendants claim that when individual "buyers or sellers [became] aware of the presence of PFAS on the property," and the impact of that PFAS on sales price, places current owners in conflict with prior owners. Opp. at 34. But these inquiries *are not* elements of any of Plaintiffs' substantive tort claims nor prerequisites for property damage recovery. Relatedly, Defendants suggest that property owners' interests conflict with those of renters or tenants because of the "individualized question … of proving which party to the lease transaction can recover any alleged diminution in value." Opp. at 35. But Defendants mischaracterize Plaintiffs' damages subclasses and the availability of diminution-in-value damages. Diminution-in-value damages are available only to the Long-Time Owner subclass and only "as an *alternative* to remediation, repair, and prevention damages" for the Owner-Occupier/Renter subclass, eliminating any potential conflict between relief for renters and owners. Mot. at 35. Defendants have ignored Plaintiffs' subclass definition, along with the fact that all putative Class Members have a mutual interest in establishing Defendants' liability using common factual evidence and identical legal theories—rendering fundamental conflicts nonexistent.

To the extent that a diminution-in-value calculation is even required (again, it is an *alternative* remedy and a means to show reasonableness of remediation and repair), it is unequivocally clear that such calculations have no impact on class certification. *Gunnells*, 348 F.3d at 429 (rejecting the necessity of individualized inquiries for damages as an unpersuasive argument made by "almost all defendants in mass tort cases" and holding that "the need for individualized proof of damages alone will not defeat class certification"); *Hart v. Louisiana-Pac. Corp.*, 2013 WL 12143171, at *2 (E.D.N.C. Mar. 29, 2013) (denying motion to decertify because "any necessity of individualized damages determination" does not destroy other elements of class certification).

Lastly, in seeking Rule 23(b)(3) certification for property damage and economic loss,

Plaintiffs remain adequate representatives for putative Class Members who may have personal injury claims in the future. In general, a court may certify damages classes limited to certain losses even where putative class members have additional claims for other damages. *See Beaulieu v. EQ Indus. Servs., Inc.*, 2009 WL 2208131, at *19 (E.D.N.C. July 22, 2009) (finding adequacy requirement met for settlement class excluding recovery of personal injury damages).[9]

Defendants' argument that "claim splitting" precludes adequacy also fails. Opp. at 36. First, Defendants refuse to even identify any Rule 23(b)(3) claim or issue to which "Defendants could successfully assert a *res judicata* defense in a subsequent action … for personal injuries." *In re Behr Dayton Thermal Prod., LLC Litig.*, 2012 WL 559913, at *3 (S.D. Ohio Feb. 21, 2012). Second, the Fourth Circuit has rejected Defendants' precise argument, holding that "a class action, 'of course, is one of the recognized exceptions to the rule against claim-splitting.'" *Gunnells*, 348 F.3d at 432 (citation omitted).[10] Third, Rule 23(c)(2)'s notice requirement softens the impact of any potential *res judicata* by permitting any class member to opt out. *Id.* Fourth, Rule 23(b)(2) certification has no *res judicata* effect on future personal injury claims. *See Leib v. Rex Energy Operating Corp.*, 2008 WL 5377792, at *9 (S.D. Ill. Dec. 19, 2008) (finding Rule 23(b)(2) medical monitoring class adequate as it "would not prevent a class member from later bringing a personal injury lawsuit"). Fifth, Defendants' out-of-circuit cases are irrelevant, as the plaintiffs there, unlike here, "disavow[ed] and waive[d] all personal injury claims" on behalf of the class. *See, e.g.*, *Martin*

---

[9] *See Muniz v. Rexnord Corp.*, 2005 WL 1243428, at *4 (N.D. Ill. Feb. 10, 2005) (finding adequacy requirement met in water contamination class action because "seeking [class-wide] damages for property damage would not bar and/or prejudice any personal injury claims that the class members may have"); *Bentley*, 223 F.R.D. at 482-83 (same); *Kennedy v. Jackson Nat'l Life Ins. Co.*, 2010 WL 2524360, at *5 (N.D. Cal. June 23, 2010) (adequacy met where the plaintiffs' damages theories did not "require an individualized inquiry into each class member's circumstances").

[10] *See Verde v. Stoneridge, Inc.*, 137 F. Supp. 3d 963, 974 (E.D. Tex. 2015) (rejecting claim-splitting argument for warranty class that excluded personal injury claims); *Bentley*, 223 F.R.D. at 483 (rejecting argument that property damage claims are *res judicata* on class members' future personal injury actions).

*v. Home Depot U.S.A., Inc.*, 225 F.R.D. 198, 203 (W.D. Tex. 2004). No such waiver exists here.

