# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### SOUTHERN DIVISION

| | |
|---|---|
| BRENT NIX, individually and on behalf of all others similarly situated, | Civil Action No. 7:17-CV-00189-D |
| Plaintiff, | |
| v. | |
| THE CHEMOURS COMPANY FC, LLC, THE CHEMOURS COMPANY, E.I. du PONT de NEMOURS AND COMPANY, INC., E.I. DUPONT CHEMICAL CORPORATION, ELLIS H. MCGAUGHY, and MICHAEL E. JOHNSON, | |
| Defendants. | |
| ROGER MORTON, individually and on behalf of all others similarly situated, | Civil Action No. 7:17-CV-00197-D |
| Plaintiff, | |
| v. | |
| THE CHEMOURS COMPANY FC, LLC, THE CHEMOURS COMPANY, E.I. du PONT de NEMOURS AND COMPANY, INC., E.I. DUPONT CHEMICAL CORPORATION, ELLIS H. MCGAUGHY, AND MICHAEL E. JOHNSON, | |
| Defendants. | |
| VICTORIA CAREY, MARIE BURRIS, MICHAEL KISER, and BRENT NIX, individually and on behalf of all others similarly situated, | Civil Action No. 7:17-CV-00201-D |
| Plaintiffs, | |
| v. | |
| E.I. du PONT de NEMOURS AND COMPANY and THE CHEMOURS COMPANY FC, LLC, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION FOR CLASS DECERTIFICATION

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND ............................................................................................................1

LEGAL STANDARD ....................................................................................................3

ARGUMENT ..................................................................................................................5

I.     Defendants are not entitled to a late-stage disruption of these already-certified classes. ....................................................................................................8

II.    The three class representatives remain adequate, and their claims remain typical........................................................................................................................11

III.   Causation, injury, and damages will be proven classwide....................................16

    A.    Plaintiffs' expert evidence applies classwide.............................................16

    B.    "Alternative causation" can be resolved classwide. ..................................20

    C.    Defendants' arguments regarding PFAS toxicity are meritless.................22

    D.    Defendants' arguments regarding PFAS remediation by public utilities are misleading and irrelevant to class certification.......................26

CONCLUSION...............................................................................................................29

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alig v. Quicken Loans Inc.*,
No. 12-cv-114, 2017 WL 5054287 (N.D.W. Va. July 11, 2017) .............................4, 8, 11, 26

*Beattie v. CenturyTel. Inc.*,
511 F.3d 554 (6th Cir. 2007) ...............................................................................13

*Brooks v. E.I. du Pont de Nemours & Co.*,
944 F. Supp. 448 (E.D.N.C. 1996)........................................................................24

*Cook v. Rockwell Int'l Corp.*,
181 F.R.D. 473 (D. Colo. 1998) ...........................................................................4

*Day v. Celadon Trucking Servs., Inc.*,
827 F.3d 817 (8th Cir. 2016) ..................................................................5, 9, 10, 11

*Easterling v. Conn. Dep't of Corr.*,
278 F.R.D. 41 (D. Conn. 2011)..............................................................................4

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982)........................................................................................3, 10

*Gonzales v. Arrow Fin. Servs. LLC*,
489 F. Supp. 2d 1140 (S.D. Cal. 2007)..................................................................5

*Grant v. E.I. du Pont de Nemours & Co., Inc.*,
No. 91-cv-55, 1995 WL 18239435 (E.D.N.C. July 14, 1995)...............................24

*In re J.P. Morgan Chase Cash Balance Litig.*,
255 F.R.D. 130 (S.D.N.Y. 2009) ..........................................................................4

*Jermyn v. BestBuy Stores*,
276 F.R.D. 167 (S.D.N.Y. 2011) ..........................................................................4

*Johnson v. Jessup*,
381 F. Supp. 3d 619 (M.D.N.C. 2019) .................................................................25

*In re Mercedes-Benz Tele Aid Cont. Litig.*,
267 F.R.D. 113 (D.N.J. 2010).............................................................................10

*Minter v. Wells Fargo Bank, N.A.*,
No. 07-3442, 2013 WL 1795564 (D. Md. Apr. 26, 2013).......................................4

ii

*Mirkin v. XOOM Energy, LLC*,
No. 18-cv-2949, 2024 WL 3063833 (E.D.N.Y. June 20, 2024)..........................................4, 10

*In re Polyester Staple Antitrust Litig.*, No. MDL 3:03-cv-1516, 2007 WL 2111380
(W.D.N.C. July 19, 2007)...................................................................................................20, 25

*In re Polyurethane Foam Antitrust Litig.*,
No. 10-md-2196, 2015 WL 4459636 (N.D. Ohio July 21, 2015)............................................4

*Rudd v. Electrolux Corp.*,
982 F. Supp. 355 (M.D.N.C. 1997) .......................................................................................24

*Sosna v. Iowa*,
419 U.S. 393 (1975).................................................................................................................15

*Tatum v. R.J. Reynolds Tobacco Co.*,
No. 02-cv-373, 2010 WL 60902 (M.D.N.C. Jan. 7, 2010)..................................................4, 9

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
445 F.3d 311 (4th Cir. 2006) .................................................................................................20

*Whisnant v. Carolina Farm Credit*,
693 S.E.2d 149 (N.C. App. 2010)...........................................................................................24

*In re WildeWood Litig.*,
52 F.3d 499 (4th Cir. 1995) ....................................................................................................24

## Other Authorities

Fᴇᴅ. R. Cɪᴠ. P. 23 .................................................................................................... *passim*

## INTRODUCTION

This case was filed over seven years ago. Since that time, Defendants DuPont and Chemours have done everything possible to obstruct resolution and delay accountability for their decades spent dumping toxic chemicals into North Carolina's Cape Fear River. Plaintiffs have spent these seven years (and counting) successfully fending off Defendants' relentless stream of motions, interruptions, and sideshows, all in steady pursuit of their day in Court.

A recurring focus of Defendants' belligerence has been the class action vehicle itself. Two and a half years ago, Defendants vigorously opposed this Court's certification of the classes. They lost. Defendants then appealed this Court's decision to the Fourth Circuit. They lost again. Now, with trial on the horizon, Defendants demand a *third* bite at the apple, asking this Court to reverse its certification order, second-guess the Fourth Circuit's decision, and rule that this case should not be adjudicated as a class action after all.

Not only is Defendants' request meritless on its own terms, but it comes at the eleventh hour: after class notice issued (without objection) to more than 100,000 property owners, after the parties spent eight months in merits discovery, including document productions, depositions, and motion practice, and after the parties fully briefed ten *Daubert* motions and a summary judgment motion. According to Defendants, the "more efficient course" at this late stage would be to break this case into tens of thousands of individual lawsuits.

Defendants are on the wrong side of the facts and the law. Their motion to decertify the class should be denied, and this case should proceed to trial.

## BACKGROUND

Over the past forty-plus years, Defendants DuPont and Chemours have contaminated North Carolina's Cape Fear River watershed with a class of chemical compounds known as per- and

polyfluoroalkyl substances ("PFAS"), released from Defendants' Fayetteville Works ("FW") manufacturing facility in Fayetteville, North Carolina. Plaintiffs are a certified class of over 100,000 property owners and renters who source their drinking water from the Cape Fear River. Plaintiffs bring claims for negligence, trespass, private nuisance, and gross negligence for the harms Defendants' decades of contamination have caused their property.