### B. Plaintiffs' interest, credibility, and understanding of the case prove adequacy

Defendants fail to show inadequacy by lodging a character attack on Mr. Nix for a single transgression for which Mr. Nix has accepted responsibility. Defendants rely solely on an inapposite case where the proposed plaintiff "had little interest in or knowledge and understanding of the case, and appeared to be merely lending his name to the suit." *Monroe v. City of Charlottesville*, 579 F.3d 380, 385 (4th Cir. 2009). None of those concerns are present here and Defendants do not claim otherwise. More importantly, "defendants do not identify a fundamental conflict or explain why [the plaintiff's] possible false statements amount to a fundamental conflict." *Pontones v. San Jose Rest. Inc.*, 2019 WL 5680347, at *7–*8 (E.D.N.C. Oct. 31, 2019); *see Haywood v. Barnes*, 109 F.R.D. 568, 579 (E.D.N.C. 1986) (adequacy "must be assessed in light of [plaintiff's] conduct **in this or previous litigation**, not based on a subjective evaluation of their personal qualifications as allegedly and tenuously evidenced by their prior criminal record").

All of the named Plaintiffs' "conduct in this … litigation," *id.*, including Mr. Nix's, prove their ability to serve as exemplary class representatives. Each possesses sufficient knowledge of this case and continually demonstrates their credibility and diligence as litigants before this Court.

### C. Defendants' course of conduct caused claims typical of the putative Class

By parsing irrelevant details of Plaintiffs' circumstances, Defendants have misconstrued Rule 23(a)'s typicality requirement. Contrary to Defendants' assertions, the typicality inquiry assesses "the defendant's alleged conduct and the legal theory advanced by the plaintiff to determine whether certification is appropriate." *Rodger v. Elec. Data Sys. Corp.*, 160 F.R.D. 532, 538 (E.D.N.C. 1995). Importantly, factual differences do not destroy typicality so long as "the injuries stem from the same course of conduct and are premised on the same legal theory." *Id.*; *see Haywood*, 109 F.R.D. at 578. Here, Plaintiffs' claims are identical to those of the putative Class

and arise from Defendants' course of conduct. *See Good v. Am. Water Works Co., Inc.*, 310 F.R.D. 274, 299 (S.D.W. Va. 2015) (finding typicality requirement met because discharging toxic chemicals is a "unique juridical link," giving rise to all tort claims in "a singular event"). For the same reasons explained above as to predominance, *see supra* § I, any differences in exposure levels, property conditions, and water heaters, do not detract from the fact that: Defendants' common course of conduct injured Plaintiffs and the putative Class in the same manner; Plaintiffs assert the same legal theories to obtain class-wide redress; and the typicality requirement is satisfied.

## IV. The Court Should Certify Plaintiffs' Rule 23(b)(2) Class for an Epidemiological Study

Defendants' attack on Plaintiffs' Rule 23(b)(2) class fails. *First*, as explained in Plaintiffs' Opposition to Defendants' Rule 12(c) Motion, the requested epidemiological study ***is not*** "medical monitoring," as Defendants' own expert concedes. D.E. 379 at 13. *Second*, requiring Defendants to fund an epidemiological study is ***not*** a request for "compensatory relief for an injury suffered." *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). "The fact that a judicial remedy may require one party to pay money … is not a sufficient reason to characterize the relief as 'money damages.'" *Id. Third*, Defendants' "cohesiveness" concerns all relate to class claims for medical monitoring, which have no bearing here; in contrast, an epidemiolocal study applies the same method to all study participants to yield a common set of epidemiolocal findings. D.E. 336-25, ¶¶ 39-42.

## V. Plaintiff's Proposed Issue Class Presents Common Issues Resolvable with Common Proof

**Common Issues Predominate:** Contrary to Defendants' suggestion, Fourth Circuit law permits certification of individual *issues* in addition to *claims*. Opp. at 43. *Farrar & Farrar*, 254 F.R.D. at 77, says nothing to the contrary. In *Farrar*, this Court noted that, while "the *Gunnells* court appeared to hold that a district court may certify individual *causes of action*, not individual *issues*, for class treatment," the Fourth Circuit's analysis in that case "is unclear." Thus, the court declined to "determine whether issue certification exists in the Fourth Circuit." *Id.*

In the fourteen years since *Farrar*, several courts have directly confronted that question and held that the Fourth Circuit *does* permit certification of issues: "There is no impediment to certifying particular issues in a case as opposed to entire claims or defenses. That is the very approach urged by the authoritative Manual for Complex Litigation." *Good v. Am. Water Works Co., Inc.*, 310 F.R.D. 274, 296 (S.D.W. Va. 2015) (citation omitted); *see Romig v. Pella Corp.*, 2016 WL 3125472, at *12 (D.S.C. June 3, 2016) ("the emerging majority and two recent decisions by courts in this circuit have found that a court 'may use Rule 23(c)(4) to certify a class as to an issue regardless of whether the claim as a whole satisfies [Rule 23(b)(3)'s] predominance test") (cleaned up). Thus, "judicial interpretation has coalesced in recent years around a 'broad view' of Rule 23(c)(4) in which common questions need predominate over individual ones only for the specific issues that are certified, not for the entire cause of action." *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 168 (D. Md. 2022) (citation omitted).