In May 2022, Plaintiffs moved for class certification. D.E. 334. Defendants opposed, arguing that Rule 23's prerequisites were not satisfied. D.E. 342. In October 2023, this Court rejected Defendants' arguments and certified two classes: (1) a "public utility" class and (2) a "groundwater" class. The certified classes consist of property owners or renters whose property:

> (1) is serviced by a public water utility servicing Bladen, Brunswick, Cumberland, New Hanover or Pender Counties that draws water from or obtains water drawn from the Cape Fear River downstream of Fayetteville Works; or
>
> (2) receives drinking water from a groundwater source with quantifiable concentrations of any of the Fayetteville Works PFAS ("FW PFAS") as defined in Exhibit A . . . .

D.E. 420 ("Cert. Order") at 36; *see* D.E. 338 (listing FW PFAS). The Court also certified three damages subclasses, including class members who (1) currently own or occupy residential property and have not yet installed both reverse osmosis filters and replacement hot water heaters; (2) have paid for bottled water, hot water heaters, and/or reverse osmosis filters from 2017 to present, and (3) purchased their residential property before June 2017 and have not yet installed both reverse osmosis filters and replacement hot water heaters. Cert. Order at 36.

Two weeks after this Court granted class certification, Defendants petitioned the Fourth Circuit for permission to appeal the Court's decision. *See* Petition for Permission to Appeal, *E.I. du Pont de Nemours & Co. v. Nix*, No. 23-00269 (4th Cir. Oct. 18, 2023), ECF No. 2. The Fourth

Circuit promptly denied the petition. Order, *Nix*, No. 23-00269 (4th Cir. Nov. 17, 2023), ECF No. 20. This certified class action then proceeded to merits discovery.

In January 2024, Plaintiffs moved for approval of the form and manner of class notice. D.E. 427. Defendants participated in the drafting of the class notice and did not oppose Plaintiffs' motion. *See id.* The Court approved the form and manner of notice, D.E. 429, and class notice issued from March through June of 2024, *see* D.E. 503 (Affidavit of Jack Sobczak) ¶¶ 3–16. In the meantime, the parties engaged in merits discovery, including document production, depositions, the exchanging of expert reports, and related motion practice. Merits discovery ended in August 2024. *See* D.E. 499.

On August 30, 2024, Defendants filed eight *Daubert* motions and a motion for partial summary judgment. *See* D.E. 526; 528; 534; 535; 538; 541; 544; 547; 550. (Plaintiffs, by contrast, filed two narrowly tailored *Daubert* motions.) The parties filed their respective oppositions on September 27, 2024 and replies on October 18, 2024.

Then, with no warning, Defendants on December 18, 2024 filed a Motion for Class Decertification, asking this Court to reconsider and reverse its prior decision to certify this class action. D.E. 629; D.E. 630 ("Mot."). Defendants' motion is premised on years-old evidence, irrelevant observations, and outright falsities. The motion should be denied.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 23, "[a]n order that grants or denies class certification may be altered or amended before final judgment," Fed. R. Civ. P. 23(c)(1)(C), meaning that a court may modify its prior certification order "in the light of subsequent developments in the litigation." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (citing Fed. R. Civ. P. 23(c)(1)). In assessing a motion to decertify a class, the court must determine

whether the Rule 23 requirements remain satisfied. *See Minter v. Wells Fargo Bank, N.A.*, No. 07-3442, 2013 WL 1795564, at *2 (D. Md. Apr. 26, 2013).

"[A]mending a certification order is disfavored in 'the absence of materially changed or clarified circumstances, or the occurrence of a condition on which the initial class ruling was expressly contingent.'" *Tatum v. R.J. Reynolds Tobacco Co.*, No. 02-cv-373, 2010 WL 60902, at *1 (M.D.N.C. Jan. 7, 2010) (quoting 3 NEWBERG ON CLASS ACTIONS § 7:47 (4th ed.)). Courts "consistently hold that 'there must be some development or change in circumstances to merit revisiting a class certification decision.'" *Alig v. Quicken Loans Inc.*, No. 12-cv-114, 2017 WL 5054287, at *10 (N.D.W. Va. July 11, 2017) (quoting *In re J.P. Morgan Chase Cash Balance Litig.*, 255 F.R.D. 130, 133 (S.D.N.Y. 2009)).

Furthermore, in considering a motion to decertify, courts must "take account of the progression of the litigation." *Id.* at *11 (quoting *Jermyn v. BestBuy Stores*, 276 F.R.D. 167, 169 (S.D.N.Y. 2011)). Courts especially "should be wary of revoking a certification order completely at a late stage in the litigation process." *Easterling v. Conn. Dep't of Corr.*, 278 F.R.D. 41, 44 (D. Conn. 2011). Once a court has certified a class, "the parties can be expected to rely on it and conduct discovery, prepare for trial, and engage in settlement discussions on the assumption that in the normal course of events[,] it will not be altered except for good cause." *In re Polyurethane Foam Antitrust Litig.*, No. 10-md-2196, 2015 WL 4459636, at *2 (N.D. Ohio July 21, 2015) (quoting *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 477 (D. Colo. 1998)).

Moreover, "[w]hen there has been no significant change between the order certifying the class and the motion to decertify, *and* when the Court of Appeals has *already refused* the movant's request for interlocutory review under Rule 23(f), courts often view the motion to decertify with disfavor." *Mirkin v. XOOM Energy, LLC*, No. 18-cv-2949, 2024 WL 3063833, at *3 (E.D.N.Y.

June 20, 2024) (emphasis added). Similarly, "a defendant bears a more onerous burden in challenging certification where, as here, the initial certification decision was carefully considered and made after certification-related discovery." *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 832 (8th Cir. 2016).

At bottom, "decertification is a 'drastic step,' not to be taken lightly." 3 NEWBERG ON CLASS ACTIONS § 7:37 (6th ed. 2025) (citing cases). Any "doubts regarding the propriety of class certification should be resolved in favor of certification." *Gonzales v. Arrow Fin. Servs. LLC*, 489 F. Supp. 2d 1140, 1154 (S.D. Cal. 2007) (citation omitted).

## ARGUMENT

Defendants attempt to justify their brazen request for a class-certification do-over by asserting that things have changed since this Court certified the classes. Defendants open their motion with a bullet-point list of so-called "developments and concessions" that they contend "contradict the representations made by Plaintiffs during class certification briefing and undermine the foundations of this Court's class certification analysis." Mot. at 3. Defendants are wrong. Each of the points on which Defendants premise their motion is either:

- ***Not new***, regurgitating arguments Defendants have already asserted and that this Court and the Fourth Circuit have rejected, or premised on information Defendants have had since well before class-certification briefing;

- ***Irrelevant***, arguing about the merits of Plaintiffs' claims rather than the discrete issues bearing on class certification, or otherwise making much ado about propositions that are immaterial to certification under Rule 23; and/or

- ***False***, mischaracterizing Plaintiffs' evidence and arguments in the case.