For each of the discrete issues raised in Plaintiffs' opening brief, common questions predominate. For all Class Members, questions about whether Defendants had and breached duties will be proven by the same evidence: (a) expert testimony establishing relevant standards of care for chemical plants operating near drinking water; and (b) documentary, testimonial, and expert evidence showing that Defendants breached that standard of care. Because the standard of care and Defendants' conduct do not vary from plaintiff to plaintiff, duty and breach may be appropriately resolved class-wide. *See Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 410, 414 (6th Cir. 2018) (issues that "turn on each Defendant's knowledge and conduct … need only be established once"); *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 607 (E.D. La. 2006).

The remaining common questions identified in Plaintiffs' opening brief may also all be resolved with "generalized, class-wide proof." *Martin*, 896 F.3d at 414. More specifically, they will

be resolved with "expert evidence" establishing the source of and extent of FW PFAS contamination in a particular geographic area, the risks posed by FW PFAS, whether specific water filters are capable of removing FW PFAS, and whether everyone in a particular geographic area needs blood tests. *Id.* These are questions that "need only be answered once because the answers apply in the same way to each property owner within the [contamination area]." *Id.*

Defendants have not identified "any individualized inquiries that outweigh the common questions prevalent within each issue." *Martin*, 896 F.3d at 414. Defendants vaguely assert that the relevant issues cannot be resolved "without an evaluation of the type, amount, and duration of the PFAS exposure at issue." Opp. at 44. But this runs counter to the expert reports Plaintiffs have put forward, which show that Defendants breached a duty to *all Plaintiffs* by discharging *any amount* of FW PFAS from Fayetteville Works, and the same remedies are needed by *every Class Member*, regardless of the type, amount, and duration of the FW PFAS contamination on their property.

**Resolving Common Issues Will Significantly Advance the Litigation:** Defendants suggest that it will not be helpful to resolve the common issues on a class-wide basis because they are "relatively simple threshold issues [that] can quickly be disposed of in individual trials." Mot. at 44-45 (quoting *Parker v. Asbestos Processing, LLC*, 2015 WL 127930, at \*15 (D.S.C. Jan. 8, 2015)). Not so. As explained above, the relevant issues will be established with expert testimony that would be extremely expensive to generate individually. Resolving these issues once would save an extraordinary volume of expert fees and would preserve judicial resources that would be required to resolve each issue tens of thousands of times for each individual Class Member.

## CONCLUSION

For these additional reasons, Plaintiffs respectfully request that the Court grant their Motion for Class Certification and for appointment of Class Representatives and Co-Lead Class Counsel.

Date: August 29, 2022

/s/ Steven Seigel
Theodore J. Leopold
**COHEN MILSTEIN SELLERS
 & TOLL PLLC**
2925 PGA Boulevard, Suite 220
Palm Beach Gardens, FL 33410
(561) 515-1400 Telephone
(561) 515-1401 Facsimile
tleopold@cohenmilstein.com

Jay Chaudhuri
N.C. Bar No. 27747
**COHEN MILSTEIN SELLERS
 & TOLL PLLC**
407 N. Person St.
Raleigh, NC 27612
(919) 890-0560 Telephone
(919) 890-0567 Facsimile
jchaudhuri@cohenmilstein.com

Andrew Whiteman
N.C. Bar No. 9523
**WHITEMAN LAW FIRM**
5400 Glenwood Ave., Suite 225
Raleigh, NC 27612
(919) 571-8300 Telephone
(919) 571-1004 Facsimile
aow@whiteman-law.com

S. Douglas Bunch
Douglas J. McNamara
Alison Deich
**COHEN MILSTEIN SELLERS
 & TOLL PLLC**
1100 New York Ave., N.W., Suite 500
Washington, D.C. 20005
(202) 408-4600 Telephone
(202) 408-4699 Facsimile
dbunch@cohenmilstein.com
dmcnamara@cohenmilstein.com
adeich@cohenmilstein.com

Vineet Bhatia
**SUSMAN GODFREY, L.L.P.**
1000 Louisiana St., Suite 5100
Houston, TX 77002

26

(713) 651-3666 Telephone
(713) 654-6666 Facsimile
vbhatia@susmangodfrey.com

Stephen Morrissey
Jordan Connors
Steven Seigel
**SUSMAN GODFREY, L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
(206) 516-3880 Telephone
(206) 516-3883 Facsimile
smorrissey@susmangodfrey.com
jconnors@susmangodfrey.com
sseigel@susmangodfrey.com

Gary W. Jackson
N.C. Bar No. 13976
**THE LAW OFFICES OF**
**JAMES SCOTT FARRIN, P.C.**
280 S. Mangum St., Suite 400
Durham, NC 27701
(919) 688-4991 Telephone
(800) 716-7881 Facsimile
gjackson@farrin.com

Neal H. Weinfield
**THE DEDENDUM GROUP**
1956 Cloverdale Ave.
Highland Park, IL 60035
(312) 613-0800 Telephone
(847) 478-0800 Facsimile
nhw@dedendumgroup.com

*Attorneys for Plaintiffs Brent Nix,*
*Victoria Carey, Marie Burris, and*
*Michael Kiser*

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of August, 2022, I electronically filed the foregoing document with the Clerk of Court using the ECF system, with notices of case activity to be generated and sent electronically to counsel of record who are registered to receive such service.

*/s/ Steven Seigel*
Steven Seigel