The below table summarizes the litany of problems with Defendants' core contentions:

| Defendants' Contention | Problems with Defendants' Contention |
|---|---|
| "On April 10, 2024, EPA announced the final National Primary Drinking Water Regulation for five PFAS compounds, establishing the maximum contaminant level ('MCL') threshold below which exposure to these compounds poses an acceptable risk, if any, to human health." Mot. at 1. | *Irrelevant.* Plaintiffs' certified liability case does not depend on exceedance of regulatory benchmarks. Moreover, only two of the five MCLs implemented by the EPA apply to PFAS compounds at issue in this case. The other *fifty-five* PFAS compounds with which Defendants have contaminated the Cape Fear River remain entirely unregulated. |
| "Analysis of the sampling data taken from class members' properties fails to show that Fayetteville Works ('FW') PFAS is present classwide in their water heaters or tap water." Mot. at 1. | *False.* Plaintiffs' experts thoroughly demonstrate that PFAS unique to Defendants' facility is present on class properties.<br><br>*Not new.* Defendants rely on data that was produced years ago, long before Plaintiffs even moved for class certification. |
| "Analysis of the sampling data taken from the properties of the class representatives and absent class members fails to support Plaintiffs' causal theory that PFAS is being retained in the sediment of water heaters and recirculated into homes." Mot. at 1. | *Irrelevant.* This argument has nothing to do with class certification. It is, at most, a merits argument relating to Plaintiffs' expert evidence, which Defendants are free to raise at trial.<br><br>*False.* Plaintiffs' experts thoroughly demonstrate that PFAS is retained in water heater sediment and recirculated into residential water.<br><br>*Not new.* Defendants rely on data that was produced years ago, long before Plaintiffs even moved for class certification. |
| "Analysis of the sampling data taken from the properties of the class representatives and absent class members reveals massive variation in the levels, types, regulatory status, and potential sources of the PFAS compounds found on class properties." Mot. at 2. | *Irrelevant.* Any "variation" is immaterial to Plaintiffs' liability theory, under which a Plaintiff is a member of the class if his/her property is served by certain water utilities or contains any quantifiable levels of PFAS from Defendants' Fayetteville Works facility.<br><br>*Not new.* Defendants rely on data that was produced years ago, long before Plaintiffs even moved for class certification. |

| Defendants' Contention | Problems with Defendants' Contention |
|---|---|
| "Plaintiffs concede that their class representatives cannot recover for many of the claims for which the class seeks relief and argue that their class representatives' interests are irrelevant, effectively arguing that they should be allowed to proceed as a headless class." Mot. at 2. | *False.* Plaintiffs have never "concede[d]" that their class representatives cannot recover for the claims for which the class seeks relief, nor have Plaintiffs sought to prosecute this class action without class representatives. The claims of the class representatives remain typical of the class. |
| "Plaintiffs do not dispute that the sampling data upon which they rely are too small and variable to serve as common proof of classwide causation, injury, or damages—in fact, Plaintiffs admit they are not even attempting to extrapolate the data classwide." Mot. at 2. | *False.* Plaintiffs' expert testimony shows that FW PFAS have contaminated every class property. Defendants insist on mischaracterizing these expert opinions by invoking the false premise that Plaintiffs seek to rely on sampling data as a source of statistical significance. |
| "Plaintiffs' evidence shows that not all of the PFAS compounds for which they seek recovery in this case are unique to the Fayetteville Works facility." Mot. at 2. | *Irrelevant.* Of the fifty-seven PFAS compounds at issue in this case, Defendants identify only *one* that they contend is possibly attributable to sources other than Fayetteville Works. And the presence or non-presence of this single compound is not material to class certification or the jury's ultimate liability determination.<br><br>*Not new.* Defendants already argued this point at the class certification stage, and the Court explicitly rejected it. |
| "Plaintiffs' experts have repudiated the idea that there is no safe level of exposure to PFAS." Mot. at 2. | *Irrelevant.* Plaintiffs' certified liability theory does not rely on a showing that "there is no safe level of exposure to PFAS."<br><br>*Not new.* The Court already rejected the notion that there is no safe level of PFAS at the class-certification stage and held that the issue need not be resolved for class-certification purposes.<br><br>*False.* Plaintiffs' toxicology expert, Dr. DeWitt, has not "repudiated" any such notion and has instead refined her testimony at the merits stage to focus on demonstrating the toxicological risks associated with exposure to PFAS. |

| Defendants' Contention | Problems with Defendants' Contention |
|---|---|
| "Plaintiffs' experts have repudiated any ability or intention of proving causation, injury, or damages using classwide proof." Mot. at 2. | **_False._** Plaintiffs have not "repudiated" their substantial body of classwide proof. Extensive testimony from multiple experts amply shows that FW PFAS have contaminated all class properties, demonstrating damages classwide. |
| "Current data indicates that major portions of the class area now draw their water either from sources with PFAS levels below detection levels or areas where PFAS levels are below the MCLs." Mot. at 3. | **_False._** The public utility reports that Defendants cite do not support these representations. Multiple reports either disclose ongoing PFAS contamination or relate to a different subject entirely and do not mention PFAS at all. |
| | **_Irrelevant._** Plaintiffs' evidence demonstrates that class members' homes are already contaminated with PFAS, which will continue to be reintroduced into drinking water, irrespective of whether incoming water contains lower levels of PFAS. Moreover, only two PFAS compounds at issue in this case are subject to MCLs, and, in any event, Plaintiffs' liability theories do not rest on the exceedance of any MCL. |

In sum, Defendants identify *nothing* that warrants revisitation of this Court's and the Fourth Circuit's rulings that this case may proceed as a class action. The Rule 23 requirements remain satisfied as before, and Defendants' demand to relitigate these issues should be rejected.

## I. Defendants are not entitled to a late-stage disruption of these already-certified classes.

There are multiple, fundamental problems with Defendants' eleventh-hour request that the Court decertify the classes. These reasons are alone sufficient to deny Defendants' motion.

<u>First</u>, as demonstrated in further detail below, nothing has changed since this Court certified the classes in October 2023. Courts consistently hold that "there must be some development or change in circumstances to merit revisiting a class certification decision." *Alig*, 2017 WL 5054287, at *10 (citation omitted). "A motion to decertify is not . . . to be treated as another bite at the apple in the absence of changed circumstances." *Id.* Here, despite Defendants' claim that they "respect the Court's decision, and will not reargue or seek reconsideration of the

issues addressed in that Order," Mot. at 1, their motion *disregards* the Court's decision, boldly reargues points already rejected, and cites evidence Defendants have had for years (including *before* class-certification briefing), as if the evidence emerged only recently. *See, e.g.*, *infra* pp. 11–12. The absence of any changed circumstances is, by itself, a basis to deny Defendants' motion in its entirety. *See Tatum*, 2010 WL 60902, at *2 (denying a motion to decertify where "Defendants . . . presented no evidence or controlling case law that has been discovered or issued which would merit revisiting the original class certification order," and "Defendants' only basis for decertifying the class is their own disagreement with the Court's certification opinion").

*Second*, not only has nothing come along to undermine the Court's certification decision, but the decision itself was made after *years* of discovery on certification issues. As the Eighth Circuit has explained, a "defendant bears a more onerous burden in challenging certification where . . . the initial certification decision was carefully considered and made after certification-related discovery." *Day*, 827 F.3d at 832. That is precisely the case here. The parties engaged in substantial document discovery, nearly *thirty* depositions of fact and expert witnesses, and the exchange of nearly *forty* expert reports before finally briefing Plaintiffs' motion for class certification—which, in turn, consisted of five briefs, approximately 130 pages of substantive argument, and over 100 exhibits. The Court ultimately issued a 62-page order ruling on the certification motion and related motions. *See* Cert. Order. As in *Day*, Defendants here have "had a full and fair opportunity to contest class certification," *Day*, 827 F.3d at 832, and they submit no reason why they should be permitted to burden this Court's time and resources with a do-over.

*Third*, decertification is especially inappropriate given that the Fourth Circuit has already rejected Defendants' appeal of this Court's ruling. As one court recently explained, "[w]hen there has been no significant change between the order certifying the class and the motion to decertify,

and *when the Court of Appeals has already refused the movant's request for interlocutory review under Rule 23(f)*, courts often view the motion to decertify with disfavor." *Mirkin*, 2024 WL 3063833, at *3 (emphasis added). This case is on all fours with *Mirkin*. Barely a year ago, Defendants sought the Fourth Circuit's review of this Court's certification order. The Fourth Circuit **denied** Defendants' petition. *See* Order, *Nix*, No. 23-00269, ECF No. 20. Defendants' motion asking this Court to reverse its certification order thus "essentially seek[s] 'relief from a district court that has already been denied by a court of appeals.'" *Id.* (citing *In re Mercedes-Benz Tele Aid Cont. Litig.*, 267 F.R.D. 113, 135 (D.N.J. 2010)).

<u>Fourth</u>, decertification is yet further disfavored when class notice has already issued. In explaining courts' power to modify certification decisions under Rule 23, the Supreme Court was careful to say that a certification order is tentative "particularly during the period *before any notice is sent* to members of the class." *Falcon*, 457 U.S. at 160 (emphasis added). Reinforcing this principle, in *Day*, the court affirmed the denial of defendants' decertification motion where the defendants moved to decertify *after* the court had already "ordered that notices be sent out to potential class members." *Day*, 827 F.3d at 832. When the district court approved the notice, it had found that the defendants' previous objections to the notice had been addressed, after which time defendants "did not file any additional objections." *Id.* The facts here are yet starker. In January 2024, Plaintiffs moved for approval of the form and manner of class notice. D.E. 427. Defendants *participated in the drafting* of the proposed notice by requesting certain modifications that Plaintiffs accommodated. Ultimately, Defendants agreed *not* to oppose Plaintiffs' motion. *See id.* Nor did they indicate that they planned to seek decertification at any point in time. Subsequently, the Court approved the form and manner of notice, noting that the motion was unopposed. D.E. 429 at 2. Plaintiffs' Class Notice administrator sent notice to class members

from March through June of 2024. *See* D.E. 503 ¶¶ 3–16. Upsetting the Court's certification decision at this late stage would be highly prejudicial to the class members, who have now received and relied on notice of this litigation, of their class membership, and of their right to remain a class member or opt out.[1] *See Day*, 827 F.3d at 832 n.8 ("Plainly, once notice is sent, a judge should approach modification [of a certification order] more tentatively.").

These multiple threshold issues—alone and collectively—warrant denial of Defendants' motion to decertify in full. Nonetheless, Plaintiffs proceed to address the specifics of Defendants' arguments, lest there be any doubt that the motion is baseless.

## II. The three class representatives remain adequate, and their claims remain typical.

Defendants continue to take issue with the three class representatives, Brent Nix, Victoria Carey, and Dr. Marie Burris. *See* Mot. at 6–10. Defendants' recycled arguments are meritless.

First, Defendants contend that the class representatives are inadequate and atypical because "none . . . offer any evidence that they are entitled to replacement water heaters." *Id.* at 6. Defendants assert that the three class representatives lack evidence of PFAS contamination in their water heaters, thus preventing them from recovering replacement water-heater damages. *Id.* at 7. This line of reasoning fails for multiple reasons.

Setting aside that this argument is fatally flawed both factually and legally, *see infra* pp. 12–13, Defendants do not even attempt to identify any "development or change in circumstances" on this subject since the class-certification stage. *Alig*, 2017 WL 5054287, at *10. That's because nothing has changed. Defendants' attack on the class representatives is premised on certain water sampling data,[2] but ***these documents were produced more than three years ago***, long before class-

---

[1] The June 12, 2024 deadline for class members to opt out of the classes has long passed.

[2] To be clear, Defendants' decertification motion does not cite any evidence at all on this issue. Instead, the decertification motion cites to an echo chamber of comments from Defendants'

certification briefing even began. Declaration of Allen J. Hernandez ("Hernandez Decl.") ¶¶ 3–5. Indeed, much of it was produced in July 2020, nearly two years before Plaintiffs moved for class certification in May 2022. *Id.* ¶ 3. Another portion of the data was produced in March 2021, still over a year before class-certification briefing. *Id.* ¶ 4. And even the latest-produced of these materials were produced to Defendants in October 2021, more than six months before class-certification briefing. *Id.* ¶ 5. Defendants' invocation of years-old evidence highlights that this third attempt to defeat class certification is unfounded, improper, and stale.

Not only is the cited evidence old; the legal arguments are recycled as well. Defendants made this exact argument in their motion for partial summary judgment, contending that "[t]he Class Representatives present no evidence that their water heater sediment contains PFAS." D.E. 551 at 5. Plaintiffs demonstrated in opposition to that motion that the argument fails on the merits. Most notably, Defendants' reasoning conflates the distinct concepts of injury and remedy. Plaintiffs' *injury* is the contamination of their properties with FW PFAS, which in turn necessitates a *remedy*, in the form of replacement water heaters (among other relief). *See* D.E. 585 at 5–7. As this Court has already explained in certifying the class, "[i]f . . . any quantifiable concentration of FW PFAS necessitates replacement or repair of residential water systems . . . , then a measurable concentration of the 12 PFAS defendants currently test for . . . would appear to justify replacement or repair." Cert. Order at 39 n.2; *see* D.E. 585 at 5.

---

lawyers, pointing the Court to pages of Defendants' own summary judgment brief. *See* Mot. at 6–7 & n.14 (citing D.E. 551 at 5–6, 11). The summary judgment brief in turn cites Defendants' Rule 56.1 statement of material facts. *See* D.E. 551 at 5–6, 11 (citing "SOMF"). The Statement of Material Facts—which Plaintiffs vigorously dispute, *see* D.E. 586—in turn cites documents that Plaintiffs produced in July 2020, March 2021, and October 2021. *See* Hernandez Decl. ¶¶ 3–5.

That is what Plaintiffs' substantial body of expert evidence shows: all class properties—including those of the three class representatives—are contaminated with PFAS from Defendants' Fayetteville Works facility. *See, e.g.*, Cert. Order at 43 (citing, *inter alia*, the expert reports of Ruth Albright, David Duncklee, Brien Gidlow, and Defendants' own "records and testing"); *see also infra* pp. 17–20. Separately, Plaintiffs' experts have opined that replacement of water heaters is an appropriate remedy for these properties contaminated with PFAS. *E.g.*, D.E. 572-1 (2021 Griffith Rep.) ¶¶ 53, 54. The class representatives' claims are thus typical of the class, as they "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members, and . . . are based on the same legal theor[ies]." Cert. Order at 42 (quoting *Beattie v. CenturyTel. Inc.*, 511 F.3d 554, 561 (6th Cir. 2007)). Defendants may dispute that water-heater replacement is an appropriate measure of damages, but that contention is immaterial to the typicality question Defendants now raise to the Court. Defendants are free at trial to attempt to convince the jury that such damages are inappropriate, including by cross-examination of Plaintiffs' experts, submission of their own expert testimony,[3] or even cross-examination of the class representatives themselves. But there is no doubt that this question can readily be answered classwide.

Defendants' other repurposed arguments fare no better. Defendants assert that Mr. Nix moved out of the class area in 2020, that Dr. Burris has not lived in the class area since 2015, and that Dr. Burris rents her home to her ex-husband at no charge. Mot. at 8–9. These are old facts that Defendants have already deployed to no avail. Defendants challenged the typicality of Mr.

---

[3]  Notably, Defendants' substantive arguments against these damages are wholly unsupported by any expert testimony or opinion. *See* Mot. at 6–7. Despite the technical nature of the issues, in both their motion for partial summary judgment and motion to decertify, Defendants hang their hat entirely on attorney argument about Plaintiffs' evidence.

Nix's and Dr. Burris's claims on these exact grounds over two years ago in their opposition to Plaintiffs' motion for class certification. *See* D.E. 342 at 38–40. The Court rejected Defendants' arguments. *See* Cert. Order at 52–56 (addressing the class representatives). Similarly, Defendants assert that Ms. Carey's water provider sources its water from "sources that have tested non-detect for PFAS." Mot. at 8–9. Setting aside that this proposition is irrelevant, as discussed *infra* p. 28, this too is a well-trod path. Defendants argued in opposing class certification that differences across the water utilities serving the utility class meant that the utility class representatives' claims are atypical. D.E. 342 at 39.[4] In certifying the classes, this Court rejected all of Defendants' challenges to the class representatives. Cert. Order at 52–56. Defendants fail to explain why the Court should now review the same facts and arguments and come to a different conclusion.

Unable to point to any developments that warrant reversing this Court's approval of the class representatives, Defendants resort to mischaracterizing Plaintiffs' arguments in prior motion practice. Citing Plaintiffs' opposition to Defendants' motion for partial summary judgment, Defendants assert (incorrectly) that Plaintiffs "suggest that the class may proceed independently regardless of whether the class representatives can recover damages sought by the class." Mot. at 7 (emphasis added). Defendants then describe this fictional position as a "proposal that a headless class may proceed without its class representatives." *Id.* at 8.

Plaintiffs have never proposed that a class action may proceed without class representatives. Plaintiffs are well aware of Rule 23 and what it requires, which is why Plaintiffs argued only that, in Defendants' motion seeking summary judgment "*classwide*," Defendants' narrow fixation on individual class representatives' damages claims was misplaced. *See* D.E. 585

---

[4] Defendants urged these points *again* in their motion for partial summary judgment. *See* D.E. 551 at 15–17, 21.

at 3–4.  As the Supreme Court explained decades ago, once a court "certifie[s] the propriety of the class action, the class of unnamed persons described in the certification acquire[s] a legal status separate from the interest asserted by" the class representatives.  *See id.* at 3 (quoting *Sosna v. Iowa*, 419 U.S. 393, 399 (1975)).  Plaintiffs did not then, and do not now, "propos[e]" a "headless class."  Defendants' suggestion to the contrary is wrong.

Defendants further mislead when they cite the class representatives' "*conceded inability* to recover most of the forms of relief sought by the class" and assert that "it is *undisputed*" that the class representatives cannot recover certain damages.  Mot. at 10 (emphasis added).  Of course, Plaintiffs "concede[]" no such thing.  As Plaintiffs explained at length in their opposition to Defendants' summary judgment motion, the claims of the class members, and of the class representatives, are not "moot" as Defendants had argued, because none has been afforded complete relief from the injuries Defendants have caused.  *See* D.E. 585 at 12–14 (explaining that each class representative "retain[s] a 'legally cognizable interest in the outcome' of this case").  For example, "Ms. Carey has received *none* of Plaintiffs' requested remedies, despite that (1) her home and water heater tested positive for Defendants' PFAS, and (2) the evidence shows that Defendants' PFAS have continued to pour into her home since that time."  *Id.* at 13.  Dr. Burris "still requires a replacement water heater at her Bladen County property."  *Id.* at 14.  And Mr. Nix has not been compensated for "the 'cases and cases of bottled water' that he bought 'in bulk' after discovering that his home's water was contaminated with PFAS," or the money he spent purchasing a reverse-osmosis filtration system.  *Id.* at 13–14 (quoting D.E. 588 (Nix 2021 Dep. 143:21–144:11; 144:13–20)).  Far from a "conce[ssion]," Plaintiffs demonstrated in their summary-judgment opposition that each of the class representatives is—as before—entitled to relief as a result of Defendants' contamination of their properties.

In sum, nothing has changed in the fifteen months since this Court found that Mr. Nix, Ms. Carey, and Dr. Burris satisfy the requirements of Rule 23. Defendants' rehashed challenges to the three class representatives should be rejected.

## III. Causation, injury, and damages will be proven classwide.

In the latter half of their motion, Defendants run the same tired plays from the same tired playbook: arguing, again, that Plaintiffs cannot prove the merits of their case using common evidence. Mot. at 10–23.

Defendants' arguments on this score are revealing. Here and elsewhere, Defendants appear to contend that their decades-long discharge of PFAS from Fayetteville Works has not resulted in legally cognizable injuries to class properties. Of course, if Defendants believed that the evidence bore this out, one would expect them to be eager to adjudicate Plaintiffs' claims classwide. After all, an adverse ruling would be binding on all class members. Tellingly, the opposite appears to be true: despite that a trial on the merits would resolve Defendants' arguments once and for all, they are desperate to avoid such a trial.

In any event, as discussed below, Defendants are wrong that Plaintiffs lack classwide proof of their claims.

### A. Plaintiffs' expert evidence applies classwide.

In one of their most brazen misrepresentations, Defendants assert that Plaintiffs have "*disclaim*[ed] any attempt to prove causation, injury, or damages through their expert witnesses on a classwide basis." *Id.* at 11 (emphasis added). Defendants support this falsehood with a bullet-point list of criticisms of Plaintiffs' experts' opinions. These arguments are meritless on their own terms and, in any event, have nothing to do with this Court's certification of the classes. Each of the experts with whom Defendants take issue offers classwide proof. Specifically, and contrary to each of Defendants' arguments:

- ***Mr. Roger Griffith's expert opinions on household remediation apply classwide.*** Mr. Griffith opines, *inter alia*, that "incoming water contaminated with Fayetteville Works PFAS contaminate[s] the sediment layer in water heaters in a similar concentration as in the incoming water." D.E. 572-1 (2021 Griffith Rep.) ¶ 54. He also opines that "[c]ontaminate from the sediment layer will be released and reintroduced into the home's plumbing and tap water," and that "[i]t is not possible (absent replacement of the water heater) to prevent the reintroduction of contamination back into the water stream of the home's plumbing system once it is in the water heater sediment." *Id.* These facts apply to the entire class. Defendants' attempt to weaponize the notion that Mr. Griffith's "data" is not "a statistically significant representation of all class members' water heaters" misses the mark. Mot. at 11. Mr. Griffith's opinions are based on his mechanical engineering expertise and his review of relevant scientific literature and other factual material. D.E. 572-1 (2021 Griffith Rep.) ¶ 27. His analysis does not—and does not purport to—depend upon statistical significance.

- ***Dr. Kimberly Gray's opinions on PFAS adhesion apply classwide.*** Dr. Gray opines on the mechanisms by which PFAS bind to bacteria, organic material, nutrients, and minerals in pipes and thus re-circulate into drinking water. *See* D.E. 587-1 (2021 Gray Opening Rep.) ¶¶ 1–3. She opines, *inter alia*, that "[a]ll pipe surfaces support biofilms," and that "biofilm and . . . bacteria contain proteins which bind PFAS, accumulate PFAS over long times and dynamically sorb, desorb and cycle PFAS into the water." *Id.* ¶ 1. She further explains that "PFAS are attracted to the positive charge . . . of mineral surfaces and will accumulate at the bottom of the tank[,] creating a store of in-place pollutants and a significant threat to home owners' health." *Id.* ¶ 3.

Defendants offer no explanation for why Dr. Gray's opinions regarding the behavior of PFAS in water systems would be inconsistent or otherwise not common across class members. Defendants instead appear to challenge the substance of Dr. Gray's opinions and the strength of Plaintiffs' proof. *See* Mot. at 12. But these arguments are, at most, fodder for cross-examination at trial.

- ***Mr. David Duncklee's expert opinions on the source of PFAS contamination apply classwide.*** Mr. Duncklee opines, *inter alia*, that "air deposition of PFAS contaminants covers hundreds of square miles surrounding Fayetteville Works," and that "Fayetteville Works PFAS in air emissions have infiltrated and continue to infiltrate to groundwater, contaminating the aquifer system, and then seep from groundwater into the surface waters of the Cape Fear River system." D.E. 570-3 (2024 Duncklee Rep.) ¶ 75. These facts bear on causation as to the class as a whole. Indeed, in granting class certification, this Court already observed that Mr. Duncklee "describe[s] avenues of common causation," including by "opin[ing] that the PFAS produced at the Fayetteville Works contained a unique 'chemical fingerprint' attributable to defendants stemming from defendants' manufacturing process." Cert. Order at 43. Again, Defendants' fixation on the "representative[ness]" of individual groundwater properties, Mot. at 12, reflects either a misunderstanding or mischaracterization of the evidence. As Plaintiffs have already explained in opposition to Defendants' *Daubert* motion challenging Mr. Duncklee's opinions, Mr. Duncklee's analysis is not a statistical model. The purpose of the data that Defendants continue to seize on is to "'validate [Mr. Duncklee's] opinions' concerning the scope and extent of Defendants' contamination, given that

they show that 'Fayetteville Works PFAS were found in all . . . site media at all of the properties.'"  D.E. 569 at 9 (quoting D.E. 570-3 (2024 Duncklee Rep.) ¶¶ 17, 50).

- ***Mr. Brien Gidlow's opinions on contamination of the public utility class apply classwide.***  In 2021, Mr. Gidlow opined, *inter alia*, that "the concentration of FW PFAS that leave the Brunswick County Northwest Water Treatment Plant . . . and the CFPUA Sweeney Water Treatment Plant . . . will reach and contaminate the retail connections served by the water treatment plants that deliver water from the Cape Fear River . . . ." D.E. 587-4 (2021 Gidlow Rep.) ¶ 1.  The Court already credited Mr. Gidlow's opinions as viable classwide proof when it granted class certification, explaining that Mr. Gidlow "measured the geographic reach of PFAS contamination attributable to defendants and opined that PFAS attributable to defendants has flowed into putative class members' residences from [those two plants]."  Cert. Order at 43.  In his 2024 supplemental report, Mr. Gidlow maintained that "any PFAS compound introduced at the source of the distribution system through the outflow of a water treatment plant *will reach each retail connection*."  D.E. 587-5 (2024 Gidlow Rep.) ¶ 5 (emphasis added).  These facts apply classwide, and Defendants fail to demonstrate the contrary.  They instead nitpick at purported limitations of certain data.  *See* Mot. at 12.  But this is the same data that, as Plaintiffs have explained, was produced over three years ago.  In any event, Defendants are free to challenge the underlying data at trial.  Their arguments are not germane to class certification.

- ***Ms. Ruth Albright's opinions tracing the origins of PFAS contamination to Defendants apply classwide.***  As this Court already observed in granting class certification, Ms. Albright describes how Fayetteville Works discharged millions of

pounds of PFAS traceable to defendants into the water supply and surrounding air, and that FW PFAS has a "unique 'chemical fingerprint' attributable to defendants." Cert. Order at 43 (citing D.E. 336-8 (2021 Albright Rep.) ¶¶ 37, 97). Defendants criticize the substance of Ms. Albright's opinions, arguing that her modeling has certain shortcomings and limitations. Mot. at 13. But they do not attempt to articulate why those merits arguments have any implications for certification of the class. Defendants are free to argue these points to a jury, whose determinations on causation can and will apply to the entire class.

- ***Dr. Richard DeGrandchamp's opinions on standard of care apply classwide.*** Defendants evidently disagree with Dr. DeGrandchamp's testimony but do not contend that this has any implications for class certification. *See id.* Nor could they. Dr. DeGrandchamp's opinions do not apply to Plaintiffs at all; they are instead focused on *Defendants'* conduct and their decades-long violations of industry standards of care.

In sum, Plaintiffs' extensive expert testimony and supporting evidence amply demonstrate that they can prove their case classwide. Defendants' quibbles on the merits provide no basis to revisit the Court's certification decision. *See In re Polyester Staple Antitrust Litig.*, No. MDL 3:03-cv-1516, 2007 WL 2111380, at *13 (W.D.N.C. July 19, 2007) ("The likelihood of the plaintiffs' success on the merits . . . is not relevant to the issue of whether certification is proper." (quoting *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006)).

### B. "Alternative causation" can be resolved classwide.

Defendants next argue that "alternate causation"[5] cannot be resolved classwide because one specific PFAS compound out of the fifty-seven at issue in this case—PFOA—is associated

---

[5] Plaintiffs presume that Defendants mean "*alternative* causation."

with sources other than Defendants' Fayetteville Works facility. Mot. at 13–15. Yet again, Defendants repeat themselves. In their sur-reply in opposition to Plaintiffs' motion for class certification, Defendants specifically argued that "PFOA, one of the first compounds on Plaintiffs' list [of FW PFAS], has been manufactured by a number of companies, used by more in numerous applications, and is nearly ubiquitous in the environment." D.E. 397 at 2. According to Defendants, this demonstrated that "the Court would need to undertake individualized causation analyses to determine whether Defendants or some other parties are responsible for the PFAS found on a given property." *Id.* The Court explicitly rejected this and related arguments, stating: "Defendants in their sur-reply introduced new evidence that four PFAS identified in the class certification motion may not be solely attributable to defendants. This evidence, however, addresses *a merits question common to the entire class*." Cert. Order at 44 (internal citations omitted) (emphasis added). The Court has thus already heard and rejected this exact proposition. It should reject Defendants' demand that it be revisited.

Repetition aside, Defendants' argument is premised on fiction. They conjure up an imaginary problem in which a given property near or downstream of Fayetteville Works is contaminated with *only* PFOA and none of the fifty-six *other* PFAS compounds associated with Fayetteville Works. *See* D.E. 338 (listing FW PFAS). In this made-up scenario—so the argument goes—the Court would need to adjudicate whether that *one* property's PFOA contamination is attributable to Defendants or some other source. But Defendants have unsurprisingly identified no such property. This asserted "problem" does not exist.

To be sure, Defendants purport to cite one such example, pointing to one of twenty-seven "public utility properties" that "only test[] above an MCL for PFOS and PFOA in a single sample." Mot. at 15. The problems with this attempted example are numerous. First, the data Defendants

cite is old; it was produced over a year before class-certification briefing began. Hernandez Decl.

¶ 4. Second, MCLs are immaterial to Plaintiffs' liability theory, which does not depend on the

exceedance of regulatory benchmarks. *See infra* pp. 24–25. Third, only two of the fifty-seven

compounds at issue in this case—PFOA and HFPO-DA ("GenX")—are even subject to an MCL

(as of April 2024). The notion that the other fifty-five compounds do not "exceed[]" an MCL is

misleading because, for those compounds, no MCL even exists. *See infra* pp. 23–24. Fourth, the

presence or non-presence of PFOA and other individual compounds on a "public utility propert[y]"

is irrelevant to class certification, as membership in the public utility class is *not* defined with

reference to specific FW PFAS compounds, but rather whether the "property . . . is serviced by a

public water utility servicing Bladen, Brunswick, Cumberland, New Hanover or Pender Counties

that draws water from or obtains water drawn from the Cape Fear River downstream of Fayetteville

Works." Cert. Order at 36.

In short, Defendants are free to argue to the jury that they are not responsible for PFOA

contamination because they are not the only company that contaminated the region with PFOA.

But such an argument would (i) apply equally to all class members, and (ii) be immaterial to

Plaintiffs' liability theory, which is concerned with all *other* PFAS compounds that are indisputably

associated *only* with Defendants. Defendants' rehashed PFOA arguments do not undermine this

Court's certification decision.

### C. Defendants' arguments regarding PFAS toxicity are meritless.

Defendants contend that common evidence cannot resolve questions regarding whether

PFAS in drinking water is sufficiently harmful to "qualify as an actual injury requiring a remedy."

Mot. at 16–21. Here, Defendants misfire on all fronts. As this Court aptly explained at the class-

certification stage (rejecting this same line of argument), the record sufficiently showed that "some

measurable level of PFAS exposure in drinking water for human beings is unsafe (i.e., dangerous)

and some higher level of PFAS exposure in drinking water for human beings is toxic (i.e., poisonous)," but, "[i]n order to address class certification, . . . *the court need not draw those lines*." Cert. Order at 30–31 (emphasis added). Nothing adduced in the period since that statement by the Court has undermined that reasoning.

Demanding that the Court revisit this toxicology question, Defendants first attempt to discredit Plaintiffs' expert, Dr. Jamie DeWitt, by observing that Dr. DeWitt does not opine that there is "no safe level" of PFAS exposure in drinking water. Mot. at 16–17. This argument is a sideshow. In certifying the class, the Court *explicitly declined* to rely on such an opinion, stating that "[w]hether there is no safe level of PFAS exposure in drinking water for human beings or whether PFAS is toxic to human beings is *irrelevant to class certification* on" Plaintiffs' substantive claims. Cert. Order at 30 (emphasis added). Expert evidence on this topic remains, as before, irrelevant to certification.

Likely aware that these arguments do not move the needle on class certification, Defendants then direct the Court's attention to the EPA's enactment of Maximum Contaminant Levels ("MCLs") for five PFAS compounds in April 2024. *See* Mot. at 17–21. Defendants contend that, with the implementation of these MCLs, "[t]he line of excess risk resulting in damage has been drawn, and who crosses that line cannot be shown with classwide evidence." *Id.* at 18.

Defendants' arguments regarding the EPA's MCLs fail. As a factual matter, as noted above, the EPA set MCLs for only *two* compounds at issue in this case: PFOA and GenX. *See* PFAS National Primary Drinking Water Regulation; Correction, 89 Fed. Reg. 49,101, 49,103 (June 11, 2024). While Defendants briefly mention this fact, they conspicuously neglect to acknowledge that this case involves *fifty-seven* PFAS compounds. *See* D.E. 338 (listing FW PFAS). Accordingly, other than GenX and PFOA, **all PFAS compounds at issue here remain entirely**

*unregulated as before*.  Thus, notwithstanding Defendants' efforts to get around this Court's prior distinctions from *Brooks* and *In re WildeWood*,[6] it remains true for the vast majority of PFAS compounds in this case that, "[u]nlike in *Brooks* or *In re Wilde Wood Litigation*, defendants have not provided evidence that North Carolina regulatory agencies have determined a minimum safe amount of FW PFAS contamination or protocol to treat water contaminated with PFAS to a level with a safe amount of PFAS."  Cert. Order at 50.

Regardless, even if *every* FW PFAS compound were subject to an EPA MCL, Plaintiffs' liability case would remain intact.  As Plaintiffs explained in opposition to Defendants' motion for partial summary judgment (where Defendants raised these same arguments), Plaintiffs' substantive claims for nuisance, negligence, and trespass do not depend on Defendants' exceedance of regulatory benchmarks.  *See* D.E. 585 at 22–23 (citing *Rudd v. Electrolux Corp.*, 982 F. Supp. 355, 369–70 (M.D.N.C. 1997) ("The touchstone [of nuisance] is reasonableness where the social utility of defendants' use is balanced against the harm and interference with plaintiff's use of her property."); *Grant v. E.I. du Pont de Nemours & Co., Inc.*, No. 91-cv-55, 1995 WL 18239435, at *4 (E.D.N.C. July 14, 1995) (noting that trespass requires only that an unauthorized substance "physically touch[]" the land); and *Whisnant v. Carolina Farm Credit*, 693 S.E.2d 149, 156 (N.C. App. 2010) (reciting the standard duty, breach, causation, and injury elements of a negligence claim)); *see also* Cert. Order at 49–50.  Moreover, Plaintiffs' expert evidence addresses these MCLs head on.  As Dr. DeWitt explains, the EPA's "standards and proposed standards are intended to protect people from all *currently known* health risks from certain PFAS exposures," and "may not be fully protective of human health for individuals who have been exposed to PFAS—or

---

[6]  *Brooks v. E.I. du Pont de Nemours & Co.*, 944 F. Supp. 448 (E.D.N.C. 1996); *In re WildeWood Litig.*, 52 F.3d 499, 503 (4th Cir. 1995).

combinations of PFAS—that have not been extensively studied." D.E. 584-1 (2024 DeWitt Rep.) at 7 (emphasis in original).

Furthermore, as the above discussion demonstrates, the relevance of MCLs (or lack thereof) is a merits issue, not a certification issue. *See In re Polyester Staple Antitrust Litig.*, 2007 WL 2111380, at *13 ("The likelihood of the plaintiffs' success on the merits . . . is not relevant to the issue of whether certification is proper."). In other words, the jury will be free to decide what, if anything, the EPA's MCLs say about the reasonableness of Defendants' conduct and Plaintiffs' entitlement to a remedy. But that determination will apply classwide. Defendants attempt to shoehorn these merits arguments into a motion to decertify by pointing to sampling data that they contend show "variations in substances present on properties at sub-MCL or above-MCL levels" and "variations in the presence of regulated vs. unregulated compounds." Mot. at 18–19. But these arguments are meritless, too.

Defendants first cite sampling data from certain properties that source drinking water from the groundwater, *see id.* at 19 (citing D.E. 531), and argue that the data show "tremendous variance in the type and concentration of PFAS detected across properties, and even across different wells on the same property," *id.* But whether a given well, on a given day, tests above *one of two* MCLs for *two* specific compounds (irrespective of Defendants' fifty-plus other contaminants) is trivial in light of the substantial evidence common to the class. *See Johnson v. Jessup*, 381 F. Supp. 3d 619, 634 (M.D.N.C. 2019) (noting that Rule 23 "does not require that all the questions of law and fact raised by the dispute be common, just that any dissimilarities between the claims do not impede a common resolution" (cleaned up) (citation omitted)). Any such compound-specific "variations" on a single property do not undermine Plaintiffs' evidence common to the groundwater class, which demonstrates that FW PFAS will "persist in and continue to contaminate nearly 100 miles

of the Cape Fear River and hundreds of square miles of the Cape Fear River Watershed," including the "surface and subsurface soils, groundwater, floodplains, sediments, surface water (including the Cape Fear River and its tributaries), and the source water of Plaintiffs' homes and properties." D.E. 570-3 (2024 Duncklee Rep.) ¶ 2. Defendants' fixation on one-off samples of certain groundwater wells is a distraction.

Defendants then move on to public utility class data, *see* Mot. at 19–21, but, again, this data was produced more than a year before class certification briefing and more than two years before this Court's certification order. Hernandez Decl. ¶¶ 3–4. There has been no "development or change in circumstances" on this issue, *Alig*, 2017 WL 5054287, at *10, and Defendants' eleventh-hour attempt to weaponize this old data should be rejected. Even if the data had changed since the class-certification stage, Defendants fail to offer any expert analysis of these technical issues, instead offering bare attorney argument that improperly purports to summarize *hundreds* of pages of data without expert analysis. *See* Mot. at 19–21. These non-expert arguments do not, as an evidentiary matter, undermine Plaintiffs' substantial expert evidence demonstrating classwide contamination, including Mr. Gidlow's testimony that Defendants' PFAS continue to reach and contaminate every home connected to a public utility. D.E. 587-4 (2021 Gidlow Rep.) ¶¶ 24–38, 50–59; D.E. 587-5 (2024 Gidlow Rep.) ¶¶ 5–7. There is thus ample classwide proof of causation as to the public utility class.

### D. Defendants' arguments regarding PFAS remediation by public utilities are misleading and irrelevant to class certification.

In closing, Defendants assert that certain public utilities "now draw their drinking water from sources which do not positively detect for PFAS or from sub-MCL sources." Mot. at 22. Defendants already made this argument in moving for partial summary judgment, and Plaintiffs have already demonstrated why it is meritless. Plaintiffs thus adopt and incorporate by reference

their responses to these arguments in opposition to summary judgment. *See* D.E. 585 at 14–17. Plaintiffs nonetheless summarize the key defects in Defendants' arguments again here.

First, Defendants' representations about these public utilities are misleading at best. In arguing that five of the utilities[7] "provide their customers water that is *below any PFAS MCL levels*," Defendants again ignore that there are only *two* compounds at issue in this case that are even subject to MCLs. *See* 89 Fed. Reg. at 49,103. As Plaintiffs explained in opposition to summary judgment, these utilities "continue to distribute water contaminated with" not only GenX and PFOA, but also with "*other* FW PFAS, such as PFMOAA, R-EVE, PMPA, PFO2HxA, for which there are no EPA MCLs." D.E. 585 at 15 (citing D.E. 587-12, D.E. 587-13 (2024 Gidlow Rep., Attachments A (excerpted) & B)). Moreover, "[t]he CFPUA report that *Defendants* cite states that 'CFPUA's PFAS sampling does show some compounds periodically breaking through the filters,' including 'ultra-short-chain PFAS, which include PFPrA and PFMOAA.'" *Id.* (citing D.E. 586 ¶ 107). And "Pender County's report reflects the presence of every single PFAS compound tested for." *Id.* at 15–16 (citing D.E. 586 ¶ 109). Defendants' suggestion that these utilities are providing clean water is flatly belied by the evidence.

Defendants also mislead with regard to utilities Oak Island and Ocean Isle. As Plaintiffs explained in opposing summary judgment—and Defendants conspicuously failed to rebut in reply—"the reports from Ocean Isle and Oak Island that Defendants rely on to claim 'no detection of PFAS,' simply *do not address PFAS* at all. The Oak Island report merely refers readers to the EPA's website '[f]or the latest on GENX / PFAS information.' The Ocean Isle report does not

---

[7]  Defendants list Cape Fear Public Utility Authority ("CFPUA"), Wrightsville Beach, Pender County Utilities, and Bald Head Island as providing water "below any PFAS MCL Levels." Mot. at 22.

mention PFAS at all." D.E. 585 at 16 (citing D.E. 586 ¶¶ 111–12). Defendants' repeated mischaracterizations of these public utility reports should not be condoned.

Regardless, even if the reports Defendants cite showed what Defendants say they show, the result has no impact on certification of the class. Most notably, ongoing PFAS remediation by public utilities has no bearing on the harms that Plaintiffs have *already* experienced, and continue to experience, at Defendants' hands, nor on the remedies Plaintiffs seek for those harms, including costs for bottled water, installation of water filtration systems, and increases in utility rates (precisely *because of* the utilities' remediation efforts). Those injuries and remedies remain, as before, provable by common evidence.

The classwide evidence to this effect includes, for example, Dr. Gray's unrebutted evidence that biofilms on pipes in water systems will retain PFAS from contaminated water. D.E. 587-1 (2021 Gray Opening Rep.) ¶¶ 1-3; D.E. 587-3 (2021 Gray Rebuttal Rep.) ¶¶ 12, 34 ("It is well established that biofilms form on all pipe and plumbing surfaces . . . ."). The classwide evidence also includes Mr. Griffith's opinion that PFAS that already exists in home water systems will *continue* to be released into drinking water, because the contaminated water heater sediment will remain in the heater "*even if the incoming water is no longer contaminated*." D.E. 572-1 (2021 Griffith Rep.) ¶ 54 (emphasis added). On remedies, Mr. Griffith opines that, "[a]bsent the development of an established and scientifically proven decontamination protocol, the replacement of contaminated water heaters is the only approach that can fully eliminate the risk of [FW] PFAS contamination from water heaters." *Id.* ¶ 26. Economist Dr. David Sunding attests that utility customers have paid and will continue to pay increased utility rates because utilities have largely passed the costs of PFAS remediation on to their customers. *See* D.E. 588-2 (2024 Sunding Rep.) ¶ 10.

28

All of this evidence—of injury and remedy—is common to the class. Defendants' non-expert summary of cherry-picked reports from a handful of utilities does not undermine this reality.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for class decertification.

Dated: January 17, 2025          Respectfully submitted,

/s/ *Steven M. Seigel*
Theodore J. Leopold
Leslie Mitchell Kroeger
Rachael Flanagan
**COHEN MILSTEIN SELLERS & TOLL PLLC**
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
(561) 515-1400 Telephone
(561) 515-1401 Facsimile
tleopold@cohenmilstein.com
lkroeger@cohenmilstein.com
rflanagan@cohenmilstein.com

Jay Chaudhuri
N.C. Bar No. 27747
**COHEN MILSTEIN SELLERS & TOLL PLLC**
407 North Person St.
Raleigh, NC 27612
(919) 890-0560 Telephone
(919) 890-0567 Facsimile
jchaudhuri@cohenmilstein.com

S. Douglas Bunch
Alison Deich
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave., N.W., Suite 800
Washington, D.C. 20005
(202) 408-4600 Telephone
(202) 408-4699 Facsimile
dbunch@cohenmilstein.com
adeich@cohenmilstein.com

Vineet Bhatia
Allen J. Hernandez
**SUSMAN GODFREY, L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, TX 77002
(713) 651-3666 Telephone
(713) 654-6666 Facsimile
vbhatia@susmangodfrey.com
ahernandez@susmangodfrey.com

Stephen Morrissey
Jordan Connors
Steven Seigel
**SUSMAN GODFREY, L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
(206) 516-3880 Telephone
(206) 516-3883 Facsimile
smorrissey@susmangodfrey.com
jconnors@susmangodfrey.com
sseigel@susmangodfrey.com

Gary W. Jackson
N.C. Bar No. 13976
**THE LAW OFFICES OF
JAMES SCOTT FARRIN, P.C.**
280 South Mangum Street, Suite 400
Durham, NC 27701
(919) 688-4991 Telephone
(800) 716-7881 Facsimile
gjackson@farrin.com

Neal H. Weinfield
**THE DEDENDUM GROUP**
1956 Cloverdale Ave.
Highland Park, IL 60035
(312) 613-0800 Telephone
(847) 478-0800 Facsimile
nhw@dedendumgroup.com

***Attorneys for Plaintiffs and the Class***

## CERTIFICATE OF SERVICE

I hereby certify that, on January 17, 2025, a true and correct copy of the above and foregoing document was served on all counsel of record via the Court's electronic filing system.

*/s/ Allen J. Hernandez*
Allen J. Hernandez